# EXHIBIT B

# JOINT INTENTIONS AND COMMITMENTS

Enhanced student achievement, based upon high standards and expectations, must be the driving force behind every activity of New York City public schools.  To accomplish this, we must reinvent schools so that decision-making is shared by those closest to students, including parents, teachers, administrators and other stakeholders.  Layers of bureaucratic impediments must be peeled away so that flexibility, creativity, entrepreneurship, trust and risk-taking become the new reality of our schools.  Before the millennium, the factory model schools of the 1900s must make way for the child-centered schools of this century.

To this end, the Union and the Board mutually agree to join together with other partners in the redesign and improvement of our schools, including closing those that have failed and supporting their restructuring.  We must challenge ourselves each day to improve student learning, based upon academic rigor, newfound flexibility, meaningful assessments and true accountability.  Roles and responsibilities of parents, staff and other partners must be defined. The standards to which we hold our students must never be lower than those we hold for our own children.  To accomplish this, we must focus on both the depth and breadth of each proposed instructional and operational change, each designed to support the children and their teachers, whom we expect to meet these rigorous standards.

Change must be service-oriented, supportive and sufficiently flexible so that each school's educational vision can become a reality.  It must be practical, possible, efficient and timely. Respect for each other and for every student must be unconditional if we are to accomplish what we must.

To reach these goals, we commit to working together along with other stakeholders to develop specific recommendations in areas requiring immediate attention.  These will include, but not be limited to:

- School-Based Budgeting
- Early Intervention and Prevention of Inappropriate Referrals to Special Education
- Professional Development
- Parent Outreach and Support
- Workload Standards

This commitment is our pledge to the children of the City of New York, not just to a promise but to a reality of educational excellence.

AGREEMENT MADE AND ENTERED INTO by and between THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK (hereinafter referred to as the "Board"') and School Secretaries Chapter, United Federation of Teachers, Local 2, American Federation of Teachers, AFL-CIO (hereinafter referred to as the "Union" or "Chapter").

WHEREAS, the Board has voluntarily endorsed the practices and procedures of collective bargaining as a peaceful, fair and orderly way of conducting its relations with its employees insofar as such practices and procedures are appropriate to the special functions and obligation of the Board, are permitted by law and are consonant with the paramount interests of the school children, the school system and the public; and

WHEREAS, in a special referendum conducted among the professional educational personnel, over 70 percent of those who participated favored collective bargaining as a way of conducting their relation with the Board; and

WHEREAS, the Board, on March 8, 1962, adopted a Statement of Policies and Practices with Respect to Representation of Pedagogical and Civil Service Employees for Purposes of Collective Bargaining with the Board of Education (hereinafter referred to as the "Statement of Policies"); and

WHEREAS, pursuant to the Statement of Policies, the Board on October 11, 1962, following a secret-ballot election, certified the New York City School Secretaries Association (hereinafter referred to as the "Association") as exclusive bargaining representative for a unit of all employees employed by the Board of Education in the titles of School Secretary, Senior School Secretary and Secretarial and Financial Assistant, including regular substitutes but excluding per diem substitutes, and thereafter entered into a collective bargaining agreement with the Association for such employees which expired on June 30, 1965: and

WHEREAS, pursuant to the Statement of Policies, at an appropriate time before the expiration date of the agreement with the Association, the Chapter filed a request for an election to determine the collective bargaining representative for the employees in the unit and submitted evidence that it represented a substantial number of such employees; and

WHEREAS, in a secret-ballot election thereafter conducted by the American Arbitration Association among the employees in the unit to determine whether they wished the Association or the Chapter, or neither to represent them in collective bargaining with the Board, the Chapter received a majority of the valid votes cast, and the Board accordingly issued a Certificate of Exclusive Bargaining Status on June 25, 1965, designating the Chapter as the exclusive bargaining representative for the employees in the unit; and

WHEREAS, more than fifty percent of the substitute school secretary internes requested representation by the Union, and the Board agreed to accrete them to the school secretary bargaining unit; and

WHEREAS, other than occasional per diem substitutes were accreted to the bargaining unit pursuant to a determination by the Public Employment Relations Board; and

WHEREAS, school secretary assistants and bilingual school secretary assistants were accreted to the bargaining unit in accordance with Article One (Recognition) of the 1980-82 Agreement; and

WHEREAS, an Agreement heretofore entered into by and between the parties effective October 13, 2007 expired on October 31, 2009 ; and

WHEREAS the parties entered into a Memorandum of Agreement on May 1, 2014, effective from November 1, 2009 through November 30, 2018 (the "May 1st MOA"); and

WHEREAS, designated representatives of the Board have met with representatives of the Union and fully considered and discussed with them, on behalf of the employees in the bargaining unit, changes in salary schedules, improvement in working conditions, and machinery for the presentation and adjustment of certain types of complaints, it is agreed as follows:

# ARTICLE ONE
## UNION RECOGNITION

The Board recognizes School Secretaries Chapter, United Federation of Teachers, Local 2, American Federation of Teachers, AFL-CIO, as the exclusive bargaining representative for a unit of all those employees employed by the Board of Education in the titles of School Secretary, Senior School Secretary, Secretarial and Financial Assistant and Substitute School Secretary Interne (including regular substitutes, full-term per diem substitutes, and other-than-occasional per diem substitutes, but excluding occasional per diem substitutes), and also School Secretary Assistants and Bilingual School Secretary Assistants. Employees in the unit are hereinafter referred to as "school secretaries."

The Board recognizes the Union as the exclusive bargaining representative of a separate bargaining unit of all occasional per diem school secretaries who work at least one day during any current school year and who are ineligible for unemployment benefits during the school holidays and vacation periods, including the summer months. Employees in the unit are referred to as "secretaries" or "employees," and their terms and conditions of employment are set forth in Article 22 of this Agreement.

During the term of this Agreement should the Board employ a new title or category of employees having a community of interest with employees in an existing bargaining unit described herein, employees in such new title or category shall be included within the existing bargaining unit where they have a community of interest, and upon request of the Union the parties shall negotiate the terms and conditions of employment for such new title or category of employees; but nothing contained herein shall be construed to require re-negotiation of terms and conditions of employment applicable to employees in an existing bargaining unit as a result of the Board's redesignation of the title or category of employees in the unit.

Nothing contained herein shall be construed to prevent any Board official from meeting with any employee organization representing employees in the above titles for the purpose of hearing the views and proposals of its members, except that, as to matters presented by such organizations which are proper subjects of collective bargaining, the Chapter shall be informed of the meeting and, as to those matters, any changes or modifications shall be made only through negotiation with the Chapter.

It is understood that all collective bargaining is to be conducted at Board headquarters level. There shall he no negotiation with the Union or with any other employee group or organization at any other level.

Nothing contained herein shall be construed to prevent any individual employee from informally discussing a complaint with his immediate superior.

Nothing contained herein shall be construed to deny to any employee his rights under Section 15 of the New York Civil Rights Law or under the State Education Law or under applicable civil service laws and regulations.

# ARTICLE TWO
## FAIR PRACTICES

The Union agrees to maintain its eligibility to represent school secretaries by continuing to admit persons to membership without discrimination on the basis of race, creed, color, national

origin, sex, marital status, sexual orientation, handicapping condition or age and to represent equally all employees without regard to membership or participation in, or association with the activities of, any employee organization.

The Board agrees to continue its policy of not discriminating against any employee on the basis of race, creed, color, national origin, sex, marital status, sexual orientation, handicapping condition, age or membership or participation in, or association with the activities of, any employee organization.

The Board agrees that it will not require any employee to complete an oath or affirmation of loyalty unless such requirement is established by law.

The Board of Education agrees that, as a result of the strike and its related activities, it will not dismiss, demote, discipline, or otherwise act against any staff member because of his or her participation in said strike or related activities. Specifically excluded from the foregoing are any and all provisions of the Taylor Law (New York Civil Service Law, Section 200 et seq.), none of which are waived hereby.

Any records of court proceedings or other memoranda relating to job action or strike shall not be put in a staff member's permanent file, except as required by law.

## ARTICLE THREE
## SALARIES AND BENEFITS

**A. Salaries and Differentials**

The salaries and differentials of employees serving in non-extended time schools covered by this agreement, and the eligibility requirements therefor, shall be as follows:

**1. Salary Schedules**

### SCHEDULE II c-2 School Secretary

### Rates Effective May 19, 2008

| Step | Base | Base + 1 Diff | Base + 2 Diff |
|------|------|---------------|---------------|
| 1A | $32,988 | $35,420 | $35,878 |
| 1B | $32,988 | $35,420 | $35,878 |
| 2A | $35,376 | $37,808 | $38,266 |
| 2B | $35,943 | $38,375 | $38,833 |
| 3A | $36,516 | $38,948 | $39,406 |
| 3B | $37,591 | $40,023 | $40,481 |
| 4A | $38,205 | $40,637 | $41,095 |
| 4B | $38,823 | $41,255 | $41,713 |
| 5A | $39,452 | $41,884 | $42,342 |
| 5B | $40,619 | $43,051 | $43,509 |
| 6A | $41,282 | $43,714 | $44,172 |
| 6A+L5 | $42,032 | $44,464 | $44,922 |
| 6B | $41,948 | $44,380 | $44,838 |

| | | | |
|---|---|---|---|
| 6B+L5 | $42,698 | $45,130 | $45,588 |
| 7A | $42,615 | $45,047 | $45,505 |
| 7A+L5 | $43,365 | $45,797 | $46,255 |
| 7B | $43,279 | $45,711 | $46,169 |
| 7B+L5 | $44,029 | $46,461 | $46,919 |
| 8A | $44,945 | $47,377 | $47,835 |
| 8A+L5 | $45,695 | $48,127 | $48,585 |
| 8B | $46,779 | $49,211 | $49,669 |
| 8B+L5 | $47,529 | $49,961 | $50,419 |
| 8B+LI0 | $50,103 | $52,535 | $52,993 |
| 8B+L13 | $50,912 | $53,344 | $53,802 |
| 8B+L15 | $53,430 | $55,862 | $56,320 |
| 8B+L18 | $54,560 | $56,992 | $57,450 |
| 8B+L20 | $59,435 | $61,867 | $62,325 |
| 8B+L22 | $62,618 | $65,050 | $65,508 |

## Rates Effective May 1, 2013

| Step | Base | Base + 1 Diff | Base + 2 Diff |
|---|---|---|---|
| 1A | $33,318 | $35,774 | $36,237 |
| 1B | $33,318 | $35,774 | $36,237 |
| 2A | $35,730 | $38,186 | $38,649 |
| 2B | $36,302 | $38,758 | $39,221 |
| 3A | $36,881 | $39,337 | $39,800 |
| 3B | $37,967 | $40,423 | $40,886 |
| 4A | $38,587 | $41,043 | $41,506 |
| 4B | $39,211 | $41,667 | $42,130 |
| 5A | $39,847 | $42,303 | $42,766 |
| 5B | $41,025 | $43,481 | $43,944 |
| 6A | $41,695 | $44,151 | $44,614 |
| 6A+L5 | $42,453 | $44,909 | $45,372 |
| 6B | $42,367 | $44,823 | $45,286 |
| 6B+L5 | $43,125 | $45,581 | $46,044 |
| 7A | $43,041 | $45,497 | $45,960 |
| 7A+L5 | $43,799 | $46,255 | $46,718 |
| 7B | $43,712 | $46,168 | $46,631 |
| 7B+L5 | $44,470 | $46,926 | $47,389 |
| 8A | $45,394 | $47,850 | $48,313 |
| 8A+L5 | $46,152 | $48,608 | $49,071 |
| 8B | $47,247 | $49,703 | $50,166 |
| 8B+L5 | $48,005 | $50,461 | $50,924 |
| 8B+LI0 | $50,604 | $53,060 | $53,523 |

| | | | |
|---|---|---|---|
| 8B+L13 | $51,421 | $53,877 | $54,340 |
| 8B+L15 | $53,965 | $56,421 | $56,884 |
| 8B+L18 | $55,106 | $57,562 | $58,025 |
| 8B+L20 | $60,030 | $62,486 | $62,949 |
| 8B+L22 | $63,244 | $65,700 | $66,163 |

## Rates Effective May 1, 2014

| Step | Base | Base + 1 Diff | Base + 2 Diff |
|---|---|---|---|
| 1A | $33,651 | $36,132 | $36,599 |
| 1B | $33,651 | $36,132 | $36,599 |
| 2A | $36,087 | $38,568 | $39,035 |
| 2B | $36,665 | $39,146 | $39,613 |
| 3A | $37,250 | $39,731 | $40,198 |
| 3B | $38,347 | $40,828 | $41,295 |
| 4A | $38,973 | $41,454 | $41,921 |
| 4B | $39,603 | $42,084 | $42,551 |
| 5A | $40,245 | $42,726 | $43,193 |
| 5B | $41,435 | $43,916 | $44,383 |
| 6A | $42,112 | $44,593 | $45,060 |
| 6A+L5 | $42,878 | $45,359 | $45,826 |
| 6B | $42,791 | $45,272 | $45,739 |
| 6B+L5 | $43,557 | $46,038 | $46,505 |
| 7A | $43,471 | $45,952 | $46,419 |
| 7A+L5 | $44,237 | $46,718 | $47,185 |
| 7B | $44,149 | $46,630 | $47,097 |
| 7B+L5 | $44,915 | $47,396 | $47,863 |
| 8A | $45,848 | $48,329 | $48,796 |
| 8A+L5 | $46,614 | $49,095 | $49,562 |
| 8B | $47,719 | $50,200 | $50,667 |
| 8B+L5 | $48,485 | $50,966 | $51,433 |
| 8B+LI0 | $51,110 | $53,591 | $54,058 |
| 8B+L13 | $51,935 | $54,416 | $54,883 |
| 8B+L15 | $54,504 | $56,985 | $57,452 |
| 8B+L18 | $55,657 | $58,138 | $58,605 |
| 8B+L20 | $60,630 | $63,111 | $63,578 |
| 8B+L22 | $63,876 | $66,357 | $66,824 |

## Rates Effective May 1, 2015

| Step | Base | Base + 1 Diff | Base + 2 Diff |
|------|------|---------------|---------------|
| 1A | $34,667 | $37,223 | $37,704 |
| 1B | $34,667 | $37,223 | $37,704 |
| 2A | $37,177 | $39,733 | $40,214 |
| 2B | $37,772 | $40,328 | $40,809 |
| 3A | $38,375 | $40,931 | $41,412 |
| 3B | $39,505 | $42,061 | $42,542 |
| 4A | $40,150 | $42,706 | $43,187 |
| 4B | $40,799 | $43,355 | $43,836 |
| 5A | $41,460 | $44,016 | $44,497 |
| 5B | $42,686 | $45,242 | $45,723 |
| 6A | $43,384 | $45,940 | $46,421 |
| 6A+L5 | $44,173 | $46,729 | $47,210 |
| 6B | $44,083 | $46,639 | $47,120 |
| 6B+L5 | $44,872 | $47,428 | $47,909 |
| 7A | $44,784 | $47,340 | $47,821 |
| 7A+L5 | $45,573 | $48,129 | $48,610 |
| 7B | $45,482 | $48,038 | $48,519 |
| 7B+L5 | $46,271 | $48,827 | $49,308 |
| 8A | $47,233 | $49,789 | $50,270 |
| 8A+L5 | $48,022 | $50,578 | $51,059 |
| 8B | $49,160 | $51,716 | $52,197 |
| 8B+L5 | $49,949 | $52,505 | $52,986 |
| 8B+LI0 | $52,653 | $55,209 | $55,690 |
| 8B+L13 | $53,503 | $56,059 | $56,540 |
| 8B+L15 | $56,150 | $58,706 | $59,187 |
| 8B+L18 | $57,338 | $59,894 | $60,375 |
| 8B+L20 | $62,461 | $65,017 | $65,498 |
| 8B+L22 | $65,805 | $68,361 | $68,842 |

## Rates Effective May 1, 2016

| Step | Base | Base + 1 Diff | Base + 2 Diff |
|------|------|---------------|---------------|
| 1A | $35,877 | $38,522 | $39,020 |
| 1B | $35,877 | $38,522 | $39,020 |
| 2A | $38,475 | $41,120 | $41,618 |
| 2B | $39,090 | $41,735 | $42,233 |
| 3A | $39,714 | $42,359 | $42,857 |
| 3B | $40,884 | $43,529 | $44,027 |

| Step | Base | Base + 1 Diff | Base + 2 Diff |
|------|------|---------------|---------------|
| 4A | $41,551 | $44,196 | $44,694 |
| 4B | $42,223 | $44,868 | $45,366 |
| 5A | $42,907 | $45,552 | $46,050 |
| 5B | $44,176 | $46,821 | $47,319 |
| 6A | $44,898 | $47,543 | $48,041 |
| 6A+L5 | $45,715 | $48,360 | $48,858 |
| 6B | $45,622 | $48,267 | $48,765 |
| 6B+L5 | $46,439 | $49,084 | $49,582 |
| 7A | $46,347 | $48,992 | $49,490 |
| 7A+L5 | $47,164 | $49,809 | $50,307 |
| 7B | $47,070 | $49,715 | $50,213 |
| 7B+L5 | $47,887 | $50,532 | $51,030 |
| 8A | $48,882 | $51,527 | $52,025 |
| 8A+L5 | $49,699 | $52,344 | $52,842 |
| 8B | $50,876 | $53,521 | $54,019 |
| 8B+L5 | $51,693 | $54,338 | $54,836 |
| 8B+LI0 | $54,491 | $57,136 | $57,634 |
| 8B+L13 | $55,371 | $58,016 | $58,514 |
| 8B+L15 | $58,110 | $60,755 | $61,253 |
| 8B+L18 | $59,339 | $61,984 | $62,482 |
| 8B+L20 | $64,641 | $67,286 | $67,784 |
| 8B+L22 | $68,102 | $70,747 | $71,245 |

## Rates Effective May 1, 2017

| Step | Base | Base + 1 Diff | Base + 2 Diff |
|------|------|---------------|---------------|
| 1A | $37,509 | $40,274 | $40,795 |
| 1B | $37,509 | $40,274 | $40,795 |
| 2A | $40,226 | $42,991 | $43,512 |
| 2B | $40,869 | $43,634 | $44,155 |
| 3A | $41,521 | $44,286 | $44,807 |
| 3B | $42,744 | $45,509 | $46,030 |
| 4A | $43,442 | $46,207 | $46,728 |
| 4B | $44,144 | $46,909 | $47,430 |
| 5A | $44,859 | $47,624 | $48,145 |
| 5B | $46,186 | $48,951 | $49,472 |
| 6A | $46,941 | $49,706 | $50,227 |
| 6A+L5 | $47,795 | $50,560 | $51,081 |
| 6B | $47,698 | $50,463 | $50,984 |
| 6B+L5 | $48,552 | $51,317 | $51,838 |
| 7A | $48,456 | $51,221 | $51,742 |
| 7A+L5 | $49,310 | $52,075 | $52,596 |

| Step | Base | Base + 1 Diff | Base + 2 Diff |
|---|---|---|---|
| 7B | $49,212 | $51,977 | $52,498 |
| 7B+L5 | $50,066 | $52,831 | $53,352 |
| 8A | $51,106 | $53,871 | $54,392 |
| 8A+L5 | $51,960 | $54,725 | $55,246 |
| 8B | $53,191 | $55,956 | $56,477 |
| 8B+L5 | $54,045 | $56,810 | $57,331 |
| 8B+LI0 | $56,970 | $59,735 | $60,256 |
| 8B+L13 | $57,891 | $60,656 | $61,177 |
| 8B+L15 | $60,754 | $63,519 | $64,040 |
| 8B+L18 | $62,039 | $64,804 | $65,325 |
| 8B+L20 | $67,582 | $70,347 | $70,868 |
| 8B+L22 | $71,201 | $73,966 | $74,487 |

## Rates Effective May 1, 2018

| Step | Base | Base + 1 Diff | Base + 2 Diff |
|---|---|---|---|
| 1A | $38,244 | $41,063 | $41,594 |
| 1B | $38,244 | $41,063 | $41,594 |
| 2A | $41,015 | $43,834 | $44,365 |
| 2B | $41,670 | $44,489 | $45,020 |
| 3A | $42,335 | $45,154 | $45,685 |
| 3B | $43,582 | $46,401 | $46,932 |
| 4A | $44,294 | $47,113 | $47,644 |
| 4B | $45,009 | $47,828 | $48,359 |
| 5A | $45,738 | $48,557 | $49,088 |
| 5B | $47,091 | $49,910 | $50,441 |
| 6A | $47,861 | $50,680 | $51,211 |
| 6A+L5 | $48,732 | $51,551 | $52,082 |
| 6B | $48,633 | $51,452 | $51,983 |
| 6B+L5 | $49,504 | $52,323 | $52,854 |
| 7A | $49,406 | $52,225 | $52,756 |
| 7A+L5 | $50,277 | $53,096 | $53,627 |
| 7B | $50,177 | $52,996 | $53,527 |
| 7B+L5 | $51,048 | $53,867 | $54,398 |
| 8A | $52,108 | $54,927 | $55,458 |
| 8A+L5 | $52,979 | $55,798 | $56,329 |
| 8B | $54,234 | $57,053 | $57,584 |
| 8B+L5 | $55,105 | $57,924 | $58,455 |
| 8B+LI0 | $58,087 | $60,906 | $61,437 |
| 8B+L13 | $59,026 | $61,845 | $62,376 |
| 8B+L15 | $61,945 | $64,764 | $65,295 |
| 8B+L18 | $63,255 | $66,074 | $66,605 |

| | | | |
|---|---|---|---|
| 8B+L20 | $68,907 | $71,726 | $72,257 |
| 8B+L22 | $72,597 | $75,416 | $75,947 |

**Rates Effective June 16, 2018**

| Step | Base | Base + 1 Diff | Base + 2 Diff |
|---|---|---|---|
| 1A | $39,391 | $42,295 | $42,842 |
| 1B | $39,391 | $42,295 | $42,842 |
| 2A | $42,245 | $45,149 | $45,696 |
| 2B | $42,920 | $45,824 | $46,371 |
| 3A | $43,605 | $46,509 | $47,056 |
| 3B | $44,889 | $47,793 | $48,340 |
| 4A | $45,623 | $48,527 | $49,074 |
| 4B | $46,359 | $49,263 | $49,810 |
| 5A | $47,110 | $50,014 | $50,561 |
| 5B | $48,504 | $51,408 | $51,955 |
| 6A | $49,297 | $52,201 | $52,748 |
| 6A+L5 | $50,194 | $53,098 | $53,645 |
| 6B | $50,092 | $52,996 | $53,543 |
| 6B+L5 | $50,989 | $53,893 | $54,440 |
| 7A | $50,888 | $53,792 | $54,339 |
| 7A+L5 | $51,785 | $54,689 | $55,236 |
| 7B | $51,682 | $54,586 | $55,133 |
| 7B+L5 | $52,579 | $55,483 | $56,030 |
| 8A | $53,671 | $56,575 | $57,122 |
| 8A+L5 | $54,568 | $57,472 | $58,019 |
| 8B | $55,861 | $58,765 | $59,312 |
| 8B+L5 | $56,758 | $59,662 | $60,209 |
| 8B+LI0 | $59,830 | $62,734 | $63,281 |
| 8B+L13 | $60,797 | $63,701 | $64,248 |
| 8B+L15 | $63,803 | $66,707 | $67,254 |
| 8B+L18 | $65,153 | $68,057 | $68,604 |
| 8B+L20 | $70,974 | $73,878 | $74,425 |
| 8B+L22 | $74,775 | $77,679 | $78,226 |

All regularly appointed school secretaries will advance to the next step in the salary schedule on the anniversary date of their appointment and on March 1 of each year until they have advanced to the last step of the salary schedule.

Regular substitute school secretaries, when assigned as such, shall be compensated at the first salary step in Schedule II c-2, set forth above, or at such salary step and rate as may be payable pursuant to a certificate of salary fixation issued by the Chancellor in accordance with the by-

laws of the Board of Education. Regular substitute school secretaries will advance to the next step in the salary schedule upon completion of each full year of regular substitute service and on March 1 of each such year but not beyond step 4A of the salary schedule.

Full-term and other-than-occasional per diem substitute school secretaries serving in full-time vacancies shall be compensated at the first salary step in Schedule II c-2 or at such salary step and rate as may be payable pursuant to a certificate of salary fixation issued by the Chancellor. Such per diem substitute school secretaries will advance to the next step in the salary schedule upon completion of 170 school days of service and on March 1, following the completion of each such unit of 170 school days of service but not beyond Step 4A of the salary schedule.

Full-term and other-than-occasional per diem substitute school secretaries serving in regularly scheduled part-time positions shall be compensated for each full day of service at the rate of one two-hundredth of the first salary step of Schedule II c-2 or at the rate of one two-hundredth of such salary step and rate as may be payable pursuant to a certificate of salary fixation issued by the Chancellor. Such per diem substitute school secretaries will advance to the next step in the salary schedule upon completion of 170 school days of service and on March 1, following the completion of each such unit of 170 school days of service but not beyond Step 4A of the salary schedule.

### School Secretary Assistant

The salary rates applicable to School Secretary Assistants shall be:

| Years of Service | Rates Effective | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 5/19/08 | 5/1/13 | 5/1/14 | 5/1/15 | 5/1/16 | 5/1/17 | 5/1/18 | 6/16/18 |
| One or Less | $33,583 | $33,919 | $34,258 | $35,293 | $36,525 | $38,187 | $38,936 | $40,104 |
| More than one | $34,975 | $35,325 | $35,678 | $36,755 | $38,038 | $39,769 | $40,549 | $41,765 |

### Schedule VIn-1 Substitute School Secretary Interne

The salary rates applicable to Substitute School Secretary Internes shall be:

| Years of Service | Rates Effective | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 5/19/08 | 5/1/13 | 5/1/14 | 5/1/15 | 5/1/16 | 5/1/17 | 5/1/18 | 6/16/18 |
| One or Less | $31,777 | $32,095 | $32,416 | $33,395 | $34,561 | $36,134 | $36,842 | $37,947 |
| More than one | $33,136 | $33,467 | $33,802 | $34,823 | $36,038 | $37,678 | $38,417 | $39,570 |

All regular substitute school secretary-internes will advance to the second step in the salary schedule upon completion of one full year of regular substitute service.

Full-term and other-than-occasional per diem substitute school secretary-internes serving in full-time vacancies shall be compensated at the first salary step in Schedule VI n-1. Such per diem substitute school secretary-internes will advance to the second salary step upon completion of 175 school days of service.

Full-term and other-than-occasional per diem substitute school secretary-internes serving in regularly scheduled part time positions shall be compensated for each full day of service at the rate of one two-hundredth of the first step set forth in Schedule VI n-1. Such per diem substitute school secretary-internes will advance to the second step in the salary schedule upon completion of 175 days of service.

**2. Longevity Increments**

a. Effective September 16, 1998 (May 19, 2008 for the five year longevity increment) or on such date thereafter as the requirements shall be met, additional compensation shall be paid to those secretaries eligible therefor pursuant to the conditions and at the rates set forth below. Such additional compensation shall be known as the "longevity increment" and the gross annual salary rates of secretaries to whom said longevity increment is payable shall be computed by adding the sum provided per annum to the rates ascertained without consideration of said longevity increment. Longevity increments shall be payable as follows to appointed secretaries with the requisite years of pedagogical service in the New York City public schools:

### Longevity Increments

| Years of NYC Public School Service | Effective | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **5/19/08** | **5/1/13** | **5/1/14** | **5/1/15** | **5/1/16** | **5/1/17** | **5/1/18** | **6/16/18** |
| 5 but less than 10 | $750 | $758 | $766 | $789 | $817 | $854 | $871 | $897 |
| 10 but less than 13 | $3,324 | $3,357 | $3,391 | $3,493 | $3,615 | $3,779 | $3,853 | $3,969 |
| 13 but less than 15 | $4,133 | $4,174 | $4,216 | $4,343 | $4,495 | $4,700 | $4,792 | $4,936 |
| 15 but less than 18 | $6,651 | $6,718 | $6,785 | $6,990 | $7,234 | $7,563 | $7,711 | $7,942 |
| 18 but less than 20 | $7,781 | $7,859 | $7,938 | $8,178 | $8,463 | $8,848 | $9,021 | $9,292 |
| 20 but less than 22 | $12,656 | $12,783 | $12,911 | $13,301 | $13,765 | $14,391 | $14,673 | $15,113 |
| 22 or more | $15,839 | $15,997 | $16,157 | $16,645 | $17,226 | $18,010 | $18,363 | $18,914 |

b. Pursuant to law, the service required for these longevity increments shall include teaching service outside the New York City public school system and/or related non-teaching experience for which salary credit was granted by the Board prior to April 12, 1971.

### 3. Differentials

a.    School secretaries (including substitutes) except assistants and internes shall receive as additional compensation a salary differential (the "Educational Differential") upon the issuance of a certificate by the Chancellor evidencing compliance with any of the following:

(1) a degree from a recognized two-year college.

(2) a Bachelor's degree from a recognized four-year college.

(3) graduation from a four-year high school and 60 semester hours of courses, approved by the Chancellor[1].

b.    School secretaries (including substitutes) except assistants and internes shall receive as additional compensation a salary differential (the "Professional Differential") upon the issuance of a certificate by the Chancellor evidencing satisfactory completion of thirty credits of approved and appropriate courses such as business administration, word processing, secretarial sciences or foreign language, as set forth in Personnel Memorandum No. 20, 1988-89 and any successor; and/or effective September 1996, professional development courses and/or activities approved by the Chancellor.

c.    The degree or credits submitted for the differential earned second shall be in addition to those accepted for the differential earned first.

d.    The Educational and Professional Differentials described in a and b above may be earned in either order. The differentials shall be compensated at the rates per year set forth below:

| Effective Date | Differential Earned First | Differential Earned Second | Both |
|---|---|---|---|
| Effective May 19, 2008 | $2,432 | $458 | $2,890 |
| Effective May 1, 2013 | $2,456 | $463 | $2,919 |
| Effective May 1, 2014 | $2,481 | $467 | $2,948 |
| Effective May 1, 2015 | $2,556 | $481 | $3,037 |
| Effective May 1, 2016 | $2,645 | $498 | $3,143 |
| Effective May 1, 2017 | $2,765 | $521 | $3,286 |
| Effective May 1, 2018 | $2,819 | $531 | $3,350 |
| Effective June 16, 2018 | $2,904 | $547 | $3,451 |

### 4. General Regulations

In any and all schedules herein set forth, advancement by increments to salary steps shall be conditioned upon regulations adopted by the Board of Education upon the recommendation of the Chancellor.

Whenever, in the schedules set forth, provision is made for the payment of a salary differential based upon the completion of additional approved study, the certificate issued by the

---

[1]Business courses appropriate to the school secretary's license will be accepted by the Chancellor toward fulfillment of the 60 semester hours as follows:

    Each satisfactorily completed 30 hours of study in office skills or office practices will be credited as two semester hours.

    Courses offered for such credit must have been completed at a business school registered by the New York State Education Department, or by a similar agency in another state having similar standards of accreditation, or must have been completed as a post-graduate course at a New York City high school by a four-year high school graduate with an academic diploma.

    All courses which have been accepted for licensing of school secretaries will be accepted by the Chancellor toward fulfillment of the course requirements for the differential.

Chancellor shall provide that the effective date thereof shall be determined in accordance with appropriate regulations issued by the Chancellor with the approval of the Board of Education.

Correspondence courses are not acceptable for the salary differential or advancement on the increment schedule.

**B. Staff Development Rate**

The hourly rate for paid attendance at training sessions shall be:

Effective May 19, 2008…………………………………$19.12
Effective May 1, 2013………………………………..$19.31
Effective May 1, 2014………………………………..$19.50
Effective May 1, 2015………………………………..$20.09
Effective May 1, 2016………………………………..$20.79
Effective May 1, 2017………………………………..$21.74
Effective May 1, 2018………………………………..$22.17
Effective June 16, 2018..………………………………..$22.84

**C. Salary Credit**

**1. Regular Substitute Service**

An appointee as a regular school secretary who has performed prior satisfactory service as a regular substitute school secretary for a period of one or more terms during the 10-year period preceding appointment shall be placed in the appropriate salary schedule as though all such regular substitute secretarial service had been performed in the capacity of a regular secretary; and such appointee shall be given salary credit for each term of such regular service as a school secretary preceding appointment.

**2. Per Diem Substitute Service**

An appointee as a regular school secretary shall be granted one year of salary credit for each 170 days of prior satisfactory substitute service in the day public schools of the City of New York, provided that such substitute service was performed during the period of five years immediately prior to appointment.

An appointee as a regular school secretary who has had 85 or more days of such substitute service, but less than 170 days, or who has 85 or more days in excess of 170 days or multiple thereof, shall receive one term of salary credit.

An appointee as a regular school secretary who has had three years or more of such substitute service during the period of five years immediately prior to appointment shall receive salary credit, similarly computed, for substitute service rendered during the period of 10 years immediately prior to appointment.

Newly appointed persons shall enter at a salary step not higher than step 6A and shall receive salary credit for each term up to 20 of prior regular substitute service and prior per diem substitute service.

**3. Related Occupational Experience**

Effective February l, 1985 a school secretary or substitute school secretary shall be granted salary credit for appropriate related occupational experience gained in the ten (10) years immediately preceding date of appointment for appointees or date of original license/certificate for substitutes on a year for year basis as prescribed in Chancellor's Regulations C-500 and C-535.

### D. Credit for In-Service Courses

Where records of in-service courses needed to establish eligibility for salary differential are not available, an affidavit by the school secretary-applicant for salary differential shall be accepted by the Board in lieu of other evidence of course completion, provided that such affidavit includes the following:

1. approximate date of completion of the course;

2. such description of the course as the applicant can furnish;

3. a statement that the school secretary-applicant received a salary increment during the year that the course was completed and such increment was granted, upon submission of evidence of completion of the course;

4. a statement that the school secretary-applicant did not during the year in question qualify for salary increment on any basis other than completion of the in-service course.

In lieu of the information required in sub-paragraphs 3 and 4 above, the school secretary may include in the affidavit the following:

a. the institution where the course was taken

b. the name of the instructor

### E. Vacation Pay

#### 1. Summer Vacation Pay

Summer vacation pay shall be pro-rated for the school year in which employees are appointed and for the school year in which their service ceases on the following basis: Employees who are appointed after the start of the school year and employees who are terminated, laid off, resign or retire on/or before the end of the school year shall receive vacation pay for the summer following their appointment or cessation of service as follows: one-tenth of the amount of the vacation pay which would be payable for a full school year's service shall be paid for each month of service or major fraction thereof during the school year in which they are appointed or cease service except that service of less than a major fraction during the first month of appointment shall be credited for summer vacation pay. The pro-rating of summer vacation pay for the year in which employees are appointed and for the year in which their service ceases in accordance with this provision shall not diminish the employee's entitlement to any other benefit including health insurance and welfare coverage that would have been received under the prior method of payment.

An employee who serves as a regular or per diem substitute and is appointed after the beginning of the school year shall be entitled to the additional vacation pay of a regular or per diem substitute for the year in which s/he is appointed on the basis of substitute service prior to appointment.

#### 2. Vacation Pay Credit and Service Credit

a. The estate of a school secretary who dies during the school year shall receive a pro-rata amount, based on the length of his/her employment during the school year, of the vacation pay he would have received had he been employed during the entire school year. This section shall not apply to those school secretaries who are presumed to have retired on the day immediately preceding their death pursuant to Section B20-410 of the Administrative Code of the City of New York, as amended.

b. A regularly appointed school secretary, who has rendered actual service during any school year covered in part by leave of absence for maternity and child care shall be given credit for salary increment purposes for any pro-rata vacation pay received for such service.

### F. Health Insurance and Welfare Benefits
#### 1. Choice of Health Plans

The Board agrees to arrange for, and make available to each school secretary, a choice of health and hospital insurance coverage from among designated plans and the Board agrees to pay the full cost of such coverage.

Regularly appointed employees who are laid off and who are covered by a health and hospital insurance plan at the time they are laid off shall continue to be so covered for ninety days from the day on which they are laid off, and the Board will pay the full cost of such coverage.

The provisions of Appendix C (Health Insurance) shall apply as modified herein.

The Board, the Union and the City of New York ("City") continue to discuss, on an ongoing basis, the citywide health benefits program covering employees represented by the Union and employees separated from service. Any program-wide changes to the existing basic health coverage will be expressly incorporated into and made a part of this Agreement.

The parties acknowledge that collective bargaining regarding health benefits is within the purview of negotiations between the Municipal Labor Committee and the City. Cost-containment initiatives and program modifications in the City Health Benefits Program shall be discussed with the Municipal Labor Committee.

#### 2. Supplemental Benefits

a. The Board will provide funds at the rate of $1,720 ($1,745 effective July 1, 2014, $1,770 effective July 1, 2015, $1,795 effective July 1, 2016, $1,820 effective July 1, 2017) per year on a pro-rata basis per month on behalf of each employee, for the purpose of making available for each employee supplemental welfare benefits and for the purpose of making available college scholarships for children from low income families graduating from the city's public high schools under a plan devised and established jointly by representatives of the Union and of the Board. The Board will continue to make payments for supplemental benefits at the rates per year set forth herein on a pro-rata basis per month for ninety days from the day of layoff on behalf of each regularly appointed employee who is laid off.

b. Domestic partners of covered employees will be provided with welfare fund benefits in the same manner in which covered employees who are married receive such benefits for their spouses.

c. The Union established a supplemental welfare benefits fund program for employees represented by the Union who have separated from service subsequent to June 30, 1970, who were eligible to receive supplemental welfare benefits and who were covered by a welfare fund at the time of such separation pursuant to a separate agreement between the Board of Education and the certified union representing such employees, who remain primary beneficiaries of the New York City Health Insurance Program and are entitled to benefits paid for by the City through such program.

The Board of Education shall contribute the following annual amounts on a pro-rata monthly basis for each eligible individual for remittance to the Union to such supplemental benefits fund pursuant to the terms of a supplemental agreement to be reached by the parties:

(1). Eligible employees separated from service from July l, 1970 through September 8, 1982

      Effective November 1, 2009................... $1,160

      Effective July 1, 2014............................ $1,185

      Effective July 1, 2015............................ $1,210

      Effective July 1, 2016............................ $1,235

Effective July 1, 2017 ............................ $1,260

(2). Eligible employees separated from service after September 8, 1982
Effective November 1, 2009.................... $1,600
Effective July 1, 2014............................ $1,625
Effective July 1, 2015............................ $1,650
Effective July 1, 2016............................ $1,675
Effective July 1, 2017............................ $1,700

d. Employees who are separated from service and thereafter return to active service will be entitled to the same Welfare Fund benefits as other active employees. For the period of their active employment, such employees will not also receive retiree benefits. Accordingly, the Union Welfare Fund will receive only one contribution on behalf of each such employee, which shall be at the applicable contribution rate for active employees.

e. The 2009 Health Benefits Agreement, dated July 2, 2009 between the City Commissioner of Labor Relations James F. Hanley and Municipal Labor Committee Chair Harry Nespoli, is deemed to be part of this Agreement. The Letters of Agreement regarding Welfare Fund Contributions, dated May 5, 2014 and August 14, 2014, between the City Commissioner of Labor Relations Robert W. Linn, and Municipal Labor Committee Chair Harry Nespoli, are deemed to be part of this Agreement. The side letter agreement between the City Commissioner of Labor Relations James F. Hanley and UFT President Randi Weingarten, dated October 21, 2004, is deemed to be part of this Agreement. Pursuant to those Agreements, the parties have agreed to a series of payments to the Welfare Fund.

f. Pursuant to the Municipal Labor Coalition Benefits Agreement, the Union Welfare Fund shall provide welfare fund benefits equal to the benefits provided on behalf of an active Welfare Fund-covered employee to widow(ers), domestic partners and/or children of any active Welfare Fund-covered employee who dies in the line of duty as that term is referenced in Section 12-126(b)(2) of the New York City Administrative Code. The cost of providing this benefit shall be funded by the Stabilization Fund.

**3. Health Care Flexible Spending Account**

a. A flexible health care spending account shall be established pursuant to Section 125 of the Internal Revenue Code. Those employees covered by this Agreement shall be eligible to participate on the same basis as they are eligible to participate in the city-wide health benefits program. Participating employees shall contribute at least $260 per year up to a maximum of $5,000 per year. The labor-management health committee which includes Union and City representatives may modify these contributions levels, based on experience of the plan.

b. Expenses covered by the account shall include but not be limited to deductibles, co-insurance, co-payments, excess expenses beyond plan limits, physical exams and health related transportation costs for vision, dental, medical and prescription drug plans where the employee and dependents are covered. In no case will any of the above expenses include those non-deductible expenses defined as non-deductible in IRS Publication 502.

c. An administrative annual fee of $48.00 shall be charged for participation in the program. Pursuant to Section 125 of the Internal Revenue Code, an employee's participation in the account is irrevocable during any plan year and any excess funds in an employee's account at the close of any plan year is retained by the plan and not refundable to the employee.

### 4. Dependent Care Assistance Program

a. A dependent care assistance program shall be established pursuant to Section 125 of the Internal Revenue Code. Those employees covered by this Agreement shall be eligible to participate on the same basis as they are eligible to participate in the citywide health benefits program. Participating employees shall contribute at least $500 per year up to a maximum of $5,000 per year. The labor-management health committee which includes Union and City representatives may modify these contribution levels, based on experience of the plan.

b. An annual administrative fee of $48.00 shall be charged for participation in the program. Pursuant to Section 125 of the Internal Revenue Code, an employee's participation in the account is irrevocable during any plan year and any excess funds in an employee's account at the close of any plan year is retained by the plan and not refundable to the employee.

### 5. Retiree Health Insurance Coverage

The parties shall jointly take whatever action is necessary, including joint support of legislation, to modify retiree eligibility for health insurance coverage so that vested retirement and service retirement retirees with less than fifteen (15) years of credited service as a member of such retirement or pension system shall no longer be eligible for health insurance and welfare benefit coverage, although they may remain vested for pension purposes after ten (10) years of credited service.

The above shall apply to UFT-represented employees in TRS and BERS hired after the legislation is enacted.

### G. Reimbursement for Medical Expenses

School secretaries shall be reimbursed by the Board for reasonable medical expenses, not exceeding $750, incurred because of injuries in the line of duty, to the extent that such expenses are not covered by insurance. In accordance with existing regulations as they may be modified by the parties, this limit is waived for employees injured as a result of an unprovoked assault while on duty or while on school premises.

### H. Damage or Destruction of Property

1. School secretaries shall not be held responsible for loss within the school of school property or children's property when such loss is not the fault of the school secretary.

This does not exonerate the school secretary from responsibility for school property in his/her charge.

2. The Board will reimburse school secretaries, in an amount not to exceed a total of $100 in any school year, for loss or damage or destruction, while on duty in the school, of personal property of a kind normally worn to or brought into school, when the secretary has not been negligent, to the extent that such loss is not covered by insurance.

The term "personal property" shall not include cash. The terms "loss," "damage" and "destruction" shall not cover the effects of normal wear and tear and use.

### I. Salary Payment

1. The parties agree that a biweekly payroll gives employees a date certain for receipt of their pay. Therefore, the Board will convert the pedagogical payroll to a biweekly payroll from a semimonthly payroll as soon as practicable. The parties will make whatever contractual changes are technically necessary to accomplish this goal.

2. On the last day of the school year, employees shall receive five (5) paychecks which are not to be cashed until the date appearing on the paychecks dated on or about June 30, July 15, July 30, August 15 and August 31.

The Board and the Union agree that any employee who attempts to cash or cashes any of these five paychecks prior to the date on the paycheck(s) shall thereafter reimburse the Board and/or the City of New York for any costs resulting from such action by deduction of such costs from the payments due to said employee.

The early distribution of these five paychecks shall end if five (5) percent of the paychecks in any one summer are prematurely cashed and the practice in existence prior to this agreement shall resume.

3. The Board will recommend to the Comptroller of the City of New York that he itemize more fully employee paychecks and that he provide accompanying explanations when lump sum payments are made.

4. The Board has in place an electronic funds transfer (EFT) program without resort to a payroll lag for those bargaining unit members who are regularly scheduled employees in titles paid on the Q Bank and who elect the receipt of their paychecks by electronic funds transfer. Annual enrollments will take place each March.

5. All newly-hired employees, as of school year 2007-2008, by the Board of Education shall have their wages paid through direct deposit.

**J. Transportation Benefit Program**

Employees are eligible to participate in the NYC Transit Chek program.

The parties agree that the City will expand the current Transit Chek program to offer to eligible employees the ability to purchase a Transit Debit Card through payroll deductions in accordance with IRC Section 132. In addition to the current MTA Surface and Subway lines, the Transit Debit Card may be used to purchase tickets for mass transit commutation only (i.e., LIRR, LI MTA Buses, MetroNorth). The administrative fee for this benefit will be borne by the participants and will be deducted on a prorated basis from the participating employee's paycheck. After one year of experience with this benefit, the City will examine the level of participation and the associated costs of providing this benefit to determine whether or not the administrative fee requires adjustment.

The parties further agree to examine the possible expansion of this benefit to include other regional mass transit carriers.

**K. Performance Incentives Committee**

A committee co-chaired by the Chancellor, the President of the UFT and the New York City Commissioner of Labor Relations, or his or her high-ranking designee, shall be established to investigate the viability and desirability of merit pay and to address other compensation issues such as comparability, skills and responsibility, shortage and hard to staff areas and potential career ladder opportunities.

**L. Ratification Bonus**

1. A lump sum cash payment in the amount of $1,000, pro-rated for other than full time employees, shall be payable as soon as practicable upon ratification of the May 1st MOA to those employees who are on payroll as of the day of ratification. This lump sum is pensionable, consistent with applicable law, and shall not be part of the Employee's basic salary rate.

2. Any disputes arising under this section L shall be determined by Martin F. Scheinman. The parties shall share the costs of his services.

**M. Structured Retiree Claims Settlement Fund**

1. Upon ratification, the City shall establish a Structured Retiree Claims Settlement Fund in the total amount of $180 million, as modified by the decision of Arbitrator Martin F. Scheinman

dated November 17, 2014, to settle all claims by retirees who have retired between November 1, 2009 through June 30, 2014 concerning wage increases arising out of the 2009-2011 round of bargaining.  The Fund will be distributed based upon an agreed upon formula.

2.  Any disputes arising under this section M shall be determined by Martin F. Scheinman. The parties shall share the costs of his services.

**N.  Lump Sum Payments Stemming From the 2009-2011 Round of Bargaining**

    1.  Schedule for actives for those continuously employed as of the day of payout:

        i.  10/1/15 – 12.5%

        ii.  10/1/17 – 12.5%

        iii.  10/1/18 – 25%

        iv.  10/1/19 – 25%

        v.  10/1/20 – 25%

2.  Employees who retire after June 30, 2014 shall receive lump sum payments based on the same schedule as actives as set forth in this section N.

3.  Any disputes arising under this section N shall be determined by Martin F. Scheinman. The parties shall share the costs of his services.

**O.  Healthcare Savings**

    1.  The UFT and the City/DOE agree the UFT will exercise its best efforts to have the MLC agree to the following:

    a.  for fiscal year 2015 (July 1, 2014-June 30, 2015), there shall be $400 million in savings on a citywide basis in health care costs in the NYC health care program.

    b.  for fiscal year 2016 (July 1, 2015-June 30, 2016), there shall be $700 million in savings on a citywide basis in health care costs in the NYC health care program.

    c.  for fiscal year 2017 (July 1, 2016-June 30, 2017), there shall be $1 billion in savings on a citywide basis in health care costs in the NYC health care program.

    d.  for fiscal year 2018 (July 1, 2017-June 30, 2018), there shall be $1.3 billion in savings on a citywide basis in health care costs in the NYC health care program.

    e.  for every fiscal year thereafter, the savings on a citywide basis in health care costs shall continue on a recurring basis.

    f.  The parties agree that the above savings to be achieved on a Citywide basis are a material term of this agreement.

    g,  In the event the MLC does not agree to the above citywide targets, the arbitrator shall determine the UFT's proportional share of the savings target and, absent an agreement by these parties, shall implement the process for the satisfaction of these savings targets.

    h.  Stabilization Fund: (1) Effective July 1, 2014, the Stabilization Fund shall convey $1 billion to the City of New York to be used in support of the pro rata funding of this agreement. (2) Commencing on July 1, 2014, $200 million from the Stabilization Fund shall be made available per year to pay for ongoing programs (such as $65 welfare fund contribution, PICA payments, budget relief).  In the event the MLC does not agree to provide the funds specified in this paragraph, the arbitrator shall determine the UFT's proportional share of the Stabilization Fund monies required to be paid under this paragraph.

    2.  Dispute resolution regarding this section O

    a.  In the event of any dispute, the parties shall meet and confer in an attempt to resolve the dispute.  If the parties cannot resolve the dispute, such dispute shall be referred to Arbitrator Martin F. Scheinman for resolution.

b. Such dispute shall be resolved within ninety (90) days.

c. The arbitrator shall have the authority to impose interim relief that is consistent with the parties' intent.

d. The arbitrator shall have the authority to meet with the parties at such times as the arbitrator determines is appropriate to enforce the terms of this agreement.

e. The parties shall meet and confer to select and retain an impartial health care actuary. If the parties are unable to agree, the arbitrator shall select the impartial health care actuary to be retained by the parties.

f. The parties shall share the costs for the arbitrator and the actuary the arbitrator selects.

**P. Parking**

Provisions with respect to parking placards are contained in the letter agreement set forth in Appendix H.


# ARTICLE FOUR
# PENSION AND RETIREMENT
# PROGRAM


**A. Annuity Fund**

Beginning Oct. 1, 1970, the Board shall contribute at the rate of $400 per year to the Teachers' Retirement System to be credited monthly to the annuity account of each secretary who is at the maximum step of his or her salary schedule.

The Board will seek such legislation as may be necessary to provide for these annuity contributions. In the event that necessary enabling legislation is not enacted, the Board will pay monthly to each secretary covered in the preceding paragraph at the rate specified above.

**B. Support for Program**

With respect to pensions and retirement, the Board hereby affirms its support of the following program:

1. One year of pension credit shall be granted for each 170 days of substitute service.

2. School secretaries shall be entitled to credit for all comparable secretarial service in public school systems in New York City or in public school systems elsewhere rendered before entry into the Teachers' Retirement System of the City of New York.

**C. Board of Education Retirement System**

For members of the Board of Education Retirement System, the Board agrees to provide, effective September 8, 1969, the same pension benefits as were heretofore approved by the Board of Education for other members of the Board of Education Retirement System.

**D. Pension Legislation**

The parties have agreed to jointly support pension legislation as set forth in the letter attached as Appendix E.

**E. Tax Deferred Annuity Plan**

The parties agree to enroll newly-hired employees who do not enroll in a retirement or pension system maintained by the City of New York in the Board's 403(b) Annuity Plan at the time the employee is hired. It is further agreed that such employees will be provided with the option to withdraw from enrollment in the Board's 403(b) Annuity Plan.

**F. Pension Benefits Agreement and Deferred Compensation Plan**

1. The Pension Benefits Agreement dated June 6, 2000 is deemed to be a part of this Agreement.

2. The Board and the City shall promptly make available to the employees covered by this Agreement an eligible deferred compensation plan under Section 457 of the Internal Revenue Code in accordance with all applicable laws, rules and regulations.

# ARTICLE FIVE
# LICENSURE, ASSIGNMENT AND APPOINTMENT

**A. Regularized Licensure**

The Board of Education shall provide for the regular licensure of school secretary personnel consistent with the needs of the instructional program and subject to applicable law and the by-laws of the Board of Education. The Board will take the following actions:

The Board has established regular licenses valid for service as a school secretary under regular appointment, or for day-to-day per diem service, or for full-term assignment, or for other service as a school secretary, including bi-lingual service. All positions will be filled by persons holding such regular licenses except under the following circumstances;

1. Where a position must be filled to provide the services of a school secretary for which no person holding such regular license is immediately available after all efforts have been made to fill the position by a person holding such regular license;

2. Where the kind of school secretary work is not normally performed in the public schools and is temporary in nature;

3. Where a substitute school secretary intern is providing stenographic services for department chairmen in high schools.

**B. Provisional Secretaries**

1. A Certified Provisional Secretary (CPS) is a person who has not yet been appointed, who holds a New York State provisional or permanent certificate, a New York City regular license or a New York City substitute license issued on or before June 30, 1969. Secretaries who possess valid per diem certificates may also serve as Certified Provisional Secretaries. CPS's do not require annual renomination.

2. A Preparatory Provisional Secretary (PPS) is a person who has not yet completed the minimum requirements for New York City licensure but who possesses the minimum requirements for a certificate to serve as a substitute secretary. PPS's are eligible for renewal of their certificate to serve as a substitute for each year that they have been rated satisfactory.

3. Appointments and assignments to positions shall be made in accordance with state education law, Commissioner's regulations and applicable Board of Education regulations and provisions of this Agreement. Appointments shall be made from eligible lists of persons holding regular licenses. After all available persons with regular licenses have been appointed and where positions still remain vacant or arise during the course of the school term, certified provisional secretaries shall have priority for any assignment. Where no certified provisional is available for assignment, preparatory provisional secretaries will be eligible for such assignment.

Except in cases of emergency, any CPS or PPS employed to fill a full term or balance of term assignment will be retained for at least the duration of that term.

**C.  Assignment During the First Fifteen Days**

A school secretary who is assigned during the first fifteen (15) days of the school term to a position which is expected to be vacant for that term shall serve under the terms and conditions of this agreement which would be applicable if a regular substitute school secretary were serving in that position.

**D.  Withdrawal of Resignation and Subsequent Reemployment**

1.  Requests for withdrawal of resignation on the part of school secretaries who attained permanent tenure prior to their resignation shall be effectuated, subject only to medical examination and the approval of the Chancellor, provided that application for such withdrawal of resignation is made on or before the opening of school in September next following five years after the effective date of resignation.  In all other cases of withdrawal of resignation, the requirements of former Section 255 of the Board of Education by-laws shall continue in effect.

2.  School secretaries who resign and subsequently are re-employed shall be placed in the salary step at which they were at the time of resignation and shall be given the sick leave "bank" and sabbatical leave rights which they held at the time of resignation.

**E.  Absence Without Notice**

School secretaries who are absent for 20 consecutive school days without notice shall be deemed to have resigned unless they have reasonable cause for failure to notify.  The issue of the reasonableness of the cause and the penalty, if any, shall be subject to the grievance procedure, including binding arbitration, set forth in Article 17.

**F.  Return to Former License of Appointment**

To open more opportunities to serve in the New York City public schools, and to encourage the use of shortage area licenses, the parties have agreed to the following system for license reversion, which supplements the existing procedure.  This new system requires application and approval to revert to a former license and appointment.  Except in unusual cases, approval will not be given to change from a shortage to a non-shortage license area.  However, pedagogues serving in agreed-upon shortage areas may apply under Section 248 of the Chancellor's Regulations to revert to a former license and appointment.

Except for pedagogues serving in agreed-upon shortage areas, pedagogues who have been previously appointed under different license(s) may apply to serve under any such license(s) according to the following guidelines:

1.  The former license was validated by serving one year satisfactorily under that license and is still valid, and

2.  The most recent three years of active service have been rated satisfactory, and

3.  A vacancy in the school, district or city exists in the former license.

A pedagogue whose application to return to a former license is approved will be placed at the next reorganization in a vacant position in the same school or program in which he/she is serving.  If no such vacancy exists he/she will be placed in a vacancy in the same community school district or superintendency.  If no vacancy exists in the community school district or superintendency, the Division of Human Resources will place the pedagogue in a vacancy in the city.

For the purpose of this provision, a vacancy is defined as an unencumbered position, an anticipated vacancy, or a position currently held by a substitute.

A pedagogue who returns to a former license must serve a minimum of two school years in the license before being eligible to apply again under this provision.

A pedagogue who reverts to a license in an agreed-upon shortage area pursuant to this provision has the right to return to the license from which he/she reverted after at least two years of service in the shortage area.

## ARTICLE SIX
## HOURS AND WORK YEAR

**A. Hours**

    **1. School Secretaries Serving in Schools**

    a.  A school secretary serving in a school will have an uninterrupted lunch period within the basic seven hour and 20 minute working day equal to the length of the lunch period of teachers in the school.

    b.  The gross annual salary of employees covered by this agreement will be increased in accordance with the salary schedules herein.

    c.  In single session schools, the day will start no earlier than 8:00 a.m. and end no later than 3:45p.m.[2]

    d.  On professional development days, the school day shall be 6 hours and 50 minutes.[3]

    **2. School Secretaries Not Serving in Schools**

    A school secretary not serving in a school will have a thirty-seven and one-half (37½) hour workweek exclusive of a daily forty (40) minute lunch period, and the summer hours applicable to the Board's administrative employees.

    **3. All School Secretaries**

    Every school secretary shall have a single relief period of ten minutes during each day.

**B. Workyear**

    1.  School secretaries shall report for regular workdays on the Tuesday following Labor Day, and they shall report on Brooklyn-Queens Day for professional development.

    2.  The work year of secretaries not serving in schools shall commence on September 1 of each year and end on the following August 31.  During each such work year the secretary not serving in a school shall be granted 31 days vacation to be scheduled during the Christmas recess, Easter recess, summer vacation period and such other periods as can be mutually arranged with the bureau or office head.

    3.  The official school year calendar shall provide a one week February mid-winter recess which includes Washington's Birthday, without reducing the number of instructional days for students.

    4.  Emergency Closings

    a.  The Board of Education ("DOE") and UFT recognize that due to emergency conditions (including, but not limited to snow closings) there may be situations where the DOE may fall short of the minimum number of instructional days required annually by the Education Law.

    b.  Prior to opening of each school year, the DOE and UFT agree to jointly determine those vacation days during designated recess periods which shall be used in the event that there is a need to make up days in order to meet the statutory minimum and the order in which such days would be used.

---

[2] The parties disagree about the applicability of this Article 6A1c to school secretaries.

[3] The parties disagree about the applicability of this Article 6A1d to school secretaries.

c.  In no event shall the number of make-up days exceed the number needed to meet the minimum required by the Education Law.

**C. Pilot Program**

Detailed below are the terms for a two (2) year pilot to occur during the 2014-2015 and 2015-2016 school years only.  Should the parties wish to continue this model, they must agree in writing to do so by May 15, 2016.  If no such agreement is reached, this Article 6(C) shall not apply:

For each UFT-represented functional chapter employed by the Board ("DOE") there shall be a citywide Staff Development Committee ("SDC") consisting of the Functional Chapter Leader and equal numbers of members selected by the DOE and the Functional Chapter Leader. Each citywide functional chapter committee shall collaboratively review, consider and develop professional development programs relevant to the respective chapter's duties and reasonable to prepare and complete within the chapter's existing workday. The DOE shall review the SDC's work but shall have final approval of professional development.

<br>

# ARTICLE SEVEN
# ASSIGNMENTS

**A.  Assignments to Schools**

1.  No school secretary shall be assigned to more than two schools per week during the school year.

2.  A school secretary serving in a split assignment shall be reassigned in accordance with her or his seniority in the system to a five-day position in the district as it occurs on application, before the five-day position is filled by a new appointee.

**B.  Limitation on Assignments**

School secretaries shall not be required to perform secretarial work not related to the functioning of the school or school system.

It is understood that school secretaries are not to be expected to take custodial care of children.

**C.  Assignments Within a School**

When a school secretary leaves her or his assignment in a school by reason of transfer, resignation, retirement, death, leave of absence without pay for more than one term, or if an additional secretarial position is authorized, the secretaries on regular appointment in the school may apply to the principal for assignment to the particular duties performed by the school secretary who has left or to the duties of the new secretarial position.  The applicant with the highest seniority in the school shall be given preference among those equally qualified.

**D.  Peak Period Relief Assignments**

The Board will provide an average of 10 days per year of secretarial service for peak work relief for each non-Title 1 elementary school.

The Board will provide 15 days per year of secretarial service for peak work relief for each Title 1 elementary school, for each junior high school and for each high school.

The Board will provide on request up to six days per year for peak work relief for each alternative high school.

The Board will provide six (6) days per year of secretarial service for peak work relief for each school in the citywide program and for each committee on special education (CSE).

Per diem substitute school secretaries who are available for less than a full day's work may be assigned for peak period relief services.

The funds available for peak load days that are unused because of the unavailability of substitute school secretaries may be converted to per session hours on a dollar equivalency basis. A school secretary who is employed on the basis of such converted days is not filling a per session position for purposes of Article 7G.

**E. Non-School Assignments**

All non-school assignments available to school secretaries shall be posted listing the qualifications and a job description. Non-school assignments in a district shall be posted in all schools in the district. Non-school assignments at central headquarters shall be posted in all schools in the system. A qualified applicant shall be selected.

**F. Return to School from Non-School Assignment**

1. Assignment to a district office or central headquarters will be on a voluntary basis for a specified period of time. At the end of the assignment the school secretary shall have the right to return to the district from which he or she was assigned. In the case of assignment from a high school or organizational unit the school secretary shall have the right to return to his or her former school or to the organizational unit in accordance with his or her seniority.

2. A secretary who requests a return to his or her former position within one year or, if his or her assignment terminates sooner, at the end of the assignment, shall be returned to his or her former school in accordance with his or her seniority.

3. Secretaries serving outside of a school who apply for assignment to a vacancy in a school by December 1 of any year may transfer to a vacancy in such school effective February 1 of any year.

**G. Per Session Assignments**

**1. Posting**

Openings for per session positions shall be advertised for a reasonable period of time prior to commencement of the activity as set forth in Chancellor's regulation C-175. The announcement must contain a clear statement of the required qualifications which are reasonably required to perform the duties of the position.

**2. Selection**

a. When the services of a school secretary are required in the high schools during the summer months, the principal shall proceed as follows:

(1) The work opportunity shall first be offered to high school secretaries, both regularly appointed and regularly assigned substitutes, within that school;

(2) If the offer is not accepted by that school's secretaries, the principal shall request secretarial assignment from applications on file in the appropriate offices of the Board, in the following order of priorities:

a) High school secretaries, both regularly appointed and regularly assigned substitutes to their own school.

b) Regularly appointed high school secretaries to other high schools.

c) Regularly assigned high school substitute secretaries to other schools.

d) Regularly appointed junior high school secretaries.

e) Regularly assigned junior high school substitute secretaries.

f) Regularly appointed elementary school secretaries.

g) Regularly assigned elementary substitute school secretaries.

h) Per diem substitute secretaries who have worked in high schools.

School secretaries performing summer service in the high schools on the specified days shall serve for six and one-half hours beginning at 9:00 a.m., exclusive of the lunch period.

b. For other per session activities, the most qualified applicant shall be selected. Seniority shall determine selection among candidates who are equally qualified.[4]

c. School secretaries will be permitted to serve in more than one per session activity only if no other qualified applicants are available. Per session activities of 25 hours or less and certain other activities as mutually agreed between the Board and the UFT are not counted when determining the number of per session activities served in.

### 3. Retention

School secretaries with at least two years of continuous satisfactory service in the activity shall have priority for retention in the same activity for the following year. Secretaries with retention rights in the activity will not lose those rights if their service is interrupted for a period of not more than one year of approved leave. Such secretaries must return to service in the same activity at the first reorganization of the activity following the interruption of their service.[5]

If the number of per session positions in an activity is reduced, secretaries will be released on the basis of least seniority in the activity. If positions in the activity are subsequently restored, within a year, secretaries will be reemployed on the basis of seniority in the activity.

### 4. Pay Rate

a. The hourly per session rate shall be:

| Effective Date | Rate |
|---|---|
| May 19, 2008…………………..….... | $25.87 |
| May 1, 2013…………………………... | $26.13 |
| May 1, 2014…………………………… | $26.39 |
| May 1, 2015…………………………… | $27.19 |
| May 1, 2016…………………………… | $28.14 |
| May 1, 2017…………………………… | $29.42 |
| May 1, 2018…………………………… | $30.00 |
| June 16, 2018..……………………… | $30.90 |

b. School secretaries employed in the New Suspension Program's summer school program ("the Suspension Program") will be paid at the rate of 1/1222 of their regular annual salary per hour.[6]

c. The pay for summer secretarial service for each day of service performed shall be:

| Effective Date | Rate |
|---|---|
| May 19, 2008…………………..….... | $168.16 |
| May 1, 2013…………………………... | $169.84 |
| May 1, 2014…………………………… | $171.54 |

---

[4] Selection rights of secretaries in the Suspension Summer Program are set forth in Apendix F, paragraph 6.

[5] Certain former SOS employees have retention rights for work in the 2008 Suspension Summer Program in accordance with this provision and paragraph 7 of Appendix F.

[6] See paragraph 6 of Appendix F.

May 1, 2015.............................$176.72
May 1, 2016.............................$182.89
May 1, 2017.............................$191.21
May 1, 2018.............................$194.96
June 16, 2018...........................$200.81

**5. Sick Leave**

a.  During the regular school year school secretaries serving on a per session basis earn one sick leave session for each 20 consecutive sessions served.  This sick leave session may only be used within the next 20 sessions immediately following the period in which it is earned.  Sick leave sessions are not cumulative.  All excused sick leave sessions require the certification of a physician.

b.  School secretaries who are permanently assigned to summer programs during the first five days of the program and who serve the complete month of July are granted one session of sick leave for July.  If they continue to serve through the end of the program in August, an additional session of sick leave is granted.  One of the sick days earned may be self-treated.  The other, if earned and used, must be medically certified.

c.  Unused sick leave earned in per session activities shall be transferred to the school secretary's regular cumulative absence reserve.

**H. Chapter 683 Program**

UFT-represented employees who elect to be employed in the Board's program which implements Chapter 683 of the Laws of 1986 ("Program") shall serve under the following terms and conditions of employment during July and August:

1.  The gross annual salary rate of each such employee who serves the same student population during the regular work year (September through June) as is eligible to participate in the Program during July and August shall be computed by adding the sum of either:

a.  Seventeen and one-half (17½) percent of the applicable gross annual salary rate; or

b.  The number of hours served during July and August multiplied by the applicable per session rate; whichever is greater, to the employee's annual salary rate ascertained without consideration of said sum.

2.  The pay rate of each such employee who does not serve the same student population during the regular work year (September through June) as is eligible to participate in the Program in July and August shall be the applicable per session pay rate.

3.  As set forth in the applicable Board vacancy circulars advertising the positions available, the selection procedure for the Program shall provide a priority to those employees who serve the same student population during their regular work year as is eligible to participate in the Program in July and August.

4.  Employees who serve satisfactorily in the Program during July and August for two successive years shall be retained for succeeding years if they apply to serve in the Program during July and August provided they continue to serve the same eligible student population during their regular work year.  Retention rights of other employees who serve satisfactorily in the Program during July and August for two successive years shall be subordinate to the rights of those employees who serve the same eligible student population during the regular work year.

5.  If there is a reduction of positions in the Program during July and August, employees who are lowest in order of priority for selection will be the first to be retrenched, in inverse seniority order.

6.  The work day for employees serving in the Program during July and August shall be five hours and fifty minutes exclusive of one-half hour for a duty-free lunch.

7.  Employees paid in accordance with Paragraph 1 of this Article 7H will receive two sick days for use during July and August on a self-treated basis.  Unused sick days shall be accrued and credited to the employee's cumulative absence reserve for use during the regular school year.

8.  School secretaries will have relief time equivalent to that to which they are entitled during the regular work year.

9.  The sabbatical leave pay of employees paid in accordance with Paragraph 1 of this Article 7H shall be based on their annual salary including the amount computed pursuant to Paragraph 1.  The applicable return provision applies to service in the Program with respect to that portion of the sabbatical salary attributable to Program compensation.

10. School secretaries serving in the Program during July and August are restricted from serving in any per session activity unless no other qualified applicants are available.

11. In light of the needs of the student population served by the Program, the Board is committed to providing air-conditioned facilities for as many sites as possible.  The Board will keep the Union informed of its progress in achieving the objective of air-conditioning all sites utilized by students.

12. The Board official with responsibility for this Program shall meet and consult at times mutually agreed with representatives of the Union on matters of policy and implementation of this Article 7H.

13. Except as otherwise set forth herein:

a.  The working conditions for employees paid in accordance with Paragraph 1 of this Article 7H will be consistent with the standards of working conditions for the regular work year prescribed in this Agreement.

b.  The working conditions of employees paid in accordance with Paragraph 2 of this Article 7H will be those working conditions applicable to per session employees covered by this Agreement.

## I.  Regular Part-Time Assignments for Appointed Secretaries

1.  A limited number of regularly appointed secretaries (including secretaries on unpaid leaves) may be assigned to less than full-time positions where such an assignment meets a particular need of the school system, including, but not limited to, filling a vacancy where no full-time secretary is available, alleviating a shortage area or sharing a full-time position with another secretary on unpaid leave.  The number of these positions in any school year will be decided jointly by the Board and the Union and awarded on the basis of agreed-upon criteria.

2.  Secretaries in these positions will be entitled to full health and welfare benefits and pro rata salary (including vacation pay) and pro rata sick leave.

3.  Service performed in this program shall be considered for all seniority and salary credit consistent with current Board policy.

4.  The Board and the Union shall seek appropriate legislation, where necessary to secure pension rights.

5.  All provisions of this Agreement shall apply except Articles Six (Hours and Workyear), Seven G (Per Session Assignments), Seven H (Chapter 683 Program), Nineteen (Working

Conditions of School Secretary Assistants), Twenty (Working Conditions of Substitute School Secretary Internes), Twenty-One (Working Conditions of Full-Term and Other than Occasional Substitutes) and Twenty-Two (Working Conditions of Day-to-Day (Occasional) Substitutes).

**J.  Workload Disputes**

Upon receiving a written complaint from a school secretary regarding an existing workload, the principal or his/her designee shall meet with the employee making the complaint, and his/her representative, and reach a determination within five (5) school days.  If the complaint is not resolved, the chapter leader may forward it to the appropriate superintendent, within five (5) school days of the determination, for review.

If a timely request for review is received by the superintendent, s/he shall designate a representative to jointly investigate with a UFT appointed representative the workload that is alleged to be inappropriate.  The two representatives will then submit recommendations to the superintendent for his/her written determination, which shall be made within (10) school days of receipt of the recommendation(s).

The UFT shall have the right to appeal the superintendent's determination to the Chancellor within five (5) school days of the superintendent's written determination of the complaint, or if the superintendent does not timely render a determination, to seek review at the Chancellor's level within forty-five (45) days of the principal's receipt of the original written complaint, whichever is earlier.  Such appeal shall contain a detailed written statement of the reasons for dissatisfaction with the superintendent's determination.  The Chancellor or his/her designee shall review the workload complaint and make a final determination, not subject to further review, within fifteen (15) school days of receipt of the appeal.

**K. District 79 Reorganization**

The Memorandum of Agreement controlling the rights of employees regarding the 2007 reorganization of District 79 is contained in Appendix F.

# ARTICLE EIGHT
# STAFF DEVELOPMENT

**A.  Training to Upgrade Skills**

The Board will provide, to the extent possible, training on new types of office machines, including computers and word processors, to upgrade the skills of school secretaries.

**B.  Joint Committee**

The Board and the Union shall establish a joint committee to review and consider:

1.  Appropriate staff development programs for new and experienced secretaries;
2.  Workload issues;
3.  Appropriate procedures for dealing with complaints concerning improperly installed computer equipment.

**C.  Professional Days**[7]

On each Election Day and Brooklyn-Queens Day each school secretary shall be released from regular work for a professional day.  Secretaries who serve as instructors for the professional day shall be specially trained and participate in the development of the program.

---

[7] The parties disagree about whether the locations specified for professional development in this Article 8C apply to Brooklyn-Queens Day.

The preparation for such secretary instructors shall be held prior to the opening of school and shall be for an appropriate number of hours, during which they will be paid at the per session rate. The training shall be conducted by the Board in consultation with the Secretaries' Chapter.

The professional day shall be conducted for school secretaries within the community school district or high school superintendency, or central board programs, as appropriate, at central locations within each community school district, high school superintendency, or borough (for central board programs).

The scheduling of the professional day and the content for each group attending the professional day shall be appropriate for the needs of that group, as determined in consultation between the district, high school superintendency, or central board and a committee of school secretaries designated by the Secretaries' Chapter.

**D. Professional Development and Differential**

As one aspect of the parties' interest in professional development, a joint Board-UFT committee comprised of three (3) designees of the UFT President and three (3) designees of the Chancellor was established to expand and professionalize available staff development opportunities.

As a priority, the joint committee focused on new professional development opportunities for teachers seeking their second differential, and for other pedagogues seeking a comparable differential, and made its initial recommendations to the Chancellor. It is the intention of the parties to make such opportunities available to staff at no or modest cost, and with no additional cost to the employer. The Chancellor may establish limits on the number of these credits which can be earned per term toward the second differential via this professional development initiative (the P-credit program). It is understood that the Chancellor's decisions about all aspects of the Committee's recommendations, the design of the P-credit program and regulations for implementation of the P-credit program shall be final and binding on the parties and not subject to the grievance process. Any claim concerning the arbitrary, capricious and/or discriminatory application of such regulations to individuals will be grievable and arbitrable.

## ARTICLE NINE
## EDUCATION REFORM

**A. School-Based Management/Shared Decision-Making (SBM/SDM)**

The Union and the Board agree that SBM/SDM is a process in which all members of the school community collaborate in identifying issues, defining goals, formulating policy and implementing programs. The uniqueness of each school community requires that the SBM/SDM process and the organizational and instructional issues discussed are determined by the staff, parents, administration and students (where appropriate) at individual schools through the SBM/SDM team. The Union and the Board agree that in order to achieve SBM/SDM at the school level significant restructuring of instruction must occur, and the parties agree to work cooperatively in an effort to bring about these changes.

**1. Eligibility and Involvement**

a. All schools are eligible to apply for participation in SBM/SDM. School participation shall be voluntary and subject to approval by fifty-five percent (55%) of the voting, non-supervisory school based staff (e.g. teachers, paraprofessionals, support staff and others) and agreement of the principal, the appropriate superintendent and parents. Similarly, schools

involved in SBM/SDM may choose to opt out of the program at any time. The decision to opt out shall be voluntary and subject to approval by fifty-five percent (55%) of the voting, non-supervisory school based staff.

b. All votes of non-supervisory school based staff concerning participation in SBM/SDM shall be conducted by the UFT chapter.

c. Schools involved in SBM/SDM shall conduct ongoing self-evaluation and modify the program as needed.

**2. SBM/SDM Teams**

a. Based upon a peer selection process, participating schools shall establish an SBM/SDM team. For schools that come into the program after September 1993, the composition will be determined at the local level. Any schools with a team in place as of September 1993 will have an opportunity each October to revisit the composition of its team.

b. The UFT chapter leader shall be a member of the SBM/SDM team.

c. Each SBM/SDM team shall determine the range of issues it will address and the decision-making process it will use.

**3. Staff Development**

The Board shall be responsible for making available appropriate staff development, technical assistance and support requested by schools involved in SBM/SDM, as well as schools expressing an interest in future involvement in the program. The content and design of centrally offered staff development and technical assistance programs shall be developed in consultation with the Union.

**4. Waivers**

a. Request for waivers of existing provisions of this Agreement or Board regulations must be approved in accordance with the procedure set forth in Article 8B (School Based Options) of the Teacher Agreement i.e., approval of fifty-five percent (55%) of those UFT chapter members voting and agreement of the school principal, UFT district representative, appropriate superintendent, the President of the Union and the Chancellor.

b. Waivers or modifications of existing provisions of this Agreement or Board regulations applied for by schools participating in SBM/SDM are not limited to those areas set forth in Article 8B (School Based Options) of the Teacher Agreement.

c. Existing provisions of this Agreement and Board regulations not specifically modified or waived, as provided above, shall continue in full force and effect in all SBM/SDM schools.

d. In schools that vote to opt out of SBM/SDM, continuation of waivers shall be determined jointly by the President of the Union and the Chancellor.

e. All School-Based Option votes covered by this Agreement including those in Circular 6R, shall require an affirmative vote of fifty-five (55%) of those voting.

**B. School Allocations**

Before the end of June and by the opening of school in September, to involve faculties and foster openness about the use of resources, the principal shall meet with the chapter leader and UFT chapter committee to discuss, explain and seek input on the use of the school allocations. As soon as they are available, copies of the school allocation will be provided to the chapter leader and UFT chapter committee.

Any budgetary modifications regarding the use of the school allocations shall be discussed by the principal and chapter committee.

The Board shall utilize its best efforts to develop the capacity to include, in school allocations provided pursuant to this Article 9B, the specific extracurricular activities budgeted by each school.

The Board ("Department") shall provide to the Chapter Committee and Chapter Leader in school the School Leadership Team (SLT) view of the Galaxy Table of Organization. This shall be supplied before the end of June each school year and again by the opening of school in September of each school year.

In addition, should there be any budget modification regarding the use of school allocations, these shall be discussed by the Principal and Chapter committee. In order to facilitate such discussion, the modifications shall be provided to the Chapter Committee.

## C. Reduction of Paperwork

(1) A Central Paperwork Committee (the "Central Committee") will convene within thirty (30) days of the ratification of this agreement by the UFT. The Central Committee will be made up of an equal number of representatives appointed by the UFT President and the Chancellor. The representatives appointed by the Chancellor will include someone from the office of the Deputy Chancellor for Teaching and Learning. The Central Committee will meet at least monthly, on the first Wednesday of the month or at a mutually agreeable time, to review system-wide paperwork issues (whether paper or electronic), including, but not limited to, the requests for data in connection with the Quality Review process. The Central Committee will also establish, subject to agreement by the Chancellor and the UFT President, system-wide standards for the reduction and elimination of unnecessary paperwork ("System-wide Standards"). Should the Central Committee fail to establish System-wide Standards approved by the Chancellor within sixty (60) days of their first meeting, either the UFT or the Board (DOE) may request the assistance of a member of the Fact-Finding Panel of Martin F. Scheinman, Howard Edelman and Mark Grossman, or another mutually agreeable neutral, to help facilitate the Central Committee's discussions. Should the intervention of a neutral not result in an agreement by the Central Committee approved by the Chancellor within sixty (60) days of the neutral's involvement, the DOE and UFT will submit position statements to said neutral who will issue a binding decision. The neutral's decision setting the System-wide Standards shall be subject to Article 75 of the New York State Civil Practice Law and Rules.

(2) Once the System-wide Standards have been established they will be distributed to all schools and key stakeholders (including SLT Chairpersons, PA/PTA Presidents, UFT Chapter Leaders, UFT District Representatives, District Superintendents and CSA Representatives). Thereafter, District/High School Superintendency Paperwork Committees ("District Committees") shall be established in each community school district and high school superintendency. The District Committees shall meet monthly, at a regularly scheduled time, for the purpose of addressing paperwork issues (whether paper or electronic) at the school level and to ensure the System-wide Standards are being implemented properly in schools. These District Committees will be made up of an equal number of representatives appointed by the UFT President and the Chancellor. The representatives appointed by the Chancellor shall include the District/High School Superintendent or his/her designee.

(3) Employees (including those in functional chapters) may request that their Chapter Leader raise school-specific paperwork issues (whether paper or electronic) before the District Committee. Subject to approval by the Chancellor, if a District Committee agrees on the resolution of the paperwork issue, the resolution shall be enforced by the District or High School

Superintendent. In the event that a District Committee cannot agree on the resolution of an issue raised by a Chapter Leader of an individual school, the District Committee shall refer the issue to the Central Committee for review. Subject to approval by the Chancellor, if the Central Committee agrees on the resolution of an issue raised by a Chapter Leader, the resolution shall be enforced by the District or High School Superintendent.

(4) For alleged violations of the System-wide Standards the UFT may file a grievance, in accordance with the grievance and arbitration procedures set forth in Article 17 of this Agreement. It is understood that, prior to a grievance being filed, the paperwork issues shall go through the committee process as described above. Such grievances shall be filed directly with the DOE's Office of Labor Relations ("OLR"), which may be scheduled for arbitration within twenty (20) days of notice to OLR. The parties shall negotiate pre-arbitration hearing procedures so that each party is aware of the allegations and defenses being raised at the arbitration. All arbitration days shall be part of the existing number of days as set forth in this Agreement. An arbitrator may hear up to three (3) paperwork grievances on each arbitration date. The arbitrator will issue a brief award that is final and binding upon the parties, within five (5) school days of the arbitration.

**D. Evaluation/Observation Joint Committee**

The UFT and the Board of Education are committed to attracting and retaining the most competent staff and will strive towards the creation of an evaluation and professional development plan that gives each staff member choices and a role in his/her own professional growth. This program should enable staff to assist in the professional development of less experienced colleagues.

To this end the UFT and the Board of Education will establish a joint committee to seek out and put into place a high quality prescriptive evaluation and professional growth system.

We will seek to enhance and develop skills and knowledge as well as provide a means of identifying those whose competence is in question.

**E. Labor/Management Committee On Long Term Reforms**

With regard to the long term recommendations the 2005 Fact Finders made subject to adequate CFE funding, the parties shall establish a Labor Management Committee to discuss the following issues: a) bonuses, including housing bonuses, for shortage license areas; b) a pilot project for school-wide based performance bonuses for sustained growth in student achievement; and c) a program for the reduction of class size in all grades and divisions. If the parties agree on the terms of any or all of these issues, they may be implemented by the Board using whatever funds may be identified.

**F. School-Wide Bonus Program**

1. As set forth in Article 9E above, the New York City Board of Education and the United Federation of Teachers jointly support, and pledge to work together to implement on a pilot basis, a school-wide based bonus program pursuant to which educators will be awarded substantial cash bonuses for student achievement gains.

2. The program will be initiated immediately, with bonuses awarded for achievement gains in the 2007-2008 school year. Subject to the successful solicitation of private funds, which the BOE and UFT commit to work together to raise as soon as practicable, approximately 15% of the City's highest need schools will be eligible to participate in the program this first year. In consultation with the UFT, the BOE will identify approximately 200 of the highest-need schools in the City. Each will be invited to participate in the program, and the BOE and UFT jointly

pledge to work in good faith to encourage them to do so both this year and throughout the life of the program.

3. In future years, if the school-wide bonus program continues, awards will be funded from public appropriations which supplement and do not supplant funds available for collective bargaining.

4. In 2008-09 at least 30% of BOE schools will be eligible to participate in the program. In consultation with the UFT, the BOE will identify approximately 400 of the highest-need schools in the City.

5. Participation in the program will be at the option of each school as determined by a vote of fifty-five percent (55%) of the UFT-represented school staff and with the assent of the principal of the school. The vote shall be conducted by the UFT Chapter in the school, held within six weeks of the announcement of the program and shall be an up or down vote without conditions or restrictions on the terms of the program as set out herein. Each year the bonus program is available eligible schools shall exercise the option to participate ("Participant Schools") or not by the same voting procedure.

6. A school's agreement to participate in the bonus program shall be considered, along with other criteria, as a positive factor in determining whether the Participant School is to be phased out or given a year's moratorium on a possible phase-out. Nothing herein alters applicable law with regard to school closings.

7. Each Participant School will be eligible for a dollar award ("the pool"), which will be distributed to the school as a whole on the basis of the Progress Report or some other neutral criterion derived from the Progress Report.

8. In consultation with the UFT, the BOE will set the criteria for awarding funds to schools. The criteria will provide objective standards /benchmarks aligned with Progress Report factors and the specific details of those standards/benchmarks will be communicated to schools when the program is announced. All Participant Schools that achieve the announced standards/benchmarks shall receive the applicable money award. There shall be no cap or ceiling imposed on the number of Participant Schools receiving the award, provided the school meets the standards/benchmarks. Neither shall the relative standings of the Participant Schools affect their entitlement to the award once they have met the standards/benchmarks.

9. To account for variation in the size of schools, the size of the award each Participant School is eligible to receive will be determined by appropriate objective criteria.

10. The amount of the average per-person award should be sufficiently substantial to make a material difference to each awardee. As outlined below, each Participant School will determine the methodology for distributing any award it earns for school-wide performance. The size of each Participant School's total award for distribution in 2007-08 shall be the number of full-time UFT-represented employees on the school's table of organization times three thousand dollars ($3,000). In light of year-to-year appropriations uncertainties, nothing in this paragraph restricts the ability of the BOE to increase or decrease the total amount set annually for distribution pursuant to the program.

11. Each Participant School will form a compensation committee composed of the principal and a principal's designee (e.g., an assistant principal) and two UFT-represented staff members elected in a Chapter supervised election by the UFT-represented staff on an annual basis from among volunteers. The compensation committee will determine, by consensus, matters related to both eligibility for and the size of individual awards to UFT-represented staff members.

However the compensation committee shall presume that all UFT-represented staff employed at a school that meets the targets for the bonus have contributed to the school's achievement to some extent and therefore should share in the bonus. If there is no consensus the pool of money will not be distributed to the school.

12. Among the topics each Participant School compensation committee may decide to consider, after receiving guidance from the BOE and UFT, are whether to make equal individual awards to all eligible UFT staff, equal awards to all those in the same title, or whether to make differential awards.

13. In making awards, a compensation committee shall not consider an awardee's length of service, provided however that it may make particular determinations for individuals who served at the school for less than a full academic year.

14. The school compensation committee shall make its decisions free of pressure from the BOE or UFT.

15. Funds will be awarded to schools as soon as practicable after the BOE's Office of Accountability has received and analyzed the information necessary to make the awards. To the extent such award is made after the beginning of the school year following the year that was the basis for the award, eligible staff who have left the school shall nevertheless share in the award for their contribution the prior year.

16. The pilot school-wide bonus program shall be comprehensively evaluated by a mutually agreed upon outside independent entity which shall provide the parties with a written report and analysis of all aspects of its operation together with associated recommendations for future years the program is in operation.

17. The Chancellor and the President of the UFT, or their designees, will constitute an Oversight Committee (OC) to review appeals of individual awards. However if the awards made by the compensation committee are ratified by a simple majority of the UFT Chapter voting by secret ballot, no appeal may be taken to the OC. The OC may modify a determination of a school compensation committee only if the OC, by consensus, finds that it was arbitrary, capricious or in clear violation of law or of the procedures and standards set out herein.

18. This provision is contingent on the implementation and passage of the legislation referred to in Paragraph 6 of the October 2005 Memorandum of Agreement between the parties entitled "Pension and Retirement Program".

## ARTICLE TEN
## SAFETY AND HEALTH

### A. Assistance in Assault Cases

1. The principal shall report as soon as possible but within 24 hours to the Office of Legal Services, to the Chief Executive of School Safety and Planning and to the Victim Support Program that an assault upon a school secretary has been reported to him/her. The principal shall investigate and file a complete report as soon as possible to the Office of Legal Services and to the Chief Executive of School Safety and Planning. The full report shall be signed by the employee to acknowledge that he/she has seen the report and he/she may append a statement to such report.

2. The Office of Legal Services shall inform the employee immediately of his/her rights under the law and shall provide such information in a written document.

3. The Office of Legal Services shall notify the employee of its readiness to assist the employee. This assistance is intended solely to apply to the criminal aspect of any case arising from such assault.

4. Should the Office of Legal Services fail to provide an attorney to appear with the employee in Family Court, the Board will reimburse the employee if he/she retains his/her own attorney for only one such appearance in an amount up to $40.00.

5. An assaulted employee who presses charges against his/her assailant shall have his/her days of court appearance designated as non-attendance days with pay.

6. The provisions of the 1982-83 Chancellor's Memorandum entitled "Assistance to Staff in Matters Concerning Assaults" shall apply.

**B. School Safety Plan**

The principal is charged with the responsibility of maintaining security, safety and discipline in the school. To meet this responsibility, he/she shall develop, in collaboration with the Union chapter committee and the parents association of the school a comprehensive safety plan, subject to the approval of the Chief Executive of School Safety and Planning. The safety plan shall be updated annually using the same collaborative process, and reports of any incidents shall be shared with the chapter leader.

A complaint by an employee or the chapter leader that there has been a violation of the safety plan may be made to the principal as promptly as possible. He/she will attempt to resolve the complaint within 24 hours after receiving the complaint.

If the employee or chapter is not satisfied an appeal may be made to the Chief Executive of School Safety and Planning who will arrange for a mediation session within 48 hours.

If the employee/chapter is not satisfied with the results of the mediation, an appeal may be made by an expedited arbitration process to be developed by the parties.

**C. Citywide Security and Discipline Committee**

1. The Union and the Board shall establish a joint committee which shall meet on a regular basis to discuss and consider appropriate means of resolving safety and discipline issues. Other city agencies will be invited to participate when the Union and the Board deem it appropriate.

2. The joint committee or joint designees and any experts the Union and/or Board may designate will have access to all schools and other Board workplaces in which staff represented by the Union are assigned for the purpose of investigating and assessing allegedly unsafe working conditions. If possible, such visits shall be made on reasonable notice to the school and in a manner that minimizes disruption to the school or other workplace.

3. The joint committee, from time to time, may establish sub-committees to deal with special safety/discipline issues. It shall establish a sub-committee to deal with the issues of safety and discipline in special education schools and programs.

**D. Environmental Health and Safety Joint Committee**

1. The Union and the Board shall establish a joint committee which shall meet on a regular basis to discuss and consider appropriate means of resolving health and safety issues. The School Construction Authority will be invited to participate on issues raised by school capital modernization projects.

2. The joint committee or joint designees, and any experts the Union and/or the Board may designate, will have access to all schools and other Board workplaces in which staff represented by the UFT are assigned for the purpose of investigating and assessing allegedly hazardous working conditions. Such visits will be made upon reasonable notice to the Board's office of

occupational safety and health and in a manner that minimizes disruption to the school or other workplace.

**E.  Safe Environment**

    1.  In recognition of the importance of employee safety and health, the Board agrees to provide the appropriate recognized standards of workplace sanitation, cleanliness, light, and noise control, adequate heating and ventilation.  The Board of Education agrees to eliminate recognized hazards that are likely to cause serious physical harm.

    2.  If the Union believes a situation has arisen that is likely to cause serious physical harm, it may bring it to the attention of the Chancellor or designee who shall immediately assess the situation, including onsite inspection where appropriate, and take such action as the Chancellor deems appropriate.  In the event the Union seeks to contest the Chancellor's determination, it may exercise its statutory rights under New York State Labor Law Section 27a (PESH) or other legal authority.

    3.  The Board will issue a circular advising staff of their rights under PESH and other applicable law and post the notices required by law.

**F.  Renovation and Modernization**

    The Union and the Board believe that modernization and renovation projects are vital to enable children to receive the educational services to which they are entitled.  However, in order to limit any educational disruption that a modernization project can create, and to protect the health and safety of the staff and students that use a school setting undergoing modernization, the Board and Union have agreed to standard procedures that help to ensure that health, safety and educational standards are maintained during school capital modernization projects.  These standard procedures will be applied in school capital modernization projects undertaken by the School Construction Authority and will be posted and reviewed with all staff in any school undergoing modernization.  Where conditions require it, the standard procedures may be modified after consultation with the Union.

**ARTICLE ELEVEN**
**LEAVES**

**A.  Cumulative Absence Reserves and Sick Leaves**

    1.  Regular school secretaries reinstated after retirement will be credited with the cumulative reserves remaining to their credit upon retirement and such reserves as they accumulated as regular substitutes.

    2.  Regular school secretaries who resign or retire will be credited upon resuming service as regular substitute secretaries with 120/200 of the unused cumulative reserves remaining to their credit upon resignation or retirement.

    3.  Regular school secretaries accepting regular substitute teaching positions in order to establish eligibility for other licenses will be credited with their cumulative reserves as regular school secretaries during the period of substitute service.

    4.  Regular school secretaries called to military duty will be credited upon their return with the same sick leave allowance for the period of their military service as they would have been entitled to in school service.

5.   Regular school secretaries whose licenses are terminated will be credited with 120/200 of their unused cumulative reserves if they then serve as regular substitutes, or, if appointed anew, with their unused cumulative reserves.

6.   Employees of the Board of Higher Education who transfer as regularly appointed school secretaries to the Board shall have their cumulative reserves transferred and credited to them, but not in excess of the maximum number of days creditable in this system.

7.   Unused sick leave accumulated as a paraprofessional shall be transferable to the school secretary's "bank" as a regular substitute, or an appointed school secretary.

8.   Regular school secretaries who exhaust their cumulative sick leave may borrow up to 20 days of additional sick leave.  However, in order to assure that borrowed sick leave is repaid, the employee may be required to sign an appropriate document prepared by the Board acknowledging a legal obligation to repay upon the cessation of service.  For purposes of this provision "cessation of service" means resignation, retirement, termination for cause or death.

9.   Sick leave privileges shall extend to the taking of annual physical checkups or the taking of annual laboratory tests.  Such absences shall be limited to one day in each school year.

10. School secretaries on regular appointment shall be granted absence refunds for illness on application, without a statement from a physician, for a total of no more than 10 days in any school year.  School secretaries will be allowed to use three of such 10 days of sick leave for personal business provided that reasonable advance notice is given to the head of the school.  Days off for personal business are intended to be used only for personal business which cannot be conducted on other than a school day and during other than school hours.  Secretaries may use the days allowed for personal business in any school year for the care of ill family members.  For the purpose of this provision, family member shall be defined as: spouse; natural, foster or step parent; child; brother or sister; father-in-law; mother-in-law; any relative residing in the household; and domestic partner, provided such domestic partner is registered pursuant to the terms set forth in the New York City Administrative Code Section 3-240 *et seq.*

11. Regular substitute secretaries shall be granted absence refunds for illness on application, without a statement from a physician, for no more than five days in one school term.  However, regular substitute secretaries who serve two terms in one school year shall be granted a total of no more than 10 such absence refunds during the two terms, three of which may be used for personal business provided that reasonable advance notice is given to the head of the school.  Days off for personal business are intended to be used only for personal business which cannot be conducted on other than a school day and during other than school hours.  Secretaries may use the three days allowed for personal business in any school year for the care of ill family members.  For the purpose of this provision, family member shall be defined as: spouse; natural, foster or step parent; child; brother or sister; father-in-law; mother-in-law; any relative residing in the household; and domestic partner, provided such domestic partner is registered pursuant to the terms set forth in the New York City Administrative Code Section 3-240 *et seq.*

12. School secretaries serving in schools shall not suffer loss of sick bank days for absence due to illness from the following children's diseases: rubeola (measles), epidemic parotitis (mumps), and varicella (chicken pox).  It is understood that this paragraph does not apply to rubella (german measles).

13. The Board will approve absences without loss of sick bank days for secretaries who contract Hepatitis B as a result of working with children who have been evaluated as presenting a substantial risk of exhibiting acting out behavior.

14. Employees who are absent due to allergic or positive reaction from a skin test shall not suffer loss of sick bank days.

15. School secretaries who resign or retire shall, upon application, receive termination pay on the basis of one-half of up to 200 days of the unused sick leave accumulated as a regularly-appointed or regular substitute school secretary. If the resignation or retirement becomes effective at any time other than the end of a school year, sick leave for the period of service during that school year shall be paid at the rate of one day for each two full months of service. Termination pay pursuant to this provision shall be paid in three equal cash installments payable two months, fourteen months and twenty-six months following the termination date.

16. The estate of a school secretary who dies during the term of this contract shall receive termination pay calculated on the same basis. This paragraph shall not apply to those school secretaries who are presumed to have retired on the day immediately preceding their death pursuant to Section 13-545 of the Administrative Code of the City of New York, as amended.

17. Absence for illness after September 1, 1967, will be charged on a day-for-day basis to any unused sick leave accumulated prior to September 1, 1967.

18. Absence immediately prior to resignation shall be paid on the same basis as termination pay.

19. Employees on sabbatical leaves of absence shall not accrue days in their cumulative absence reserves for the period of the sabbatical leave.

**B. Sabbatical Leaves**

1. Subject to the limitations of subsection 10 of this Article 11B, school secretaries on regular appointment will be eligible for a sabbatical leave for study or restoration to health after each 14 years of service. The first 14 years of service may include a maximum of three years of substitute service for which salary credit was granted. Courses for study sabbatical shall be job related in accordance with criteria established by the Chancellor.

2. Approval of the school medical director is required for all sabbaticals for restoration to health. Subject to the limitations of subsection 10 of this Article 11B, school secretaries on regular appointment who have less than 14 years of service will be eligible only for a "special sabbatical leave for restoration to health" after seven years of service on regular appointment.

A "special sabbatical leave for restoration to health" shall be for a period of six months, beginning on August 1 and ending on January 31 of the following year or beginning on February 1 and ending July 31 of the same year. However, a "special sabbatical leave for restoration to health" may be taken for a period of at least one month but less than six months under the following circumstances:

a. The secretary meets all the eligibility criteria for a six-month "special sabbatical leave for restoration to health."

b. The secretary has exhausted his/her cumulative absence reserve.

c. The school medical director will determine when the secretary is fit to return to duty. The superintendent will return the secretary to his/her assignment in the school as soon as possible.

d. The secretary will be deemed to have exhausted years of service for sabbatical eligibility based upon the formula:

$$\frac{\text{Calendar Days of Leave}}{180} \times 7 \text{ years}$$

3. A sabbatical leave shall be for a period of one year, beginning on August 1 and ending on July 31 of the following year.

4.  School secretaries on sabbatical leave of absence shall receive compensation at the rate of seventy (70) percent of the school secretary's regular salary.  The sabbatical leave pay of school secretaries who receive a bonus shall be based upon their annual salary and the amount of the annual bonus received.  The sabbatical leave pay of school secretaries who receive a license salary differential shall be based upon their annual salary and the amount of the license differential.

5.  School secretaries on "special sabbatical leave for restoration to health" (as defined in paragraph 2 above) shall receive compensation at the rate of sixty (60) percent of their regular salary during such leave.  The pay for the "special sabbatical leave for restoration to health" (as defined in paragraph 2 above) of school secretaries who receive a bonus shall be based upon their annual salary and the amount of the annual bonus received.  The pay for the "special sabbatical leave for restoration to health" of school secretaries who receive a license salary differential shall be based upon their annual salary and the amount of the license differential.

6.  School secretaries serving a probationary period in a second license within the bargaining unit shall be permitted to take a sabbatical leave of absence or a "special sabbatical leave for restoration to health" (as defined in paragraph 2 above) during such period if they are otherwise eligible; however, there shall be no reduction, by reason of such leave, of the total probationary period which they are required to serve.

7.  An application for a sabbatical leave of absence or for a "special sabbatical leave for restoration to health" (as defined in paragraph 2 above) will not be denied to an eligible school secretary unless the leave would be contrary to applicable regulations.  When the number of eligible applicants in any school or organizational unit exceeds the number of sabbatical leaves and "special sabbatical leaves for restoration to health" (as defined in paragraph 2 above) permissible under applicable regulations, applications shall be granted in the school or organizational unit in order of the city-wide seniority of the applicants.  For this purpose, in the case of applications for sabbatical leave, seniority shall be determined by the number of years of service usable for eligibility for sabbatical leave, minus the years required for each sabbatical leave or "special sabbatical leave for restoration to health" (as defined in paragraph 2 above) already taken.

8.  In accordance with the LOBA determination and award in Case No. IA-1-85, the sabbatical cap shall be 5%.

Notwithstanding the 5% sabbatical cap, the taking of a sabbatical shall not cause a hardship in any department or subject area.[8]

9.  In accordance with the LOBA determination and award in Case No. IA-1-85, sabbaticals shall be conditional upon the employee remaining in the New York City School system for two (2) years after the employee's return.  Sabbaticals of six months or less shall be conditional upon the employee remaining in the New York City school system for one (1) year after the employee's return.

Failure to comply with the applicable return provision shall make the employee liable to the New York City Board of Education for the salary that the employee received during the sabbatical period.  If upon return from sabbatical, the services of the employee are terminated during the applicable return period, the requirement for any refund shall be eliminated.  If an employee is unable to return from a sabbatical or is unable to complete the applicable service

---

[8] The Union disputes the applicability of this sentence to any employees covered by this Agreement.

requirement upon return from a sabbatical due to a medical incapacity which has developed since the commencement of the sabbatical, such employee shall receive a hardship exception to this return provision. Such hardships shall be reviewed and approved by the Board's Medical Division on a case-by-case basis.

10. Employees hired on or after July 1, 1985 in titles covered by this contract are ineligible for sabbatical leaves, in accordance with the LOBA determination and award in Case No. IA-1-85. Notwithstanding the preceding sentence, effective for school year 2007-2008 employees hired on or after July 1, 1985 are eligible for sabbatical leaves for restoration to health and "special sabbatical leaves for restoration to health" as set forth above.

## C. TB Sabbaticals

Employees excused from service by the Board of Health of the City of New York because of tuberculosis may be granted up to five terms of sabbatical leave. Approval of the School Medical Director is required. Sabbaticals of this type are granted without reference to other regulations at the rate applicable to special sabbatical leaves for restoration to health.

## D. Leaves of Absence Without Pay

### 1. Purposes for Which Granted

Leaves of absence without pay shall be granted upon application to school secretaries on regular appointment for the following purposes:

a. Study related to the school secretary's license field;

b. Study to meet eligibility requirements for a license other than that held by the school secretary;

c. Acceptance of a school secretary position in a foreign country for one year, with such leave renewable for an additional year. Such school secretary position shall be sponsored or approved by the government of the United States.

The Board will recommend to the Teachers' Retirement Board the granting of retirement credit for the duration of the aforesaid leaves.

Secretaries may be granted a leave of absence without pay of up to two years to adjust personal affairs (such as the winding up of a family business on the death or incapacitation of the family member in charge) in accordance with existing rules and regulations. The Secretary may consult with the Union with respect to the matter. Secretaries who are denied such a leave may refer the matter to the Executive Director of the Division of Human Resources for review and final determination.

"Urgent needs" of the school to which the school secretary is assigned may be asserted by the Board as justifying a temporary denial of any application for leave without pay.

The Board will implement a liberal policy concerning the granting of leaves of absence without pay to UFT bargaining unit members who meet the stated criteria for such leaves. Bargaining unit members who are denied such a leave at the school or district level may appeal to the Chief Executive of the Division of Human Resources, for review and final determination.

### 2. Per Diem Service While on Leave

School secretaries on maternity leave and school secretaries on leave of absence without pay for study and related professional experience shall be permitted to perform per diem school secretarial service.

**E. Military Service Pay**

    **1. Excuse for Selective Service Examination**

School secretaries called for selective service physical examination shall be excused without loss of pay for such purpose.

    **2. Pay During Military Service**

Regular school secretaries who enter the military service shall be on leave of absence with pay during the first 30 days of such service unless the Board is otherwise required to make payment of salary during such military service.

**F. Payment for Jury Duty**

School secretaries who are required to serve on jury duty will receive full salary during the period of such service, subject to their prompt remittance to the Board of an amount equal to the compensation paid to them for such jury duty.

**G. Continuity of Service**

In determining length of service for any purpose of this agreement, continuity of service shall not be deemed to be interrupted by absence determined to be due to illness, accident or injury suffered in line of duty or by time spent in military service, the Peace Corps or VISTA, or by layoff or leave without pay.

**H. Discipline for Authorized Absences**

No employee shall be disciplined, adversely rated or have any derogatory material placed in his/her file for taking an approved sabbatical for restoration of health, approved unpaid leave for restoration of health or a central DOE approved paid leave. Discipline for time and attendance is not a reflection of the employee's performance while at work.

**I. Return from Leave of Absence**

 (a) Commencing with the beginning of the 2014-15 school year, employees on leaves of absence, for one school year or semester, through the end of the school year, must notify the DOE's Chief Executive Officer of the Division of Human Resources or his/her designee in a manner prescribed by the DOE on or before May 15th of their intent to either return to service or apply to extend their leave of absence for the following school year. Failure to comply with this deadline shall be deemed as a voluntary resignation from the DOE, except in cases where it can be demonstrated that special circumstances prevented the employee from notifying the DOE.

(b) Notwithstanding this notification given to the Board (DOE), prior to the commencement of the school year an employee may return to service or apply to extend his/her leave if he/she can demonstrate relevant circumstances materially changed after May 15th provided that the employee acts expeditiously following the change in circumstances.  An application to extend a leave made under these circumstances shall be granted under the same circumstances as one made on or before May 15th.

(c) An employee on leave for a restoration of health shall be required to notify the DOE's Chief Executive Officer of the Division of Human Resources or his/her designee, in a manner prescribed by the DOE on or before May 15th, of his/her medical status and any plans, if known, as to whether he or she intends to return to work the following school year. Failure to notify the DOE in writing by May 15th shall be deemed as a voluntary resignation from the DOE, except in cases where it can be demonstrated that special circumstances prevented the employee from notifying the DOE.

(d) Whether special circumstances prevented an employee from notifying the DOE on or before May 15th, relevant circumstances materially changed after May 15th, or an employee acted expeditiously shall be subject to the grievance procedure, including binding arbitration.

# ARTICLE TWELVE
# EXCESSING AND LAYOFF

## A. Excessing Rules - Appointed Secretaries

Before applying the Rules for involuntary excessing, the senior school secretary within license who volunteers will be excessed from the school to a vacancy within the same district or in the case of high schools, within the jurisdiction of the responsible high school superintendent. If no senior school secretary volunteers the following excessing rules shall apply to school secretaries in all school levels.

**Rule 1.** Within the school, district, or other organizational unit, the school secretary with the least seniority within license will be the first to be excessed, and probationers will be excessed before those who have completed probation.

For purposes of excessing only: (i). Any one or more F Status positions within a license that equals 1.0 FTE (i.e. positions equaling 5 days a week) will be considered a single position (if in one school) or a single position on split assignment (if in different schools within a district). (ii) Prior to an employee being excessed out of a district s/he will be offered the position described in the preceding sentence. (iii) Notwithstanding the restrictions in this paragraph, a school will be allowed to create or maintain the F status positions described in (i) in order to accommodate a hardship for a previously appointed pedagogue or because of the particular needs of the program.

**Rule 2.** In determining seniority of a school secretary for excessing, layoff seniority shall apply.

**Rule 3.** School secretaries in excess in a school unit or district office under the jurisdiction of a community district must be placed in vacancies within the district to the fullest degree possible. For school units, districts, or other organizational units under the jurisdiction of the central Board, school secretaries in excess must be placed in appropriate vacancies within the district or central office.

**Rule 4.** To minimize movement of personnel, excessed school secretaries shall be placed within the district/superintendency in appropriate openings or vacancies.

**Rule 5**. The central Board has the responsibility for placing school secretaries who are excessed from a school or office and cannot be accommodated by their own district/superintendency. Where possible, the wishes of the school secretary will be taken into account in his /her placement by the central Board. Should a city-wide excess condition, as defined in Section 2588 3 (a) of the Education Law, occur Section C of this Article shall apply.

**Rule 6.** When a school secretary position in central headquarters is abolished, the occupant of that position is excessed, and he or she shall be granted the same rights for placement as a secretary who is excessed from a community district, or from a school under central office jurisdiction.

**Rule 7.** A school secretary who has been excessed to another school may request an opportunity to return to the school from which he or she was excessed if within a year a vacancy

should occur in that school. Such a request will have priority over any other transfer or appointment to that vacancy.[9]

**A. ATR Program**

For purposes of this Rule 7(A), ATRs shall be defined as all UFT-represented school based titles in excess after the first day of school, except paraprofessionals and occupational and physical therapists.

**1. Interviews**

During the period September 15, 2014 through October 15, 2014 (and during the same period in each subsequent year to the extent this ATR Program is continued as set forth below), the Board ("DOE") will arrange, to the greatest extent reasonably possible, for interviews between ATRs and schools with applicable license-area vacancies within the district or borough to which the ATR is assigned. After October 15th, ATRs may continue, at the DOE's discretion, to be sent to interviews within the district or borough for applicable license-area vacancies. An ATR that declines or fails to report to an interview, upon written notice of it, two or more times without good cause shall be treated as having voluntarily resigned his/her employment.

When an ATR is selected by a principal for a permanent placement in either the district or borough, the ATR shall be assigned to fill the vacancy in his/her license area, be placed on the school's table of organization and take his/her rightful place in seniority order. Schools may continue to hire ATRs on a provisional basis consistent with existing agreements between the parties. An ATR that fails to accept and appear for an assignment within two (2) work days of receiving written notice of the assignment without good cause shall be treated as having voluntarily resigned his/her employment.

Any school that selects an ATR for a permanent placement will not have that ATR's salary included for the purpose of average teacher salary calculation.

ATRs in Districts 75 and 79 shall be sent for interviews only in the same borough, within their respective district, as the school to which they were previously assigned.

ATRs in BASIS shall be sent for interviews only in the same borough as the school to which they were previously assigned.

**2. Assignments of ATRs**

After October 15, 2014, ATRs, except those who have been penalized (as a result of a finding of guilt or by stipulation) in conjunction with §3020-a charges with a suspension of thirty (30) days or more or a fine of $2,000 or more, will be given a temporary provisional assignment to a school with a vacancy in their license area where available. The DOE, at its sole discretion, may choose to assign ATRs to a temporary provisional assignment who have been penalized (as a result of a finding of guilt or by stipulation) in conjunction with §3020-a charges with a suspension of thirty (30) days or more or a fine of $2,000 or more.

The DOE shall not be required to send more than one (1) ATR at a time to a school per vacancy for a temporary provisional assignment. These assignments will first be made within district and then within borough. For purposes of the ATR Program, ATRs shall also be given temporary provisional assignments to cover leaves and long term absences within their license area within district and then within borough. ATRs in Districts 75 and 79 shall be given

[9] The right of return to a vacancy in New Programs of District 79 secretaries excessed from Closing Programs is set forth in Appendix F, paragraph 10.

temporary provisional assignments only in the same borough, within their respective district, as the school to which they were previously assigned.

All temporary provisional assignments for an ATR in BASIS will be within the same borough as the school to which they were previously assigned.

It is understood that at any time after a temporary provisional assignment is made, a principal can remove the ATR from this assignment and the ATR will be returned to the ATR pool and be subject to the terms and conditions of employment then applicable to ATRs pursuant to this Agreement.

If a principal removes an ATR from an assignment to a vacancy in his/her license area because of problematic behavior as described below and the ATR is provided with a signed writing by a supervisor describing the problematic behavior, this writing can be introduced at an expedited §3020-a hearing for ATRs who have completed their probationary periods, as set forth below.

If, within a school year or consecutively across school years, two (2) different principals remove an ATR who is on a temporary provisional assignment to a vacancy in his/her license area for problematic behavior and provide the ATR with a signed writing describing the problematic behavior, the ATR shall be subject to discipline up to and including discharge as provided below. The ATR will be returned to the ATR pool pending completion of the expedited ATR §3020-a procedure set forth below.

An ATR who has been placed back in the ATR pool will be in the rotation to schools (as defined in Rule 7(B)(6)(a)) unless he/she is again offered a temporary provisional assignment at another school. Rotational assignments or assignments to a school (as opposed to a vacancy in his/her license area) shall not form the basis of an incident of problematic behavior as described herein.

To the extent that the provisions of this Rule 7(A)(2) conflict with the provisions of Rule 7(B) the provisions of this Rule 7(A)(2) shall govern.

### 3. ATR §3020-a Procedure

If, within a school year or consecutively across school years, an ATR has been removed from a temporary provisional assignment to a vacancy in his/her license area by two (2) different principals because of asserted problematic behavior, a neutral arbitrator from a panel of arbitrators jointly selected for this purpose (the panel presently consisting of Martin F. Scheinman, Howard Edelman and Mark Grossman) shall convene a §3020-a hearing as soon as possible.

Based on the written documentation described above and such other documentary and/or witness evidence as the employer or the respondent may submit, the hearing officer shall determine whether the ATR has demonstrated a pattern of problematic behavior. For purposes of this program, problematic behavior means behavior that is inconsistent with the expectations established for professionals working in schools and a pattern of problematic behavior means two (2) or more instances in a vacancy in the ATR's license area of problematic behavior within a school year or consecutively across school years. Hearings under this provision shall not exceed one full day absent a showing of good cause and the hearing officer shall issue a written decision within fifteen (15) days of the hearing date.

The parties agree that in order to accomplish the purpose of establishing an expedited §3020-a process, the following shall serve as the exclusive process for §3020-a hearings for ATRs that

have been charged based on a pattern of problematic behavior in accordance with this Agreement.

- The ATR shall have ten (10) school days to request a hearing upon receipt of the §3020-a charges;
- At the same time as the ATR is charged, the Board (DOE) will notify the UFT as to where the ATR is assigned at the time charges are served;
- The DOE shall provide the Respondent all evidence to be used in the hearing no more than five (5) school days after the DOE receives the Respondent's request for a hearing;
- Within five (5) school days of receipt of the DOE's evidence, the Respondent shall provide the DOE with any evidence the Respondent knows at that time will be used in the hearing;
- The hearing shall be scheduled within five to ten (5-10) school days after the exchange of evidence is complete;
- The hearing time shall be allocated evenly between the parties, with time used for opening statements, closing statements and cross-examination allocated to party doing the opening statement, closing statement or cross-examination and with time for breaks allocated to the party requesting the break;
- The hearing officer shall issue a decision within fifteen (15) days of the hearing date.

For the purposes of charges based upon a pattern of problematic behavior under this section only, if the DOE proves by a preponderance of the evidence that the ATR has demonstrated a pattern of problematic behavior the hearing officer shall impose a penalty under the just cause standard up to and including discharge.

All hearing officer fees in excess of the SED rate shall be shared equally by the parties.

It is understood that allegations of conduct which would fall within the definition of sexual misconduct or serious misconduct as defined in the applicable collective bargaining agreements shall be addressed through the existing process in Article 15(H) of this Agreement.

**4.  Term**

This Rule 7(A) with respect to the absent teacher reserve (referred to above as the "ATR Program") shall run through the end of the 2015-16 school year.  At the end of that term, the parties must agree to extend the ATR Program and absent agreement, the parties shall return to the terms and conditions for ATR assignment as set forth in Rule 7(B).

The parties agree and understand that the due process protections provided in this provision shall modify the provisions of Education Law §3020-a and any other agreements between the parties.

**B. Excessed Employees/ATRs**

**1.  General Provisions**

a.  Except as expressly provided herein, this Rule 7(B) shall not in any way constitute a modification of, limitation on or a waiver of any other provision of this Agreement or past practice.

b.  For purposes of this Rule 7(B) the term "Excessed Employee" shall refer to all UFT-represented employees that have been excessed, including Excessed Employees that have been

sent to a school to be considered for placement and not selected (an "ATR"). For employees that do not have licenses, the term "license" as used herein shall mean the appropriate title.

**2. Consideration for Placement of Excessed Employees**

a. An Excessed Employee/ATR, upon notification of being excessed, shall be required to register on the Open Market System for purposes of providing updated contact information. Failure to so register shall eliminate the DOE's obligation as to that Excessed Employee/ATR under this Rule 7(B).

b. Employees excessed after the execution of this Agreement shall be sent to schools for consideration for placement as follows:

(1) When one or more vacancies occur, the DOE shall send the most senior Excessed Employee in the district/superintendency with the appropriate license to the school(s) for consideration for placement, except that the DOE shall not be required to send Excessed Employees who have already been sent to a school for consideration for placement pursuant to this paragraph.

(2) An Excessed Employee sent to a school for consideration for placement shall meet with a Principal or Assistant Principal. For non-school based employees, the term "Principal or Assistant Principal" shall refer to the equivalent supervisory title.

(3) If the Principal denies the placement, and the vacancy remains, the DOE shall send a second Excessed Employee in the district/superintendency with the appropriate license to be considered for placement. Such Excessed Employee shall be the most senior in the district/superintendency who has not previously been sent for consideration for placement. No school shall be required to consider for placement more than two (2) excessed employees in a term. For purposes of this Agreement, a "term" shall be from September to January 31 or February 1 through of the end of the school year.

(4) If the DOE notifies an Excessed Employee of the school he or she is being sent to for consideration for placement before the school year begins, he/she may choose to meet with the supervisor before the school year begins if a mutually agreeable time can be arranged. The DOE shall inform Excessed Employees that are notified subsequent to the start of the school year as soon thereafter as reasonably possible of the school to which he/she is being sent for consideration for placement.

(5) Notwithstanding the above, an Excessed Employee who has not been sent for consideration for placement shall be sent for consideration for placement prior to an Excessed Employee with the same license who has been excessed in a subsequent term, even if the subsequently excessed employee has more seniority.

(6) No release by an Excessed Employee's current Principal/Supervisor shall be required if a Principal/Supervisor accepts the Excessed Employee for placement.

(7) The Principal or Assistant Principal shall meet with the Excessed Employee/ATR for consideration for placement during the regular work day. No supervisor shall prevent the Excessed Employee/ATR from attending such meetings. If Excessed Employees/ATRs fail to appear at a school for consideration for placement when properly notified, the DOE shall have fulfilled its obligation to the Excessed Employee/ATR under this section, except if the Excessed Employee/ATR has a reasonable excuse. If reasonably possible, the Excessed Employee/ATR shall notify the Principal of his/her inability to attend.

(c) All employees currently in excess status shall be sent, in seniority order, to schools in their district/superintendency for consideration for placement in vacancies in their license area

prior to any employee excessed after the date of this Agreement. Employees who are sent to a school for consideration for placement pursuant to this Rule 7(B)(2)(c) shall count for purposes of the provision in Rule 7(B)(2)(b)(3) limiting the number of Excessed Employees that a school must consider for placement to two (2) per term.

**3. Leaves and Long Term Absences**

a. The Principal shall select an appropriately licensed Excessed Employee/ATR in the district/superintendency, if any such employee exists, to fill all leaves and long-term absences. The Principal retains the right to remove an Excessed Employee/ATR from the filling of such leaves or long-term absences at any time and replace him or her with another appropriately licensed Excessed Employee/ATR. In the event that only one (1) Excessed Employee/ATR in a license area in a district/superintendency is available, the Joint Oversight Committee created in Rule 7(B)(7) shall address the issue.

b. As used in this Rule 7(B)(3), the definition of "long term absences" shall be absences of longer than twenty-nine (29) work days.

**4. Vacancies**

a. After September 15th an appropriately licensed Excessed Employee/ATR in the district/superintendency shall be temporarily utilized in a vacancy until the Principal makes a final determination whether to keep the employee in the position. An Excessed Employee/ATR that is filling a leave or long term absence may decline to be moved to or utilized in a vacancy. If the school has not yet considered two Excessed Employees/ATRs pursuant to Rule 7(B)(2)(b)(3), it shall do so as soon as possible so long as the vacancy exists.

b. If a Principal decides not to continue to utilize an Excessed Employee/ATR in the assignment, another Excessed Employee/ATR shall be utilized pursuant to the terms of this Section 4, if such an employee exists, beginning no later than the first work day of the following work week, except where three Excessed Employees/ATRs have been utilized or declined to be utilized in that vacancy. From the day the Principal decides not to continue to utilize a particular Excessed Employee/ATR until the first workday of the following week, the Principal may utilize a substitute.

c. At the end of the school year in which the temporary utilization occurs, if both the Principal and the Excessed Employee/ATR agree in writing, the employee shall be appointed to fill the vacancy in the school and take his/her rightful place in seniority order. If the employee or Principal do not wish the assignment to continue, the employee shall remain an ATR in their district/superintendency in a different school.

d. An employee that is temporarily utilized in a school shall maintain all of his/her contractual rights.

e. The prohibition against moving an Excessed Employee/ATR during a week pursuant to Rule 7(B)(5)(b) below shall not apply to an Excessed Employee/ATR who agrees to be moved to a vacancy pursuant to this Rule 7(B)(4).

**5. Assignment of Excessed Employees**

a. To the maximum extent possible, as provided herein, an Excessed Employee/ATR shall be used to cover for a UFT-represented employee in his/her title who is absent, prior to the employment of a substitute or paying another employee in the school to cover a class or classes (or other appropriate assignments). If the Principal determines for a legitimate educational reason that it is unacceptable to allow the excessed employee/ATR to continue to cover a particular position, the principal may employ a substitute for the remainder of the work week.

The Principal shall not be permitted to hire a substitute beginning with the first work day of the following work week for the same absence, unless no Excessed Employee/ATR is available.

b. An Excessed Employee/ATR shall be assigned to a school within his/her district/superintendency for no less than a week, but may be assigned to a different school within his/her district/superintendency each week. A "week" shall be Monday through Friday, or shorter if the work week is less than five (5) days.

c. An Excessed Employee/ATR shall be notified no later than Friday (or the last work-day of the week) if he/she will be assigned to a different school the following week and, if so, to which school. An ATR who has not been notified that he/she has been assigned to a different school by Friday shall report on Monday, or the first work day of the work week, and for the duration of that week, to the last school to which he/she was assigned.

### 6. Other Applicable Provisions

a. For purposes of this Rule 7(B), the terms "rotated" or "rotation" shall refer to the assignment of certain Excessed Employees/ATRs to a different school within his/her district/superintendency on a revolving basis.

b. The parties agree that for purposes of Rule 7(B)(3), starting with the commencement of the rotation, the DOE will assign ATRs/Excessed Employees to schools on a temporary basis to fill positions caused by leaves or long term absences as defined above that are not covered internally by a school through contractually permissible methods and where a substitute teacher would otherwise be utilized to cover for the absence or leave. The ATRs/Excessed Employees covering leaves and long term absences will not be rotated until the completion of the assignment unless the principal requests the removal of the ATR/Excessed Employee prior to its completion.

c. The parties agree that for purposes of Rule 7(B)(4), the date the DOE shall begin temporarily utilizing appropriately licensed ATR/Excessed Employee will be the date of the start of the rotation of ATRs/Excessed Employees as determined by the DOE in a given school year.

d. It is expressly understood that the obligation in this Rule 7(B) to send Excessed Employees/ATRs for consideration for placement or to cover vacancies, leaves or long term absences in their license area shall not apply to those Excessed Employees/ATRs who are not in the weekly rotation (*e.g.,* those temporarily utilized to cover a vacancy, leave or long term absence/assignment) to cover other vacancies, leaves or long term absences/assignments.

e. The parties agree that ATRs/Excessed Employees in the Brooklyn and Staten Island High School District (BASIS) who are rotated, shall be rotated within seniority district but not outside the borough in which the school they were originally excessed from is located.

It is expressly understood that the obligation in this Rule 7(B) to send Excessed Employees/ATRs for consideration for placement or to cover vacancies, leaves or long term absences in their license area shall only apply to BASIS ATRs within the borough in which the school they were originally excessed from is located.

### 7. Joint Committee

There shall be a Joint Oversight Committee comprised in equal parts of representatives appointed by the President of the UFT and the Chancellor of the City School District, respectively. The Joint Oversight Committee shall meet regularly, but no less than twice each term, as defined herein. The Joint Oversight Committee shall monitor the implementation of this agreement to maximize cost savings and ensure proper implementation. The DOE shall promptly provide the Joint Oversight Committee with all appropriate data and information, so long as it is requested in a reasonable amount of time.

The parties agree that starting in October of the school year, the Joint Oversight Committee (the "Oversight Committee") will meet monthly, and at each meeting the DOE will provide reports on the number of ATRs/Excessed Employees by license and district, the number of ATRs/Excessed Employees in long term assignments and the number of leaves commenced at the start of each month. The parties also agree to discuss any and all particular issues concerning the implementation of this or Rule 7(B) at these Oversight Committee meetings.

It is the intent of the parties to resolve issues relating to compliance with this agreement through the operation of the Oversight Committee. The UFT agrees that issues will be raised at the Oversight Committee prior to the commencement of any union initiated grievance or arbitration. The DOE agrees that should the committee agree about an issue of non compliance, the Division of Human Resources and Talent will reach out to DOE Staff and/or the school to ensure compliance. If a particular issue at a particular school warrants further intervention, the Deputy Chancellor for the Division of Talent, Labor and Innovation will intervene with appropriate DOE staff to ensure compliance with this agreement. At any time after an issue has been brought to the Oversight Committee, upon five (5) days written notice to the DOE, the UFT may proceed with a union initiated grievance. The DOE will issue a memorandum to schools outlining all the changes above and share a draft of the memo with the UFT for consultation purposes before issuing. This memo will be issued prior to the start of 2012-2013 school year.

**8. Provisional Agreement**

a. The parties agree that after the end of the open market hiring period, if both the school's principal and the Excessed Employee/ATR agree in writing, the Excessed Employee/ATR will be staffed to a school on a provisional basis for the school year or remainder of the school year. An agreement to be staffed provisionally for either all or the remainder of the school year shall be in writing and signed by both the schools' principal and the Excessed Employee/ATR.

b. An Excessed Employee/ATR that has been provisionally staffed for the year or remainder of the year by a school shall be treated in all respects as an employee on the school's table of organization for that year or remainder of the school year.

c. An employee that has been provisionally staffed by a school shall become an Excessed Employee/ATR again at the end of that school year unless both the employee and school principal agree in writing that he/she be hired and placed on the schools' table of organization in their rightful spot in seniority order.

d. Nothing in this Agreement is intended to alter or change the right of a principal to temporarily utilize an Excessed Employee/ATR in a vacancy and, if both the Principal and the Excessed Employee/ATR agree in writing at the end of the school year, to staff the employee to fill the vacancy in the school pursuant to this Rule 7(B).

**C. Resolved Grievances**

a. The UFT shall withdraw the UI ATR Grievance (UFT Case#C16257, OLR #11-27224, AAA # 13 390 02 368 10)

b. This agreement resolves the issues that formed the basis of the arbitration requests UFT Case #C18754, AAA Case No. 13 390 00878 12 (ATR June 27, 2011 MOA) and this grievance and subsequent request for arbitration are withdrawn with prejudice.

**Rule 8.** School secretaries who have served 20 years or longer on regular appointment shall not be excessed, except for those in neighboring schools who are excessed to staff a newly organized school.

**Rule 9.**  A school secretary shall not be excessed to a split assignment if a five-day position is available.

**Rule 10.**  Unless a principal denies the placement, an excessed secretary will be placed by the Board into a vacancy within his/her district/superintendency.  The Board will place the excessed secretary who is not so placed in an ASR position in the school from which he/she is excessed, or in another school in the same district or superintendency.[10]

**Rule 11.**  Secretaries identified as being at risk of being excessed at the commencement of the following school year will be informed of this no later than June 15, or as soon as is practicable if identified as being at risk of excess after June 15.  The deadlines for excessing secretaries will continue to be governed by applicable law.

**B.  Appointment to New Program, License or Title**

School secretaries who are displaced by the establishment of a new program, license or title shall be given an opportunity to present their qualifications and if found qualified shall be given preference for appointment to such new program, license or title.

**C.  Layoff**

1.  If a city-wide excess condition causes a layoff of staff in any licensed position, applicable provisions of law will be followed to determine the staff member to be laid off, without fault and delinquency with the understanding that said member of staff is to be placed on a preferred list for reinstatement to his or her former position.

2.  Employees on layoff who may be placed on a preferred list in another license other than the one in which they are laid off will be so placed.

**D.  Tipping**

Education funds in the Mayor's Safe City/Safe Streets Program will be utilized to eliminate tipping by establishing a dispute resolution program staffed by teachers.

**E. Voluntary Severance for Personnel Who Have Been Excessed**

1.  The Board ("DOE") may offer excessed personnel who have not secured a regular assignment after at least one year of being excessed, a voluntary severance program in an amount to be negotiated by the parties. If the parties are unable to reach agreement on the amount of the severance payment, the dispute will be submitted to arbitration pursuant to the contractual grievance and arbitration procedure. Such a severance program, if offered, will be offered to all personnel who have been in excess for more than one year.

In exchange for receipt of such severance, an excessed person shall submit an irrevocable resignation or notice of retirement.

2.  ATR Voluntary Severance Program

The DOE shall offer a voluntary severance benefit (the "Severance Program") to ATRs who volunteer to resign/retire and who execute an appropriate release in a form prescribed by the Board (DOE) and subject to legal requirements.

The period during which ATRs may volunteer to separate from the DOE in accordance with the terms of the Severance Program shall commence on the 30th day and shall terminate at 5:00 p.m. on the 60th day following the Union's ratification of this Agreement.

Other than employees who have agreed in writing to resign from the DOE, employees who are ATRs as of June 1, 2014 who volunteer for the Severance Program shall receive a severance payment according to the following schedule:

---

[10] Placement rights of secretaries excessed from District 79 Closing Programs are set forth in Appendix F, paragraphs 3, 4 and 5.

One (1) week of pay for ATRs with three (3) years of service or more, but less than four (4) years of service, as of the date of ratification of this Agreement.

Two (2) weeks of pay for ATRs with four (4) years of service or more, but less than six (6) years of service, as of the date of ratification of this Agreement.

Three (3) weeks of pay for ATRs with six (6) years of service or more, but less than eight (8) years of service, as of the date of ratification of this Agreement.

Four (4) weeks of pay for ATRs with eight (8) years of service or more, but less than ten (10) years of service, as of the date of ratification of this Agreement.

Five (5) weeks of pay for ATRs with ten (10) years of service or more, but less than twelve (12) years of service, as of the date of ratification of this Agreement.

Six (6) weeks of pay for ATRs with twelve (12) years of service or more, but less than fourteen (14) years of service, as of the date of ratification of this Agreement.

Seven (7) weeks of pay for ATRs with fourteen (14) years of service or more, but less than sixteen (16) years of service, as of the date of ratification of this Agreement.

Eight (8) weeks of pay for ATRs with sixteen (16) years of service or more, but less than eighteen (18) years of service, as of the date of ratification of this Agreement.

Nine (9) weeks of pay for ATRs with eighteen (18) years of service or more, but less than twenty (20) years of service, as of the date of ratification of this Agreement.

Ten (10) weeks of pay for ATRs with twenty (20) years of service or more, as of the date of ratification of this Agreement.

For purposes of this Severance Program, one (1) week of pay shall be defined as $1/52^{nd}$ of an ATR's annual salary.

In the event that any ATR who volunteers to participate in the Severance Program returns to service with the DOE, the ATR shall repay the severance payment received pursuant to the above within six (6) months of the ATR's hiring to such position, through payroll deductions in equal amounts.

## ARTICLE THIRTEEN
## TRANSFERS AND STAFFING

### A. General Transfers

Principals will advertise all vacancies. Interviews will be conducted by school-based human resources committees (made up of pedagogues and administration) with the final decision to be made by the principal. Vacancies are defined as positions to which no secretary has been appointed, except where a non-appointed secretary is filling in for an appointed secretary on leave. Vacancies will be posted as early as April 15 of each year and will continue being posted throughout the spring and summer. Candidates (secretaries wishing to transfer and excessed secretaries) will apply to specifically posted vacancies and will be considered, for example, through job fairs and/or individual application to the school. Candidates may also apply to schools that have not advertised vacancies in their license areas so that their applications are on file at the school should a vacancy arise.

Selections for candidates may be made at any time; however, transfers after August 7th require the release of the secretary's current principal. Secretaries who have repeatedly been unsuccessful in obtaining transfers or obtaining regular secretarial positions after being excessed, will, upon request, receive individualized assistance from the Division of Human Resources

and/or the Peer Intervention Program on how to maximize their chances of success in being selected for a transfer

**B. Hardship Transfers**

Transfers on grounds of hardship shall be allowed independent of general transfers.

Transfers of school secretaries after three years of service on regular appointment may be made on grounds of hardship on the basis of the circumstances of each particular case, except that travel time by public transportation of more than one hour and thirty minutes each way between a school secretary's home (or city line in the case of a school secretary residing outside the city) and school shall be deemed to constitute "hardship" entitling the applicant to a transfer to a school to be designated by the Division of Human Resources which shall be within one hour and 30 minutes travel time by public transportation from the school secretary's home, or city line in the case of school secretaries residing outside the city.

Administrative procedures for the effectuation of these provisions are to be formulated by the Board in consultation with the Chapter.

**C. Staffing New or Redesigned Schools**[11]

The following applies to staffing of New or Redesigned Schools ("Schools")

1. A Personnel Committee shall be established, consisting of two Union representatives designated by the UFT President, two representatives designated by the community superintendent for community school district schools or by the Chancellor for schools/programs under his/her jurisdiction, a Principal/or Project Director, and where appropriate a School Planning Committee Representative and a parent.

2. For its first year of operation the School's staff shall be selected by the Personnel Committee which should, to the extent possible, make its decisions in a consensual manner.

In the first year of staffing a new school, the UFT Personnel Committee members shall be school-based staff designated from a school other than the impacted school or another school currently in the process of being phased out. The Union will make its best effort to designate representatives from comparable schools who share the instructional vision and mission of the new school, and who will seek to ensure that first year hiring supports the vision and mission identified in the approved new school application.

In the second and subsequent years, the Union shall designate representatives from the new school to serve on its Personnel Committee.

3. If another school(s) is/are impacted (i.e., closed or phased out), staff from the impacted school(s) will be guaranteed the right to apply and be considered for positions in the School. If sufficient numbers of displaced staff apply, at least fifty percent of the School's pedagogical positions shall be selected from among the appropriately licensed most senior applicants from the impacted school(s), who meet the School's qualifications. The Board will continue to hire pursuant to this provision of the Agreement until the impacted school is closed.

4. Any remaining vacancies will be filled by the Personnel Committee from among transferees, excessees, and/or new hires. In performing its responsibilities, the Personnel Committee shall adhere to all relevant legal and contractual requirements including the hiring of personnel holding the appropriate credentials.

---

[11] The rights of secretaries to staff the New Programs in District 79 are set forth in Appendix F, paragraph 2.

5. In the event the Union is unable to secure the participation of members on the Personnel Committee, the Union will consult with the Board to explore other alternatives. However the Union retains the sole right to designate the two UFT representatives on the Personnel Committee.

## ARTICLE FOURTEEN
## UNION ACTIVITIES, PRIVILEGES
## AND RESPONSIBILITIES

**A. Restriction on Union Activities**

No school secretary shall engage in Union activities during the time he/she is assigned to his/her regular duties, except that members of the Chapter's negotiating committee and its special consultants shall, upon proper application, be excused without loss of pay.

**B. Time for Chapter Leader**

The Chapter Leader shall be allowed two days per week for investigation of grievances and for other appropriate activities relating to the administration of the agreement and to the duties of the office.

**C. Exclusive Check-Off**

The Board will honor, in accordance with their terms, only such written authorizations as are properly executed by employees in the unit covered by this agreement for the deduction of their dues in behalf of the Union.

The Board will honor individual written authorizations for the deduction of Union dues in accordance with their terms, including authorizations stating that they are irrevocable until the following June 30 and automatically renewable for another year unless written notice is given to the Board between June 15 and June 30.

**D. Agency Fee Deduction**

The Board shall deduct from the wage or salary of employees in the bargaining unit who are not members of the UFT the amount equivalent to the dues levied by the UFT and shall transmit the sum so deducted to the UFT, in accordance with Section 208(3)(b) of Article 14 of CSL. The UFT affirms it has adopted such procedure for refund of agency shop deduction as required in Section 208(3)(b) of Article 14 of CSL. This provision for agency fee deduction shall continue in effect so long as the UFT establishes and maintains such procedure.

The Union shall refund to the employees any agency shop fees wrongfully deducted and transmitted to the Union.

The Union agrees to hold the Board harmless against claims arising out of the deduction and transmittal of agency shop fees where there is a final adjudication by a court or arbitrator or by PERB that said agency shop fees should not have been deducted and/or transmitted to the Union.

The agency shop fee deductions shall be made following the same procedures as applicable for dues check-off, except as otherwise mandated by law or this Article of the Agreement.

**E. Information to the Union**

Lists of vacancies and any lists which may be established by the central board or community school districts showing seniority of school secretaries for purposes of implementing provisions of this Agreement shall be made available to the Union. In individual cases, specific information as to seniority will be made available to the Union upon request.

### F.  Consultation Meetings

The Chapter and appropriate representatives of the Chancellor shall meet once a month during the school year to consult on matters of policy involving the professional interests of school secretaries.

### G.  Consultation on Changes

The Board will consult with the Union on major changes and procedures including the revision of forms that may affect school secretaries' work.

### H.  Political Check-Off

The Board will arrange for voluntary payroll deduction contributions for federal political contests in accordance with Title 2, Section 441b of the U.S. Code.

## ARTICLE FIFTEEN
## MATTERS NOT COVERED

With respect to matters not covered by this Agreement which are proper subjects for collective bargaining, the Board agrees that it will make no changes without appropriate prior consultation and negotiation with the Chapter.

The Board will continue its present policy with respect to sick leave, sabbatical leaves, vacations and holidays except insofar as change is commanded by law.

All existing determinations, authorizations, by-laws, regulations, rules, rulings, resolutions, certifications, orders, directives, and other actions, made, issued or entered into by the Board of Education governing or affecting salary and working conditions of the school secretaries in the bargaining unit shall continue in force during the term of this agreement, except insofar as change is commanded by law.

## ARTICLE SIXTEEN
## DUE PROCESS AND REVIEW PROCEDURES

### A.  School Secretary Files

Official school secretary files in a school shall be maintained under the following circumstances:

1.  No material derogatory to a school secretary's conduct, service, character or personality shall be placed in the files unless the school secretary has had an opportunity to read the material. The school secretary shall acknowledge that he/she has read such material by affixing his signature on the actual copy to be filed, with the understanding that such signature merely signifies that he/she has read the material to be filed and does not necessarily indicate agreement with its content.  However, an incident which has not been reduced to writing within three months of its occurrence, exclusive of the summer vacation period, may not later be added to the file.

2.  The school secretary shall have the right to answer any material filed and his/her answer shall be attached to the file copy.

3.  Upon appropriate request by the school secretary, he/she shall be permitted to examine his files.

4.  The school secretary shall be permitted to reproduce any material in his/her files.

5. Members may not grieve material in the file, except that if accusations of corporal punishment or verbal abuse against a UFT-represented employee are found to be unsubstantiated, all references to the allegations will be removed from the employee's personnel file. However, the school secretary shall have the right to append a response to any letter. If disciplinary charges do not follow, the letter and the response shall be removed from the files three years from the date the original material is placed in the file.

## B. Counseling Memos

Supervisors may issue counseling memos. Counseling memos are not disciplinary. Counseling memos provide the opportunity for supervisors, in a non-disciplinary setting, to point out to employees areas of work that the supervisor believes need improvement. Counseling memos should include the supervisor's proposals for how such improvement may be achieved. Any employee who receives a counseling memo may request from the supervisor either suggestions for how to improve or requests for the supervisor to model such improvement for the counselor. Counseling memos are a vehicle for supportive improvement.

1. A counseling memo may only be written to an employee to make him/her aware of a rule, regulation, policy, procedure, practice or expectation. A counseling memo cannot include any disciplinary action or threat of disciplinary action.

a. "Counseling Memo" must appear at the top of the memo in bold print and capital letters.

b. At the conclusion of the memo the following must appear in bold print: "A counseling memo is not disciplinary in any manner and cannot be used in any action against an employee except to prove notice if the employee denies notice." If the language required in (a) and (b) is not included in the memo, it must be added.

c. A counseling memo must be presented to an employee within one (1) month of the latest incident recounted in the memo. The memo may only reference similar prior incidents that occurred no more than four (4) months from the date of the latest incident.

2. Counseling memos may not be used in any action or evaluation involving an employee in the bargaining unit ("U" rating, per session job, etc.) except to establish that the employee who denies knowledge of a rule, regulation, policy, procedure, practice or expectation was given prior notice of it, or to impeach factual testimony.

a. Counseling memos may not be used in the rating of an employee in the bargaining unit.

b. Counseling memos may not be referred to in, or attached to, any other letter sent to an employee for their official school file.

3. Counseling memos may not be grieved. Any employee who receives a counseling memo shall have the right to answer within one (1) month of receipt of the counseling memo and the answer shall be attached to the file copy of the counseling memo.

4. All counseling memos will be permanently removed from employee's official school files three (3) years after the latest incident referred to in the memo.

## C. Summons

1. A school secretary summoned by the principal to a conference which may lead to disciplinary action for reasons of misconduct may be accompanied, at his option, by the chapter leader or his/her designated alternate.

2. School secretaries summoned to the office of a community or assistant superintendent or to the Division of Human Resources shall be given two days notice and a statement of the reason for the summons, except where an emergency is present or where considerations of confidentiality are involved.

Whenever an employee is summoned for an interview for the record which may lead to disciplinary action, s/he shall be entitled to be accompanied by a representative who is employed by the city school system, or by an employee of the Union who is not a lawyer, and s/he shall be informed of this right. However, where the community or assistant superintendent or the Division of Human Resources permits an attorney who is not a member of the city school system to represent any participant in the interview, the employee shall be entitled to be represented by an attorney. An interview which is not held in accordance with these conditions shall not be considered a part of the employee's personnel file or record and neither the fact of the interview nor any statements made at the interview may be used in any subsequent Board proceeding involving the employee. It is understood that informal conferences, such as those between a community or assistant superintendent and a school secretary, or the Division of Human Resources and a school secretary, for professional improvement, may be conducted off the record and shall not be included in the employee's personnel file or record.

3. Incidents investigated by the Chancellor or by a governmental investigatory agency must be reduced to writing by the appropriate supervisor within 6 months and 12 months respectively from the date the incident either occurred or should have been discovered by the appropriate school officials. Employees must receive a complete copy of any such writing and an opportunity to answer in writing and to have such response attached. The writing may not be incorporated into the employee's personnel file or record, unless this procedure is followed, and any such writing will be removed when an employee's claim that it is inaccurate or unfair is sustained.[12]

**D. Notice of Discharge**

Regular substitutes are to be given 10 school days' notice of discharge, except in cases of emergency.

**E. Discontinuance of Probationary Service and Appeals of Unsatisfactory Ratings**

1. Regular substitutes and school secretaries on probation, except as provided in subparagraph 2 below, shall be entitled to the review procedures before the Chancellor as prescribed in Section 4.3.2 of the by-laws of the Board of Education.

By-law 4.3.2 procedures for the review of a recommendation by a superintendent for discontinuance of probationary service shall be modified to provide for the following:

a. The 4.3.2 committee shall be a tripartite committee of professional educators, one selected by the employee, one by the Board and a third selected by the other two from a list agreed upon by the Board and the Union.

b. The committee will make an advisory recommendation to the community school board or the Chancellor for central programs within 20 days after the hearing.

c. The costs of the employee's representative shall be paid by the employee. The costs of the Board's representative shall be paid by the Board. The costs of the mutually selected member of the committee shall be shared by the Board and the employee.

2. Employees on probation who have completed at least three years of service on regular appointment in the school shall be entitled, with respect to the discontinuance of their probationary service, to the same review procedures as are established for the tenured teaching staff under Section 3020-a of the Education Law.

---

[12] The parties disagree as to the applicability of Section 10 of the October 2005 MOA to this Article 16C3.

3.  Secretaries who receive doubtful or unsatisfactory ratings may appeal under Section 5.3.4 of the by-laws of the Board.

**F. Suspension**

Any school secretary who is suspended pending hearing and determination of charges shall receive full compensation pending such determination and imposition of any penalty except as set forth in Article 16H5 and 16H6.

**G. Rating "Not Applicable"**

A rating of "Not Applicable (NA)" is to be used only in situations where a pedagogical employee is reassigned out of his/her regular assignment for disciplinary reasons. The "NA" rating will apply only for the period of reassignment, cannot be used in any proceeding as evidence of wrongdoing and will not otherwise affect any other rights afforded in the Agreement where ratings are an issue.

**H. Education Law §3020-a Procedures**

Tenured pedagogues facing disciplinary charges filed, or in the case of Section 1, "Time and Attendance", discipline pursuant to that Section, will be subject to Section 3020-a of the Education Law as modified by paragraphs 1 to 16 below.

**1. Time and Attendance**

If the Board seeks to discipline a tenured pedagogue regarding absences and/or lateness but seeks a penalty short of termination, the following expedited procedure will apply:

The Board will notify the employee that it intends to bring disciplinary action against the employee pursuant to this section. The Board will include in this notice the employee's attendance record and any other documentation it intends to introduce at the hearing and a statement that pursuant to this section the arbitrator may award any penalty, or take other action, short of termination.

Within 15 calendar days following this notice, the employee must notify the Board in writing of the nature of his/her defense and submit any documentation s/he intends to submit into evidence as well as a medical release for any medical documents related to such defense.

If either party believes that it requires additional documents, it may request a telephonic conference with the arbitrator.

The expedited hearing will occur within one month of the Board's notification to the employee mentioned above. The hearing will be informal and the normal rules of trial procedure and evidence shall not apply. The arbitrator will issue an award and short decision within 15 calendar days of the hearing. The arbitrator's award will be final and binding on all parties. The award may be introduced in another Education Law § 3020-a hearing and any findings shall be binding on the §3020-a arbitrator.

One arbitrator, agreed upon between the parties, will hear all absence and lateness cases hereunder. The parties may expand the number of arbitrators if necessary. The arbitrator will hear 4 cases per hearing date on a staggered schedule, but in no situation will one case take more than ½ a day. The parties may expand the number of cases heard in a day if they deem it practical.

**2. Rotational Panel**

As discussed and agreed upon, all parties would be served better by the implementation of a permanent arbitration panel (the "Panel"). The Panel members (referred to as hearing officers or arbitrators) must be agreeable to both sides, except as set forth herein.

### a.  Subpanels

A sub-panel of arbitrators on the Panel will hear cases based predominantly on charges of incompetence (TPU cases) and a sub-panel of arbitrators on the Panel will hear cases based predominantly on charges of misconduct (ATU cases).  Expedited Cases shall be heard by a panel of hearing officers, the size of which will be set as described below.  A labor-management committee composed, in equal parts, of UFT and DOE representatives shall meet as needed to discuss any issues regarding the §3020-a Panel or process.

### b.  Number of Hearing Officers

(1) The parties agree to seat a minimum of twenty-five (25) hearing officers to hear all §3020-a cases. Should the parties fail to agree on the number of hearing officers by April 30th of preceding given school year and/or the Panel on which they will serve, either the Board ("DOE") or UFT shall submit the matter to the Fact-Finding Panel consisting of Martin F. Scheinman, Howard Edelman, and Mark Grossman for binding arbitration to determine the number of hearing officers and/or the sub-panel on which they will serve that will sit for §3020-a cases the following school year. For the 2014-15 school year the parties have agreed to seat twenty-five (25) hearing officers to hear §3020-a cases.

(2) To select hearing officers, the parties shall, each year, following April 30th, exchange in good faith lists of no fewer than ten (10) hearing officers for consideration every other week.  If the full Panel is not seated by October 15th of that school year, the DOE or UFT may request the Fact-Finding Panel consisting of Martin F. Scheinman, Howard Edelman, and Mark Grossman select the remaining hearing officers, subject to an individual hearing officer's agreement to serve, necessary to complete the Panel of §3020-a hearing officers.

(3) Representatives of the UFT and DOE shall meet at least twice a year to discuss the appropriateness of the number of hearing officers, including the possibility of agreeing to increase or decrease the number of hearing officers on either the incompetence or misconduct sub-panels on either a temporary or permanent basis.

### c.  Term of Panel Members' Service

Panel members shall serve for a maximum of a one-year term.  At the expiration of such term, the parties must agree to have arbitrators continue to serve on the Panel, and if not replacement members will be selected by the method outlined herein.  Removal prior to the end of the one-year term must be for good and sufficient cause upon mutual agreement of the parties.

### d.  Scheduling

Any arbitrator who agrees to serve on the Panel must agree to the following terms:

(1) Each arbitrator selected to serve on the Panel, , including but not limited to those serving on the competence (TPU) sub-panel, must agree to provide five (5) consecutive hearing dates per month for the months of September through June and 2 hearing dates for the months of July and August.  Consecutive days may be construed to mean five (5) dates within two (2) weeks unless otherwise agreed.

(2) Arbitrators must provide three (3) dates, within ten (10) to fifteen (15) calendar days from the date a case was assigned to him or her, for a pre-hearing conference.  One of the dates shall be at 9:00 a.m.  Advocates must accept one (1) of the three (3) dates offered or it will be assumed that the date or dates offered at 9:00 a.m. is (or are) acceptable.  Said dates must be in compliance with Education Law Section 3020-a (within 10 to 15 days from the date selected to serve) and the timeframes in section 13 below.

(3) At the pre-hearing conference, arbitrators must provide and parties must accept five (5) consecutive hearing dates within the statutory timeframe as delineated in Education Law §3020-a and the timeframes in section 13 below. Consecutive days may be construed to mean five (5) dates within two (2) weeks unless mutually agreed.

(4) The parties are committed to having these cases heard in an expeditious manner. For this reason, absent extraordinary circumstances, arbitrators are not to adjourn hearing dates. It should be noted that normally attorney or party scheduling conflicts are not extraordinary circumstances.

(5) In all cases the final hearing shall be completed and a decision issued within the timeframes set forth in Education Law § 3020-a and the timeframes in section 13 below.

(6) There is a presumption that charges against the same employee will be consolidated unless the arbitrator finds that to do so would deny a fair hearing. Additionally, in routine matters, any motions must be made and responded to orally. Thereafter, a decision shall be rendered on the issue the same date the motion was made. Should the arbitrator find that written motion practice is necessary, either party reserves the right to respond orally but, in no case, shall motion practice take place outside the scope of the timelines as outlined in Education Law, §3020-a and the timeframes in section 13 below.

Failure to abide by these rules shall be "good and sufficient" grounds for removal of an arbitrator.

### 3. Expedited Hearings

Prior to the pre-hearing conference, the Board shall determine whether the nature of the case would permit offering Respondent expedited arbitration rather than regular arbitration of the case. If the Respondent accepts the offer of expedited arbitration, the hearing shall proceed in accordance with the expedited procedure set forth below and the Board may not seek a penalty to exceed six (6) months or the equivalent monetary penalty. Should the Respondent reject the offer of expedited arbitration, the case shall proceed in accordance with the regular arbitration proceeding and the board may seek any penalty including termination.

Where the offer of expedited arbitration was rejected, the arbitrator (or the arbitration panel) shall not be informed of the offer of expedited arbitration nor that the offer was rejected.

Cases heard under the expedited arbitration procedure shall be completed in three (3) consecutive days. Each advocate shall be provided equal time to present his or her respective case. Cross-examination usually will not go beyond the scope or duration of the direct examination.

During the course of the hearings, should the evidence reveal more serious misconduct than originally charged, the arbitrator, upon his or her initiative, or upon the Board's motion, is empowered for good cause to end the expedited proceeding and order a new, regular arbitration proceeding before a different arbitrator. At the regular arbitration, the Board may seek any penalty including termination. Upon a showing of unavailability during the regular arbitration, the prior record of a completed witness who testified in the expedited arbitration shall be admissible.

Notwithstanding the above, if the Board ("DOE") decides not to seek a penalty of more than a suspension of four (4) weeks or an equivalent fine, the case shall be heard under the expedited procedures provided in this section 3, without the need for the Respondent to accept an offer of expedited arbitration.

A separate track of "non-termination" cases will be established with a separate panel of additional hearing officers that exclusively hears expedited cases.

The DOE will continue to submit cases through the expedited time and attendance procedures if the DOE deems the particular case appropriate for that procedure.

### 4. Investigations and Reassignments

Nothing in this section 4 shall be construed to convert non-mandatory subjects of bargaining into mandatory subjects of bargaining.

For purposes of this section 4, all timelines shall be measured in calendar days, but shall not include the summer break, all recess periods and holidays.[13]

### a. Misconduct Cases (i.e., any case deemed by the DOE to deal exclusively or primarily with an employee's behavior, not his or her pedagogy)

Pending investigation of possible misconduct and completion of the §3020-a hearing, the Board ("DOE") may reassign an employee only to (i) a DOE administrative office to do work consistent with law (an "Administrative Office Assignment") or (ii) an administrative assignment within his or her school with the duties and responsibilities of his or her title and this Agreement ("Administrative School Assignment"). Where the Chancellor or his/her designee determines that it is in the best interests of the school system that an employee accused of sexual misconduct as defined in Article 21(G)(6) or serious financial misconduct involving more than $1,000 not be allowed to work in an Administrative Office Assignment or an Administrative School Assignment pending the outcome of the investigation, the DOE may suspend the employee with pay rather than reassign him/her. The determination of the Chancellor or his/her designee to suspend an employee with pay shall be in writing. Prior to a suspension from all duties with pay, the Chancellor or his/her designee shall consult with the UFT President or his/her designee.

The DOE shall prefer charges pursuant to Education Law §3020-a within sixty (60) days of an employee being reassigned or suspended, except in cases where the reassignment or suspension was caused by (i) an allegation of sexual misconduct as defined in section 6 below that is being investigated by the Special Commissioner of Investigation for the New York City School District ("SCI"); (ii) an allegation of serious financial misconduct involving more than $1,000 that is being investigated by SCI; (iii) criminal charges pending against the employee; (iv) an allegation of serious assault that is being investigated by SCI; (v) an allegation of tampering with a witness or evidence, where the allegation of tampering is being investigated by SCI. In cases where the sixty (60) day period does not apply, when SCI issues a report or, in the case of criminal charges, the employee notifies the DOE of the disposition of the criminal case pursuant to Chancellor's Regulation C-105, the DOE shall have fifteen (15) days to bring §3020-a charges against the employee or return the employee to his or her prior assignment. Nothing herein shall waive any limitations period for the bringing of charges pursuant to Education Law §3020-a. The Chancellor or his/her designee and the President of the UFT or his designee shall meet monthly, or less frequently if the UFT and DOE agree, to review the status of these cases. If requested by the UFT, the DOE and the UFT will meet to review the issue of investigations and reassignments extending beyond sixty (60) days and, if there has been a significant increase in the number of such investigations and reassignments, to negotiate ways to address this issue.

Except in those cases where the DOE is not required to prefer charges within sixty (60) days, should the DOE not prefer §3020-a charges within sixty (60) days, the employee shall be

---

[13] Probationary employees will be reassigned in the same manner as tenured employees under this section, *i.e.*, to an Administrative Office Assignment, Administrative School Assignment, or suspension with pay (if permitted by this section). This section shall not be construed to create tenure or Education Law § 3020-a rights for an employee.

returned to his/her prior assignment. If an employee is returned to his/her prior assignment, adverse action shall not be taken against the employee solely because of the reassignment. If §3020-a charges are preferred subsequent to the expiration of the sixty (60) day period, the employee may then again be reassigned to an Administrative Office Assignment or an Administrative School Assignment or, where the Chancellor or his/her designee determines that it is in the best interests of the school system that an employee accused of sexual misconduct as defined in Article 21(G)(6) or serious financial misconduct involving more than $1,000 not be allowed to work in an Administrative Office Assignment or an Administrative School Assignment pending the outcome of the investigation, suspend the employee with pay rather than reassign him/her pending determination of the §3020-a charges. The determination of the Chancellor or his/her designee to suspend an employee with pay shall be in writing. Prior to a suspension from all duties with pay, the Chancellor or his/her designee shall consult with the UFT President or his designee. An employee's assignment pending investigation and/or a hearing shall not be raised at the hearing or deemed relevant in any way to the determination of the charges, any penalty issued or the adjudication of any issue in the hearing.

**b. Incompetence Cases (i.e., any case deemed by the DOE to deal exclusively or primarily with an employee's pedagogy)**

Pending the bringing of Education Law §3020-a charges for alleged incompetence and completion of the §3020-a hearing, the DOE may reassign an employee only to an (i) Administrative Office Assignment or (ii) an Administrative School Assignment. The DOE shall prefer charges pursuant to Education Law §3020-a within ten (10) days of an employee being reassigned. Should the DOE not prefer §3020-a charges within ten (10) days, the employee shall be returned to his/her prior assignment. If an employee is returned to his/her prior assignment, adverse action shall not be taken against the employee solely because of the reassignment. If §3020-a charges are preferred subsequent to the expiration of the ten (10) day period, the employee may then again be reassigned to an Administrative Office Assignment or an Administrative School Assignment pending determination of the §3020-a charges.

**c. Tolling**

If the DOE gives a reassigned employee forty-eight (48) hours notice of an interview which may lead to disciplinary action and the reassigned employee either fails to appear on the scheduled day or fails to notify the DOE that s/he is invoking any right he/she may have to not answer questions, the DOE shall reschedule the interview within a reasonable period of time and the time between the originally scheduled interview and the rescheduled interview shall not count towards the applicable 60-day or 10-day limits on the length of time an employee may be reassigned or suspended with pay. Where a principal schedules an interview which may lead to disciplinary action of an employee that has been given an Administrative School Assignment and forty-eight (48) hours notice is not required by this Agreement, Chancellor's regulations, or law, the following shall apply: If the reassigned employee either fails to appear on the scheduled day or fails to notify the principal that s/he is invoking any right he/she may have to not answer questions, the principal shall reschedule the interview within a reasonable period of time and the time between the first scheduled interview and the rescheduled interview shall not count towards the applicable 60-day or 10-day limits on the length of time an employee may be reassigned. Nothing herein shall constitute a waiver or alteration of any right the DOE may have to compel an employee to attend an interview which may lead to disciplinary action or any right an employee may have to not answer questions.

#### d. Status of Investigations

The DOE agrees to meet on a bimonthly basis with the UFT to assess the status of investigations extending beyond sixty (60) days where the employee has been suspended without pay.

#### e. Notice of Grounds for Reassignment

The letter the DOE provides to each UFT-represented employee ("Employee") to inform the Employee that he or she has be reassigned will indicate the general grounds for each reassignment (where an Employee is being investigated by the Office of the Special Commissioner of Investigation ("SCI"), just that information will be supplied). The DOE will provide all currently reassigned Employees who have not been arrested or charged under Education Law §3020-a with written confirmation of the general grounds for the reassignment.

#### f. Reassignment Process

(1) The DOE has identified a unit within the Division of Human Resources that will be responsible for managing and tracking all reassignment cases, ensuring that all reassignments are made consistent with applicable policy, and working with the other DOE offices involved to make sure that the process is accelerated based on, among others, the initiatives set forth in this Agreement. This unit will be making regular quarterly reports that will be shared with the UFT.

(2) Absent unusual circumstances, allegations being investigated by principals will not result in an Employee being removed from his or her school.

(3) Any reassignments that are not authorized by the Office of Personnel Investigation or OSI will be reviewed by central DOE. The DOE will provide the UFT with regular listings of reassigned pedagogues, no less frequently than on a weekly basis, and if the UFT disagrees with any reassignment decisions it can present its objections for consideration to the Office of Labor Relations. Should a principal reassign an Employee without proper approval pursuant to the central DOE process, the central DOE shall return the Employee to the school from which the Employee was reassigned and the principal's school-based budget shall be charged for the salary the Employee earned while reassigned (the agreement contained in this sentence shall not be a mandatory subject of bargaining).

(4) Wherever possible, Employees reassigned will be reassigned in the borough in which such Employee works. This paragraph shall not be construed as a modification to Chancellor's Regulation C-770.

(5) The DOE will review issues raised by the UFT with respect to the facilities and work space provided to reassigned Employees. In order to help ensure a safe working environment, the UFT and DOE will work together to develop a facilities protocol for building concerns consistent with the Public Employee Safety and Health Act.

Where the Board conducts an investigation of an employee and the employee has been reassigned to administrative duties pending the outcome of such investigation, the parties agree that the employee will be restored to service no later than 6 months from the date of his or her removal unless Education Law §3020-a charges have been preferred against the employee. Should the employee be restored to service, this event does not preclude the Board from subsequently preferring Education Law §3020-a charges against the employee. If charges are preferred, the employee shall remain reassigned, at the Board's discretion, pending the outcome of the disciplinary process. This requirement to restore an employee to service after 6 months does not include investigations conducted by the Special Commissioner of Investigation or investigations that are related to criminal prosecutions.

## 5. Serious Misconduct

The parties agree that certain types of alleged misconduct are so serious that the employee should be suspended without pay pending the outcome of the disciplinary process.  Serious misconduct shall be defined as actions that would constitute:

a.   the felony sale, possession, or use of marijuana, a controlled substance, or a precursor of a controlled substance or drug paraphernalia as defined in Article 220 or 221 of the Penal Law; or

b.   any crime involving physical abuse of a minor or student, (Crimes involving sexual abuse of a minor or student are addressed in paragraph 6 below.); or

c.   any felony committed either on school property or while in the performance of  secretarial duties; or

d.   any felony involving firearms as defined in Article 265 of the Penal Law; or

e. actions that would constitute a class A-I or A-II felony or any felony defined as a violent felony offense in NY Penal Law § 70.02.

If an employee is accused of committing serious misconduct, the employee shall be removed from payroll for a term not to exceed two (2) months after a finding by the "probable cause arbitrator" that there is probable cause to believe that the actions alleged were committed by the employee and that they constitute "serious misconduct" as defined above.  Probable cause exists when evidence or information which appears reliable discloses facts or circumstances making it likely that such conduct occurred and that such person committed the conduct.  To establish probable cause, the investigator assigned to the matter must be present and testify under oath before the arbitrator.  The Board may also be required to produce signed statements from the victim or witnesses, if any.  Thereafter, the respondent shall have an opportunity to respond orally to the offer of proof.  The arbitrator may ask relevant questions or may make further inquiry at the request of Respondent.  The hearing shall not require testimony of witnesses nor shall cross-examination be permitted.  An indictment on a class A-I or A-II felony, an indictment on any felony defined as a violent felony offense in NY Penal Law § 70.02, or a felony indictment on any other conduct that constitutes serious misconduct pursuant to this section 5 shall create a rebuttable presumption of probable cause.

Said probable cause hearing usually shall not exceed one half of a hearing day.

One arbitrator, agreed to by both parties, shall be assigned to hear all probable cause matters for a period of one year.  If the parties cannot agree upon one arbitrator, each party shall select one arbitrator who together will select the probable cause arbitrator.

Should the Board meet its burden of establishing probable cause of serious misconduct, the employee shall remain suspended without pay during the pendency of the disciplinary action, but in no event shall such period exceed two months except as set forth herein.

The parties expect that these cases shall be completed within two (2) months.  However, where it is not possible to complete the hearing within the two (2) month period despite the best efforts of all parties, and where the arbitrator believes that the evidence already presented tends to support the charges of serious misconduct, the arbitrator may extend the period of suspension without pay for up to thirty (30) days in order to complete the proceedings.

If the Respondent requests not to have the case proceed for a period of thirty (30) days or more and that request is granted, during the period of this adjournment, the Respondent shall remain in non-paid status.  As noted above, however, the parties are committed to having these cases heard in an expeditious manner.  For this reason, absent extraordinary circumstances, arbitrators are not to adjourn hearing dates.

While suspended without pay pending the arbitration hearing on serious misconduct charges, the Respondent may continue his or her existing health coverage, except that in no event shall the Respondent be entitled to continue his or her existing health coverage for more than six (6) months while on non-paid status except at the absolute discretion of the Chancellor. In the event that the Respondent is exonerated of all serious misconduct charges, the employee shall be restored to his or her position and be entitled to receive back pay and be made whole for the amount of time he/she remained off payroll. In the event that the arbitrator finds the employee guilty of the serious misconduct and imposes a penalty less than termination, the arbitrator shall decide whether and to what extent a reinstated employee shall be entitled to receive any back pay for the time the employee was suspended without pay.

If a finding of probable cause was based on an indictment pursuant to this section 5, the employee shall remain off payroll pending the disposition of the criminal case. The Board ("DOE") shall have fifteen (15) days after the employee notifies the DOE of the disposition of the criminal case pursuant to Chancellor's Regulation C-105 to bring Education Law §3020-a charges based on the same conduct as was at issue in the criminal case. If the DOE prefers §3020-a charges on the same conduct as was at issue in the criminal case within the fifteen (15) days, and the employee was convicted in the criminal case of any offense that constitutes serious misconduct, he/she shall remain off payroll until a decision in the §3020-a case and such §3020-a case shall be completed within the timeframes for hearings set forth in section 13 below. If the DOE prefers §3020-a charges on the same conduct as was at issue in the criminal case within the fifteen (15) days, and the employee was acquitted of all offenses that constitute serious misconduct, the DOE shall reassign the employee to an Administrative Office Assignment or an Administrative School Assignment, suspend the employee with pay (if permitted pursuant to section 13 below) or request a second probable cause hearing to continue the suspension without pay until the final outcome of the §3020-a hearing and such §3020-a case shall be completed within the timeframes for hearings set forth in section 13 below. If the DOE does not bring Education Law §3020-a charges within those fifteen (15) days, the employee shall be restored to the payroll effective as of the date the disposition of the criminal case and returned to his/her prior position. Nothing in this paragraph shall alter the provisions of this section with respect to entitlement to back pay. The DOE agrees to meet on a bimonthly basis with the UFT to assess the status of investigations extending beyond sixty (60) days where the employee has been suspended without pay. For purposes of this paragraph, all timelines shall be measured in calendar days, but shall not include the summer break, all recess periods and holidays.

The parties agree that these types of cases shall receive the highest priority, and, upon the Board's request, hearings may be held on such matters during any days previously committed by a rotational panel to other employees, as set forth above. In other words, hearings for serious misconduct take precedence over other disciplinary matters, and the Board may require adjourning other cases previously scheduled before the assigned arbitrator during that time frame in order for that arbitrator to hear serious misconduct cases within the two-month time frame.

**6. Sexual Offenses Involving Students or Minors**

A tenured pedagogue who has been charged under the criminal law or under §3020-a of the New York State Education Law with an act or acts constituting sexual misconduct (defined below) shall be suspended without pay upon a finding by a hearing officer of probable cause that sexual misconduct was committed.

A rebuttable presumption of probable cause shall exist where the Special Commissioner of Investigations ("SCI") substantiates allegations of sexual misconduct, or a tenured pedagogue has been charged with criminal conduct based on act(s) of sexual misconduct.

A report from the Chancellor's Office of Special Investigations ("OSI") substantiating allegations of sexual misconduct is relevant evidence of probable cause but does not create a rebuttable presumption of probable cause.

If a finding of probable cause was based on criminal charges pursuant to this section 6, the Board ("DOE") shall have fifteen (15) days after the employee notifies the DOE of the disposition of the criminal charge pursuant to Chancellor's Regulation C-105 to bring Education Law §3020-a charges based on the same conduct as was at issue in the criminal charge. If the DOE brings such a §3020-a charge, the employee shall remain off payroll until a decision in the §3020-a case and such §3020-a case shall be completed within the timeframes for hearings set forth in this Agreement. If the DOE does not bring §3020-a charges based on the same conduct as was at issue in the criminal charge within fifteen (15) days of the employee notifying the DOE of the disposition of the criminal charge pursuant to Chancellor's Regulation C-105, the employee shall be restored to the payroll effective as of the date the disposition of the criminal charge. Nothing in this paragraph shall alter the provisions of this section with respect to entitlement to back pay. The DOE agrees to meet on a bimonthly basis with the UFT to assess the status of investigations extending beyond sixty (60) days where the employee has been suspended without pay. For purposes of this paragraph, all timelines shall be measured in calendar days, but shall not include the summer break, all recess periods and holidays.

In §3020-a proceedings, a mandatory penalty of discharge shall apply to any tenured pedagogue a) found by a hearing officer to have engaged in sexual misconduct, or b) who has pleaded guilty to or been found guilty of criminal charges for such conduct.

The §3020-a hearing should be completed within two months, but the suspension without pay shall be extended one additional month if the hearing has not been completed, unless the Board has received an adjournment or otherwise delayed the proceeding. The suspension without pay shall also be extended until a criminal action is resolved and any §3020-a proceeding is also completed.

If the §3020-a hearing results in a dismissal of the charges or if the criminal proceeding ends in an acquittal or dismissal (and the Board has decided not to prefer charges), the pedagogue shall be entitled to back pay with interest for the entire period of the suspension without pay.

For purposes of this section, sexual misconduct shall be defined as follows:

For purposes of this definition, "student" shall mean a student or any minor. Sexual Misconduct, as used herein, shall not be construed to include nonsexual touching or other nonsexual conduct.

a. Sexual Misconduct is behavior that is intended to initiate, create, foster or advance a romantic or sexual relationship by an employee with a student, whether physical, verbal, in writing or by electronic means, regardless of location. It includes:

(1) Any sexual physical contact, or touching, without a legitimate purpose, including any act of sexual penetration with an object or body part;

(2) Exposing a student to drawings, photographs or other representations of a sexual nature, whether verbal, written, electronic or physical, without a legitimate purpose (this prohibition is not intended to preclude the use of depictions of nudity for legitimate purposes, for example, with reference to biology, health or art);

(3) Providing a gift to a student, making sexual or romantic comments or discussing sexual acts with a student, for the purpose of initiating, creating, fostering or advancing a romantic or sexual relationship.

b. Sexual Misconduct also includes:

i. Publishing, recreating or reproducing images of a sexual act involving a student;

ii. Any act of public lewdness, as defined in section 245.00 of the Penal Law, or exposure, as defined in section 245.01 of the Penal Law, directed at a student, that occurs on or off of school grounds;

iii. Possession or use of child pornography as defined by the Penal Law, unless the respondent can demonstrate that such possession was inadvertent;

iv. Serious or repeated verbal abuse, as defined in the Chancellor's regulations, of a sexual nature;

v. Any action involving the use of an imaging device that would constitute criminal conduct as defined under sections 250.40, 250.45 or 250.50 of the Penal Law;

vi. Inducing or attempting to induce incapacitation or impairment of a student for the purpose of having sexual intercourse, sexual contact or for the purpose of creating pornographic images or materials, regardless of whether sexual activity actually takes place; and

vii. Any action that would constitute criminal conduct under Article 130 of the Penal Law against a student.

A letter of agreement dated October 2, 2005 regarding sexual misconduct is attached as Appendix E.

**7. Other Felony Offenses**

Tenured pedagogues who have been convicted of, or who have pled guilty to, any felony not addressed in paragraph 5, above shall be suspended without pay pending the final outcome of the Education Law §3020-a disciplinary proceeding. The §3020-a hearing should be completed within two months, but the suspension without pay shall be extended one additional month if the hearing has not been completed, unless the Board has received an adjournment or otherwise delayed the case.

**8. Discovery Procedures and Testimony**

In order to comply with timelines for hearings, the UFT and the Board ("DOE") agree that hearings must be held in as efficient a manner as possible. Disputes relating to document production, witness lists and other procedural issues often consume hearing time and should be dealt with to the maximum extent possible in the pre-hearing conference.

**a. Discovery**

Without waiver or limitation of any other materials and information that the respondent Employee ("Respondent") is entitled to under Education Law §3020-a and the relevant collective bargaining agreements ("Discovery"), or the timing for providing such other Discovery, at least one (1) week prior to the Pre-Hearing Conference, the DOE's attorney will supply the Respondent (or Respondent's attorney) with the following:

(1) Copies of all letters in the Respondent's personnel file(s) related to the Education Law §3020-a charges;

(2) Copies of the final report regarding the investigation conducted by either the Special Commissioner of Investigations ("SCI"), the Office of Special Investigations ("OSI") or by a principal; and

(3) Copies of all witness statements related to the charges in the DOE's possession at that time. (The DOE will diligently attempt to obtain all witness statements prior to providing copies to Respondent or Respondent's attorney pursuant to this provision "c" though failure to do so will not be grounds for exclusion of evidence from an Education Law §3020-a hearing.)

Without waiver or limitation of any other materials and information that the DOE may be entitled to from Respondent, or the timing for providing such other Discovery, at least one week prior to the Pre-Hearing Conference, the Respondent (or Respondent's attorney) will provide a witness list to the DOE's attorney if the Respondent (or Respondent's attorney) has possession of such. Otherwise, a witness list will be provided to the DOE's attorney by Respondent (or Respondent's attorney) whenever practicable one week prior to the presentation of Respondent's defense.

This Agreement shall not constitute a waiver of either the Respondent's or the DOE's right to object to the admissibility of documents obtained in the regular course of discovery pursuant to the Education Law and/or this Agreement.

In addition to any other obligations the DOE may have to preserve potential Discovery material, at the time the DOE prefers Education Law § 3020-a charges against an Employee, the Office of Legal Services will send a letter to the relevant principal or school leader requiring the principal or school leader to direct all DOE employees and agents under his/her supervision to preserve (i) any relevant records related to students who may be called to testify and (ii) all relevant class rosters.

At the Pre-Hearing Conference, the DOE's attorney and the Respondent (or Respondent's attorney), along with the Hearing Officer, will attempt to: (i) pre-mark exhibits; (ii) stipulate to any facts which are not in dispute; and (iii) stipulate to the admission of any documents to which there is not a dispute about admissibility.

Every effort should be made for a Respondent to attend the Pre-Hearing Conference as well as for the DOE to have a person available who has authority to approve a settlement of the case.

The DOE will provide the student records for testifying students to the Hearing Officer for in camera inspection by the Hearing Officer prior to the hearing date at which the student testifies. It will continue to be the Hearing Officer's decision, within the requirements of Education Law § 3020-a and the relevant collective bargaining agreements, as to whether, and when, these student records are provided to Respondent or Respondent's attorney. This provision remains subject to the Family Educational Rights and Privacy Act.

The UFT and the DOE shall jointly hold meetings with the Hearing Officers and instruct them with respect to the applicable time limitations in Education Law § 3020-a and the relevant collective bargaining agreements.

To effectuate the purpose of the statute, the parties agree that Education Law §3020-a authorizes the following in advance of the hearing, to the extent it is not required to be produced earlier as provided above:

Both sides will exchange witness lists, witness statements, and physical evidence (e.g., photographs) at least before the presentation of their direct case and earlier upon motion to the arbitrator.

The Respondent shall receive copies of investigatory statements, notes, other exculpatory evidence, and relevant student records after and subject to *in camera* review.

The Board shall receive evidence and documents from the respondent upon a showing during the hearing that it is relevant.

Additionally, if the case has stemmed from an investigation conducted by the Special Commissioner of Investigation (SCI), the Board will provide the entire SCI file to Respondent, including exculpatory evidence, during the discovery phase of the §3020-a hearing unless such information is privileged. Failure to do so shall form the basis of such evidence being precluded from introduction in the §3020-a proceedings. This provision remains subject to the Family Educational Rights and Privacy Act.

**b. Testimony**

The hearing process itself can be conducted in a more efficient manner that allows for issues to be fully and fairly litigated. To accomplish this, the parties to the hearings shall adhere to the following guidelines:

(1) It is the intent of the UFT and DOE that, to the extent practicable, hearing days shall be fully utilized, that hearing days not end before 5:00 p.m. and the parties to the hearing have multiple witnesses ready to testify to avoid the loss of part of the day.

(2) Where a hearing day is not fully used, the unused time will be counted towards the time allocated to the party that caused the delay.

(3) Attorneys shall not meet with others between direct and cross examination for longer than twenty (20) minutes, except in unusual circumstances.

(4) Hearing Officers shall ensure that cross-examination is not used by either party as a dilatory tactic in order to reduce one of the parties' allotted time to present its case.

(5) Evidence shall be limited to relevant matters.

(6) Rebuttal shall be used only to deny some affirmative fact that the opposing party has tried to prove. During rebuttal, a party to the hearing may not offer proof to corroborate evidence that has already been presented by that party or proof tending merely to support that party's case after the opposing party has rested.

If relevant and requested at the pre-hearing conference, either party may introduce (i) relevant background evidence about a witness by affidavit from the witness; (ii) an affidavit from a doctor's office attesting to an employee's visit or non-visit on a particular date; (iii) an affidavit attesting to the date of an employee's arrest, the charge (if any) against the arrested employee, and the disposition of that charge. Such a witness may be cross-examined regarding any matter discussed in an affidavit.

If relevant, a (i) business record, (ii) attendance list from a faculty meeting, orientation and/or training session, or (iii) any human resource document submitted by a respondent (*e.g.,* absence or sick note) may be admitted with an affidavit from a custodian of the record, without the need for live testimony from a witness to authenticate the document.

Nothing in this section 8(b) shall be construed to convert non-mandatory subjects of bargaining into mandatory subjects of bargaining.

**9. Incompetence Cases**

The parties agree that in the spirit of progressive discipline, rather than necessarily charge an employee with incompetence, an employee, who receives an unsatisfactory rating for the first time, may be offered the opportunity to enroll in the Peer Intervention Program ("PIP") for a term of one year. Refusal to enter the PIP program is admissible in any future disciplinary proceedings. The parties further agree that during the first school term of the intervention, no formal observations will be made. During the second school term, although the employee will still be in the PIP, the administration is free to conduct observations and to rate the employee accordingly. Since the end-of-year rating will be based on these observations, a minimum of two

(2) observations shall be conducted during the second school term.  PIP may not be invoked by the employee once the disciplinary process has commenced.

Pursuant to, and as further described in section K "Peer Intervention Plus Program" below, during their participation in the Peer Intervention Plus Program ("PIP Plus"), participating secretaries shall not be charged with incompetence pursuant to Education Law §3020-a.  The fact that an employee has declined to participate or that the BOE has denied a request to participate or has not offered the secretary an opportunity to participate in the programs will be admissible in §3020-a proceedings.  Observation reports of the consulting secretaries will be admissible in §3020-a proceedings.

**10. Attorney Teams**

Each Board attorney will be paired with a union attorney for four (4) consecutive cases.  Should one case settle, another case between the same attorneys shall be substituted for the case settled in an effort to utilize the dates set by the parties with the arbitrator.

**11. ATR §3020-a Procedure**

The terms of the ATR §3020-a Procedure are set forth in Rule 7(A)(3) of Article 11A.

**12. Service of Charges**

In order to make the process as efficient as possible, service of notice of the nature of the charges and the actual charges shall be consolidated and served together upon an employee along with specifications and, in incompetence cases, a bill of particulars.  Nothing in this Agreement shall alter a Respondent's entitlement, if any, to a bill of particulars in misconduct cases.

**13. Timeframe for Hearings**

Within 10 - 15 days of the Board's receipt of the request for a hearing from an employee charged under Education Law § 3020-a, a pre-hearing conference shall be held.  Both Education Law § 3020-a and this Agreement require hearings, including closing statements, to be completed within sixty (60) days of the pre-hearing conference and a decision to be rendered within thirty (30) days of the final hearing date. The UFT and the Board ("DOE") agree this timeframe must be adhered to by all parties to the hearings and strictly enforced by hearing officers.  Hearing officers shall establish a trial schedule at the pre-hearing conference to ensure that hearings are completed within the required statutory and contractual timeframes and ensure an equitable distribution of days between the DOE and the charged employee.

Education Law § 3020-a permits "limited extensions" beyond the sixty (60) days where it is determined that "extraordinary circumstances" warrant.  "Extraordinary circumstances" shall be construed narrowly by hearing officers so that the granting of "limited extensions" allowing hearings to last beyond sixty (60) days is the exception and not the rule.  Pursuant to section 2, above, a hearing officer may be removed prior to the end of his or her one-year term only for good and sufficient cause, which may include failure to comply with this Agreement, upon mutual agreement of the UFT and DOE.

If the hearing officer determines that a necessary witness is a former student who is unavailable because he/she is residing outside of New York City or a current student who is unavailable because he/she has left New York City for an extended period of time, this shall constitute an "extraordinary circumstance."  In such a case, the hearing officer shall schedule the hearing to begin or continue as soon as possible given the availability of the witness as demonstrated to the hearing officer.

A party to the hearing or the hearing officer may request an unedited copy of the relevant transcript if a certified transcript is not available when needed.  The unavailability of a certified

transcript shall not excuse adherence to the time limitations for completion of a hearing and issuance of a decision. The UFT and DOE will jointly explore the feasibility of expediting the receipt of Education Law §3020-a hearing transcripts by the UFT and DOE jointly paying the court reporters' fees and then seeking reimbursement from the New York State Education Department.

For purposes of this section 13, all timelines shall be measured in calendar days, but shall not include the summer break, all recess periods and holidays.

**14. Decisions**

Both Education Law §3020-a and this Agreement require decisions within thirty (30) days of the completion of the hearing.

**15. Meeting with the Panel of Hearing Officers**

The Chancellor and the President of the UFT will personally, jointly meet with the panel of hearing officers annually to impress upon the hearing officers that both parties to this Agreement are serious about meeting the timelines in the law, the collective bargaining agreements, and this Agreement. The Chancellor and the President will urge the hearing officers to strictly control the hearings and require all parties to the hearing to conform to the timelines provided herein. They will assure the hearing officers that no hearing officer will be removed by either party to this Agreement for enforcing these rules.

**16. Settlements**

The UFT and the Board ("DOE") are committed to exploring innovative settlement approaches that would permit the parties to Education Law §3020-a proceedings to reach settlement in a greater number of cases brought under Education Law §3020-a.

**I. False Accusations**[14]

1. Knowingly false accusations of misconduct against employees will not be tolerated.

If an accusation of sexual misconduct or physical abuse against an employee is found by the Board or Special Commissioner of Investigation to have been knowingly false when made, the Board will take the following actions to restore the falsely accused employee's reputation: removing all references to the charges from the employee's personnel file(s) and adding evidence of the unfounded nature of the charge to departmental files that may have to be maintained to satisfy other legal requirements, if any; and restoring any back pay owed with interest and, at the employee's request, confirming to any regulatory agency the finding that the employee was falsely accused.

2. The disciplinary process should never be used to retaliate against whistleblowers or for any other illegal reasons. All employees who make a knowingly false allegation shall be subject to discipline, but decisions relating to the imposition of such discipline on non-UFT bargaining unit members shall not be subject to the grievance processes set forth in the relevant collective bargaining agreements.

**J. Peer Intervention Program (PIP)**

The Board and the Union recognize that instructional services should be delivered by a highly qualified and motivated staff, accorded the respect and professional treatment to which they are entitled.

---

[14] See Appendix G. This Section I of Article 16 corresponds to Article 21H of the Teacher contract.

Towards that end the Board and the Union have agreed to provide resources and to provide peer assistance on a voluntary confidential basis to staff who have completed probation and who believe that their competence will benefit from that assistance in the manner provided below.

1. The Peer Intervention Panel ("Panel") shall be composed of nine members, six of whom shall be selected by the Union and three of whom shall be administrators selected by the Board.

2. This Panel will set qualifications and procedures for the selection of intervenors, an alternative careers liaison and a coordinator of the program. The Panel shall advertise, as needed, the intervenor, coordinator and alternative careers liaison positions on a City-wide basis, posting the qualifications and procedures previously developed. The program's professional staff shall be selected in accordance with the posted procedure.

3. The Panel will also design and continually monitor a professional development program that enables the selected staff to meet the goals set forth above.

4. The intervenors shall serve for four year renewable terms.

5. Any secretary who has a reasonable basis for needing such assistance and/or receives a U-rating or formal warning may request assistance from the Peer Intervention Program, in writing on a form promulgated by the Panel. The Panel will review the requests and promptly notify the secretary of its determination as to whether assistance will be provided in that case. Such communications will be kept completely confidential.

6. The intervenor will develop a plan to assist the participating secretary tailored to the specific needs of that  secretary and will work with the secretary directly for not more than one year.

7. For three months following the start of the intervention period, supervisors will not evaluate or observe the participating secretary. However, supervisors will otherwise continue to exercise their responsibilities.

8. The Board, the Union, and the participating secretary agree that for any disciplinary action other than an appeal of a previous U-rating, all time limitations within which to bring such actions will be tolled for the three month period in which the supervisor does not evaluate or observe the participating secretary. For such U-rating appeals, the parties agree that the time limitations are tolled for the entire period of intervention.

9. All communications between the intervenor and the participating secretary shall be completely confidential. As a condition of involvement in the program, all participants in the program, including the intervenor and the participating secretary, must consent to the confidentiality provisions set forth in this paragraph. The Board and Union agree that the intervenor, or any other person involved in the peer intervention program shall not be subpoenaed by the Board or the Union or called to testify, produce documents or participate in any other way concerning the intervention in any proceeding involving the participating secretary including potential subsequent proceedings under §3020-a of the Education Law as modified by Section H above (hereinafter "§3020-a proceeding"). No arbitrator, in any proceeding under the parties' control, shall accept evidence regarding such communications.

If PIP is used as a remedy in a §3020-a proceeding or if the parties agree to use it as a settlement to such a proceeding, this paragraph continues to apply except that if the intervention was not successful a statement from the program saying "PIP was attempted and was not successful" may be submitted into evidence in any subsequent §3020-a proceeding with respect to charges concerning competence.

10. Except as otherwise herein provided, the Union, the Board or any participating secretary may exercise any constitutional, statutory, regulatory or contractual right otherwise provided by law, regulation or contract.

11. The Board agrees to make available on a best efforts basis alternative career opportunities in the Board and/or the City for secretaries who decide to leave the profession in the course of or following intervention through access to other employment alternatives within the system and/or the City; or retraining/redeployment through the Board of Education or New York City.

12. Administrative procedures for effectuation of these provisions will be formulated by the Panel in consultation with the Board and the Union and thereafter distributed by the Panel.

13. These procedures relate solely to issues of competency and no other grounds for discipline.

14. The acts of the Panel, intervenor, coordinator, Union and Board shall be final.

**K. Peer Intervention Plus Program ("PIP Plus")**

1. The existing Peer Intervention Program (PIP) will work with any secretaries who would like assistance (as capacity permits) except those in danger of receiving charges pursuant to Education Law §3020-a for incompetence who have been recommended for the new program established below.

2. A new program (PIP Plus) will be created for tenured secretaries in danger of receiving charges pursuant to §3020-a for incompetence, which will be staffed by independent consulting secretaries. These consulting secretaries will not be employed by the Board of Education and will not be active members of the UFT, and instead will be provided by an independent third party vendor, mutually agreed to by the parties, pursuant to a contract in a form developed by the Board and approved by the UFT.

3. Consulting secretaries in the PIP Plus program will develop plans to assist the participating U-rated tenured secretaries, tailored to the specific needs of the secretaries. During their participation in PIP Plus, participating secretaries will not be charged with incompetence pursuant to §3020-a. Observation reports of the consulting secretaries will be provided to the participating secretaries, and will be admissible in §3020-a proceedings. Participation in the program is voluntary. A principal may recommend participation or a secretary may volunteer to participate. The fact that an employee has declined to participate or that the Board has denied a request to participate or has not offered the secretary an opportunity to participate in the programs will be admissible in §3020-a proceedings.

4. A labor/management committee will review the PIP Plus program annually and agree on necessary changes, if any.

5. The existing Peer Intervention Program will not be decreased in size because of the establishment of this new PIP Plus program.

6. The Board ("DOE") will evaluate cases of tenured Employees receiving unsatisfactory rating(s) for poor performance and, where it deems it appropriate, will refer the case to PIP Plus.

**L. Medical Review Procedures**

**1. Requests for Medical Examination**

The report of the immediate supervisor requesting examination of a school secretary pursuant to Education Law §2568 shall be made in duplicate. A copy of the report shall be forwarded to the school secretary.

**2. Injury in the Line of Duty**

In order to provide for an expeditious handling of injury in the line of duty claims, the following is provided:

a. Within five school days of a claim of injury in the line of duty requiring an employee to be absent, the superintendent shall make a determination as to whether the accident occurred in the line of duty.

b. Where the employee is in a non-pay status pending a determination by the Medical Bureau of the duration of absence attributable to injury in the line of duty, the Medical Bureau will make its determination within ten days of the employee's submitting himself for the required physical examination.

**3. Medical Report and Review**

a. The report of the Medical Bureau on a school secretary who was called for medical evaluation shall, upon written request of the school secretary, be sent to the school secretary's physician within 25 days after the evaluation.

b. Upon the employee's request to the Medical Bureau, his physician shall have the right to examine his medical file.

c. A regular employee shall have the right to an independent evaluation by a medical arbitrator selected from rotating panels of doctors to be selected by mutual agreement of the Board and the Union if the finding of the Medical Bureau to the Chancellor has resulted in:

(1) Placement of the employee on a leave of absence without pay for more than one month; or

(2) Termination of the employee's services; or

(3) A recommendation for disability retirement; or

(4) A denial of a leave with or without pay for more than one month.

A request for an independent evaluation of the finding of the Medical Bureau shall be submitted in writing by the employee to the Division of Human Resources within 10 school days of receipt of notice from the Division of Human Resources that he has been placed on leave of absence without pay for more than one month, or that his services have been terminated, or that he has been recommended for disability retirement, or that he has been denied a leave with or without pay for more than one month. The Board and the Union may agree on a case by case basis to permit, in special circumstances, an independent medical evaluation to employees who do not otherwise qualify for one under this Agreement.

The medical arbitrator shall examine the employee and consult with the employee's physician and the Board's physician. The arbitrator's authority shall be limited to determining the medical aspects of the employee's claim. The arbitrator's decision shall be rendered within 10 days after he has completed the evaluation of the employee, and if made within his authority under this agreement shall be accepted as final and binding by the Board and the employee.

The fee of the medical arbitrator shall be shared equally by the Board and the employee.

## ARTICLE SEVENTEEN
## GRIEVANCE PROCEDURE

It is the declared objective of the parties to encourage the prompt and informal resolution of employee complaints as they arise and to provide recourse to orderly procedures for the satisfactory adjustment of complaints. A resolution should occur at the earliest possible step in every case that can reasonably be resolved.

In order to accomplish its stated purpose, a grievance conference must be attended by those individuals who may be able to promote resolution or, if resolution is not possible in a particular case, to provide the necessary information for a fair determination of the grievance. At the Chancellor's level, principals will be expected to attend or to have a suitable representative present at the conference. Failure to attend may result in sustaining the grievance on procedural grounds.

## A. Definition

A "grievance" shall mean a complaint by an employee in the bargaining unit (1) that there has been as to her or him a violation, misinterpretation, or inequitable application of any of the provisions of this agreement, or (2) that he/she has been treated unfairly or inequitably by reason of any act or condition which is contrary to established policy or practice governing or affecting employees, except that the term "grievance" shall not apply to any matter as to which (1) a method of review is prescribed by law, or by any rule or regulation of the State Commissioner of Education having the force and effect of law, or by any bylaw of the Board of Education or (2) the Board of Education is without authority to act.

As used in this Article, the term "employee" shall mean also a group of employees having the same grievance.

## B. Adjustment of Grievances

Grievances of employees within the bargaining unit shall be presented and adjusted in the following manner:

### 1. General Procedures

### a. School Level (Step 1)

Any employee within the bargaining unit may, either orally or in writing, present a grievance to the head of the school within thirty school days after the employee has knowledge of the act or condition which is the basis of the complaint.

A grievance which is presented in writing shall set forth specifically the act or condition and the grounds on which the grievance is based, the contractual provision which is alleged to have been violated and the remedy sought. A Step 1 Grievance Form such as the one set forth in Appendix B (Grievance Forms) shall be used, but failure to use the form will not result in forfeiture of the grievance. A grievance which is technically flawed at Step 1 may be promptly amended or refiled without regard of the stated time limitations.

The employee and the head of the school shall confer on the grievance with a view to arriving at a mutually satisfactory resolution of the complaint. At the conference, the employee may appear personally or he/she may be represented by a Union representative or by any school secretary of his/her choice in the local school district; but where the employee is represented he/she must be present. The Union representative shall be the chapter leader or his/her alternate in the school or, where there is no Union member in the school, any other designated Union representative.

Whenever a grievance presented to the head of the school by the employee personally or through a personal representative would involve the application or interpretation of the terms of this agreement, or would affect the working conditions or welfare of the employees in the bargaining unit, he shall give the chapter leader or his/her alternate in the school the opportunity to be present and state the views of the Union, except that, where there is no Union member in the school, the Union may be represented by any other designated Union representative.

The head of the school shall communicate his/her decision to the aggrieved employee and to his/her representative and to any Union representative who participated in this step within five school days after receiving the complaint. Where the grievance has been presented in writing, the decision shall be in writing, and the decision shall include supporting reasons in response to the information supplied by the grievant on the Step 1 Grievance Form or its equivalent

**b. Chancellor (Step 2)**

If the grievance is not resolved at Step 1, the Union may appeal from the decision at Step 1 to the Chancellor addressed to the attention of the Deputy Executive Director, Office of Labor Relations and Collective Bargaining, within 15 school days after the Step 1 decision has been communicated. The appeal shall be in writing, shall set forth specifically the reasons for the appeal, and shall be accompanied by a copy of the appeal and the decision at Step 1. It shall also state the name of the employee's Union representative.

The Chancellor or his/her designated representative shall meet and confer with the Union representative and the aggrieved employee with a view to arriving at a mutually satisfactory resolution of the complaint. The Union representative and the aggrieved employee shall be given at least two school days notice of the conference and an opportunity to be heard. The Union representative may be the representative at Step 1 or a representative designated by the Union grievance department, or both.

Notice of the conference shall also be given to the head of the school. The head of the school will be expected to attend the conference or to have a suitable representative present at the conference in order to promote resolution of the grievance or, if resolution is not possible, to provide the necessary information for a fair determination of the grievance.

The Chancellor shall communicate his/her decision in writing together with the supporting reasons, to the aggrieved employee and to the Union representative who participated in this step, within 20 school days after receiving the appeal.

The head of the school shall receive a copy of the decision at this step. The Union shall also receive a copy of any decision at this step.

**2. Procedures for Special Groups of School Secretaries**

a. The procedures set forth in paragraph 1 of this article shall apply to all school secretaries in the unit except that, for those not assigned to schools the grievance should be presented to the immediate supervisor at Step 1 and at Step 2 to the Chancellor.

b. Chapter 683 grievances regarding summer assignments shall be heard according to the following procedure:

(1) All internal District 75 postings, vacancy notices and turnaround (retention rights) lists will be prominently posted and made available to employees in all District 75 sites.

(a) All internal application notices/postings for District 75 staff who do not claim retention rights shall be posted in the schools no later than April 30.

(b) Retention rights turnaround documents shall be posted in the schools no later than May 15.

(c) The Final Assignment list shall be posted in all schools no later than June 7.

(2) Subsequently, an employee who has a complaint regarding a non-per session summer assignment shall attempt to resolve it informally. If the complaint has not been resolved, the complainant shall file a grievance with the Superintendent no later than the 10th workday from the posting of the final assignment list, or in the case of assignments that were not contained in the final assignment list, no later than the 10th workday from knowledge of the assignment which

is the basis for the complaint. The Superintendent or his or her designee shall meet and confer with the aggrieved employee with a view to arriving at a mutually satisfactory resolution of the complaint. The employee shall be entitled to Union representation. The employee shall be present at this conference. The Superintendent shall communicate his/her decision in writing, together with supporting reasons, to the aggrieved employee and to the Union District Representative within five (5) working days after having received the appeal.

If the grievance is not resolved at the Superintendent's level, the Union may appeal the decision to the Chancellor within five (5) working days after the decision by the Superintendent or his or her designee has been issued. The appeal shall be in writing, shall set forth specifically the reasons for the appeal and shall be accompanied by a copy of the appeal and decision at Step 1. The Chancellor or his/her designated representative shall meet and confer with the Union Representative and the aggrieved employee with a view to arriving at a mutually satisfactory resolution of the complaint. The Chancellor shall communicate his/her decision in writing, together with the supporting reasons, to the aggrieved employee and to the Union Representative who participated in this step within five (5) working days after receiving the appeal. If the grievance is not resolved at the Chancellor's level, or if no decision is issued within five (5) working days from the receipt of the appeal, the UFT may proceed to arbitration. The UFT shall notify the Superintendent and the Board's Office of Labor Relations and Collective Bargaining of its intent to proceed to arbitration no later than the Monday following Labor Day of the year in which the grievance arose.

The Superintendent shall also receive a copy of the decision at this Step. The Union shall receive a copy of any decision at this Step.

### 3. Special Procedures for Grievances Relating to Salary and Leave Matters

Any grievance relating to salary and leave matters shall be filed by the Union directly with the Executive Director of the Division of Human Resources. In such cases, the provisions of the general procedures relating to Step 2 shall apply to the presentation and adjustment of the grievance at the level of the Executive Director, except that (1) the grievance shall be filed within a reasonable time not to exceed three months after the employee has knowledge of the act or condition which is the basis of the complaint and (2) the employee need not be present at the conference. The Executive Director shall render a decision on behalf of the Chancellor and such decision shall be considered a decision at the level of the Chancellor.

### 4. Initiation or Appeal of Special Types of Grievance or Complaints

a. Grievances arising from the action of officials other than the head of a school may be initiated with and processed by such officials in accordance with the provisions of Step 2 of this grievance procedure. Where appropriate, such grievances may be initiated with the Chancellor by the Union.

b. The Chapter has the right to initiate or appeal a grievance involving alleged violation of the Agreement. Such grievance shall be initiated with the appropriate community or assistant superintendent or, where appropriate, with the Chancellor.

### 5. Appearance and Representation

a. Conferences held under this procedure shall be conducted at a time and place which will afford a fair and reasonable opportunity for all persons entitled to be present to attend. When such conferences are held during Board of Education working hours all persons who participate shall be excused without loss of pay for that purpose.

b.  No officer or executive board member, delegate, representative, or agent of a minority organization shall represent the aggrieved employee at any step in the grievance procedure.  An agent shall include any person who, acting in an official capacity for a minority organization, regularly performs for that organization such acts as: distributing literature, collecting dues, circulating petitions, or soliciting membership.  An agent shall not include any person who performs such duties occasionally or without any official designation by the minority organization involved.  A minority organization shall mean any organization, other than the Union, which exists or acts for the purpose of dealing with the head of a school or any Board official for the improvement of working conditions, or the handling of grievances, of employees in the bargaining unit.

**6.  Time Limits**

a.  Failure at any step of this procedure to communicate the decision on a grievance within the specified time limits shall permit the aggrieved employee to proceed to the next step.  Failure at any step of this procedure to appeal a grievance to the next step within the specified time limits shall be deemed to be acceptance of the decision rendered at that step.

b.  The time limits specified in any step of this procedure may be extended, in any specific instance, by mutual agreement.

**C.  Arbitration**

A grievance dispute which was not resolved at the level of the Chancellor under the grievance procedure may be submitted by the Chapter, to an arbitrator for decision if it involves the application or interpretation of this Agreement.  Grievances involving the exercise of Board discretion under any term of this Agreement may be submitted to arbitration to determine whether the provision was disregarded or applied in a discriminatory or arbitrary or capricious manner so as to constitute an abuse of discretion, namely: whether the challenged judgment was based upon facts which justifiably could lead to the conclusion as opposed to merely capricious or whimsical preferences, or the absence of supporting factual reasons.

A grievance may not be submitted to an arbitrator unless a decision has been rendered by the Chancellor under the grievance procedure, except in cases where, upon expiration of the 20-day time limit for decision, the Union filed notice with the Chancellor of intention to submit the grievance to arbitration and no decision was issued by the Chancellor within five school days after receipt of such notice.

The proceeding shall be initiated by the Union filing with the Board a notice of arbitration.  The notice shall be filed within 15 school days after receipt of the decision of the Chancellor under the grievance procedure or, where no decision has been issued in the circumstance described above, three days following the expiration of the five school day period provided above.  The notice shall include a brief statement setting forth precisely the issue to be decided by the arbitrator and the specific provision of the agreement involved.  The parties shall jointly schedule the arbitration hearings.

A panel of seven or more arbitrators shall be designated by mutual agreement of the parties to serve for any case or cases submitted to them in accordance with their ability to promptly hear and determine the case or cases submitted.

The parties agree to enter into a stipulation of facts whenever possible in advance of the hearing.

The parties seek the most expeditious decisions in arbitrations and will not normally file briefs or order transcripts.  If either or both parties order a transcript, it shall be on an expedited

basis. However, if a party unilaterally files a brief, it shall be filed within five working days of the hearing or receipt of the transcript, if one is ordered. The other party shall have the right to file a reply brief within five working days of receipt of the brief.

The voluntary labor arbitration rules of the American Arbitration Association shall apply to the proceeding insofar as they relate to the hearings and fees and expenses.

The arbitrator shall issue his decision not later than 30 days from the date of the closing of the hearings or, if oral hearings have been waived, then from the date of transmitting the final statements and proofs to the arbitrator. The decision shall be in writing and shall set forth the arbitrator's opinion and conclusions on the issues submitted. The arbitrator shall limit his decision strictly to the application and interpretation of the provisions of this Agreement and he shall be without power or authority to make any decision:

1. Contrary to, or inconsistent with, or modifying or varying in any way, the terms of this Agreement or of applicable law or rules or regulations having the force and effect of law.

2. Involving Board discretion or Board policy under the provisions of this Agreement, under Board by-laws, or under applicable law, except that he may decide in a particular case whether the provision was disregarded or applied in a discriminatory or arbitrary or capricious manner so as to constitute an abuse of discretion, namely whether the challenged judgment was based upon facts which justifiably could lead to the conclusion as opposed to merely capricious or whimsical preferences or the absence of supporting factual reasons.

3. Limiting or interfering in any way with the power, duties and responsibilities of the Board under its by-laws, applicable law, and rules and regulations having the force and effect of law.

The decision of the arbitrator, if made in accordance with his jurisdiction and authority under this agreement, will be accepted as final by the parties to the dispute and both will abide by it.

The arbitrator may fashion an appropriate remedy where he finds a violation of this Agreement. To the extent permitted by law, an appropriate remedy may include back pay. The arbitrator shall have no authority to grant a money award as a penalty for a violation of this Agreement except as a penalty is expressly provided for in this Agreement.

The arbitrator's fee will be shared equally by the parties to the dispute.

The Board agrees that it will apply to all substantially similar situations the decision of an arbitrator sustaining a grievance and the Union agrees that it will not bring or continue, and that it will not represent any employee in, any grievance which is substantially similar to a grievance denied by the decision of an arbitrator.

Two hundred (200) arbitration dates may be scheduled per year for all UFT grievances. The use of the two hundred (200) days will governed in all respects by the rules in this Agreement, including, but not limited to, rules that exclude certain arbitrations from the two hundred (200) day limit.

Principals may testify at arbitrations by telephone subject to the following conditions: (i) the principal may not look at any written material or be aided by anyone in the room during his/her testimony except as authorized or directed by the arbitrator; (ii) the principal may not be joined in the room by anyone without notifying the arbitrator, all parties and their representatives; (iii) the UFT district representative, or the UFT district representative's designee, may be present in the room with the principal; and (iv) the principal's testimony shall still be under oath. The sole role of the UFT district representative, or the UFT district representative's designee, shall be to verify the principal's compliance with these conditions; the UFT district representative or designee may not participate in the proceedings except to notify the arbitrator and/or the parties'

representatives if he or she believes these conditions are being violated. The UFT district representative, or the UFT district representative's designee, shall not be released from his/her classroom responsibilities for this purpose. Nothing in this Agreement shall in any way limit the right of the UFT arbitration advocate to cross-examine the principal. If the arbitrator orders the principal to testify or be cross-examined in person, the principal shall not be allowed to testify or be cross-examined by telephone.

Nothing in this Agreement shall in any way limit the currently existing rights of Employees to attend arbitrations.

**D. General Provisions as to Grievances and Arbitration**

l. The filing or pendency of any grievance under the provisions of this Article shall in no way operate to impede, delay or interfere with the right of the Board to take the action complained of, subject, however, to the final decision on the grievance.

2. Nothing contained in this Article or elsewhere in this Agreement shall be construed to permit the Union to present or process a grievance not involving the application or interpretation of the terms of this Agreement in behalf of any employee without his/her consent.

3. Nothing contained in this Article or elsewhere in this Agreement shall be construed to deny to any employee his/her rights under Section 15 of the New York Civil Rights Law or under the State Education Law or under applicable Civil Service Laws and Regulations.

4. (a) Procedural arbitrability objections based upon the asserted untimeliness of a grievance or appeal, or failure to follow or properly adhere to contractual grievance procedures will, normally, be raised at the Chancellor's level. In instances where the employer could not reasonably have been able to raise such a claim at the Chancellor's level, but intends to raise such a claim at the arbitration level for the first time, the employer shall communicate to the Union within one week prior to the scheduled hearing of such intent.

(b) These guidelines are not intended to be applied to preclude a party from raising an arbitrability objection at a hearing where such preclusion would appear to be unfair or substantially prejudicial to a party's interest in the ultimate outcome of a case.

(c) Nothing contained herein shall be construed as a waiver of any substantive arbitrability objection or to preclude any other resort to judicial proceedings as provided by law.

# ARTICLE EIGHTEEN
# SPECIAL COMPLAINTS

It is the declared objective of the parties to encourage the prompt and informal resolution of special complaints not covered by the grievance procedure and to dispose of such complaints as they arise and to provide recourse to orderly procedures for their adjustment.

**A. Definition**

A "special complaint" is a complaint by an employee in the bargaining unit that persons or groups are engaging in a course of harassing conduct, or in acts of intimidation, which are being directed against him/her in the course of his/her employment and that the school principal or community or assistant superintendent has not afforded the employee adequate relief against such course of conduct or acts of intimidation.

**B. Filing and Priority Handling**

A special complaint shall be promptly filed with the Chancellor by the Union. Such complaint shall receive expedited handling pursuant to this article.

## C. Joint Investigation and Informal Resolution

Within twenty-four (24) hours after the special complaint is filed with the Chancellor, the Board ("Department") must notify the Union of the management member assigned to the joint investigating committee ("JIC"). The JIC shall consist of one representative designated by the Chancellor and one representative designated by the Union shall investigate the complaint at the school level to ascertain the facts and bring about a prompt resolution of the problem without resort to formal procedures. In the course of its investigation, the joint committee shall confer with the principal of the school, the community or assistant superintendent and other persons involved in the controversy. In view of the expedited nature of Special Complaint proceedings, the JIC shall complete its investigation in no more than one (1) school day, and as soon as possible but no later than seven (7) school days from the filing date. The Union shall notify the Department member of the of the JIC, the Chancellor's designee or the Office of Labor Relations advocate assigned to the case at the fact finding stage, in writing as soon as possible, should new allegations of harassment arise after the Committee has completed its investigation.

## D. Administrative Hearing and Continued Attempt at Informal Resolution.

If the complaint is not resolved by the joint investigating committee, the Union shall request a hearing before the Chancellor. Within forty-eight (48) hours after receipt of the request for hearing, the Chancellor, or a representative designated by him/her, shall hold a hearing at which the joint investigating committee shall report its findings and all persons involved, including the affected employee, shall have an opportunity to be heard. The complaining employee shall be represented by the Union.

At the hearing the Chancellor or his/her representative shall make every effort to resolve the complaint informally and all persons involved shall cooperate toward this end. The Chancellor's hearing shall be completed in no more than one (1) school day.

## E. Decision of the Chancellor

Within seventy-two (72) hours following the close of the hearing, the Chancellor shall notify all parties of his decision and the manner in which it shall be effectuated.

Should the Department fail to process a complaint or issue a timely decision at any step, the Union shall be permitted to proceed to the next step in the Special Complaint process. The Union will not be prejudiced in any way by the Department's failure to adhere to the Special Complaint procedure and the timelines therein. When the Department fails to issue a Chancellor's decision within 72 hours following the close of the hearing, the case shall not count toward the annual cap of arbitration dates set forth in Article 22 if the Union decides to bring the complaint to fact finding.

If within ten (10) school days after the close of a Chancellor's level hearing the Department fails to issue a decision or position statement similar to the kind the parties utilize in expedited arbitration, the one day hearing cap for fact finding will be increased to two days for that particular case. None of the hearing dates will count toward the annual cap of arbitration dates set forth in Article 22. The fact finder shall manage the case with the two day cap as he or she deems appropriate. Rebuttal time shall be set aside for the Union to utilize if it so chooses.

If within ten (10) school days prior to the date a special complaint is scheduled for fact finding the Department fails to issue a Chancellor's level decision or a position statement similar to the kind the parties utilize in expedited arbitration, the one day hearing cap for fact finding will be increased to three days. None of the hearing days will count toward the annual cap of arbitration dates set forth in Article 22. The fact finder shall manage the case with the three day

cap as he or she deems appropriate.  Rebuttal time shall be set aside for the Union to utilize if it so chooses.  The fact-finding hearing shall be completed in no more than one (1) school day.

## F.  Fact-Finding and Recommendations

If the complaint is not resolved by the Chancellor, the Union shall submit it for hearing and fact-finding before an arbitrator selected in accordance with Article 17C of this Agreement.  The submission shall be made within ten (10) school days after the issuance of the Chancellor's decision.

The voluntary labor rules of the American Arbitration Association shall apply to the proceeding insofar as they relate to the hearing, fees and expenses.

The fact finder shall render findings not later than seventy-two (72) hours from the date of the close of the hearings or, if oral hearings have been waived, then from the date of transmitting the final statements and proofs to the fact finder.

The findings of fact shall be in writing.  The fact finder shall limit his/her findings strictly to the question of whether the employee's complaint has been substantiated by the evidence.  If the fact finder finds the complaint to be substantiated and unremedied, he/she shall recommend an appropriate remedy.

The fact finder shall not interpret or apply the provisions of this Agreement or exercise any of the other functions specified in Article 17 of this contract, nor shall he exercise any of the powers conferred pursuant to Section 3020-a of the Education Law.

## G.  Board Consideration

Within ten (10) days after receipt of the fact finder's report, the Board shall make a determination.

## H.  Expansion of Special Complaint Procedure to Include Supervisors

Complaints against supervisors may be considered in an expeditious manner in accordance with the provisions of this Article.

## ARTICLE NINETEEN
## WORKING CONDITIONS OF
## SCHOOL SECRETARY ASSISTANTS

## A.  Applicability

School secretary assistants and bilingual school secretary assistants (assistants) shall serve under all terms and conditions of this Agreement applicable to substitute school secretaries except:

l.  Assistants are not eligible to serve in non-school positions.  Therefore Article Six A2 (School Secretaries Not Serving in Schools) and Article Seven E (Non-School Assignments) and Seven F (Return to School from Non-School Assignment) of this Agreement shall not apply.

2.  Article Seven G (Per Session Assignments) and Article Twenty (Working Conditions of Substitute School Secretary Internes) shall not apply.

3.  The provisions of Article Twenty-One (Working Conditions of Per Diem Substitutes) which are applicable to full term substitutes who commence service after the fifteenth day of the school term for the duration of the term on a full time basis shall also be applicable to Assistants who commence service on a full time basis after the fifteenth day of the school term for the duration of the term.

**B. Other Conditions**

1. The Board shall provide a training program which will include six credits of appropriate college study at no cost to the Assistant. Satisfactory participation in the training program, which shall emphasize stenography and other secretarial skills, shall be a condition of continued employment as an Assistant.

2. Upon licensure or certification as a school secretary, the Assistant shall be employed to the extent possible in the same school under the terms and conditions of this Agreement applicable to school secretaries, and shall receive salary, benefit and seniority credit for the Assistant service as though it were substitute school secretary service.

3. The Board resolution of December 16, 1981 and the Regulation of the Chancellor No. C-305 implementing the resolution are applicable conditions for employment of Assistants.

## ARTICLE TWENTY
## WORKING CONDITIONS OF SUBSTITUTE
## SCHOOL SECRETARY INTERNES

**A. Applicable Provisions**

Substitute School Secretary Internes shall serve under the terms and conditions of this Agreement except as otherwise set forth in this Article or elsewhere in this Agreement.

**B. Inapplicable Provisions**

The following provisions of this Agreement shall not apply to Substitute School Secretary Internes: Article Four A (Annuity Fund); Article Four B (Support for Program); Article Six A2 (School Secretaries Not Serving in Schools); Article Seven (Assignments); Article Eleven B (Sabbatical Leaves); Article Eleven D (Leaves of Absence Without Pay); Article Twelve (Excessing and Layoff); Article Thirteen A and B (General and Hardship Transfers); Article Sixteen F (Suspension); Article Sixteen H (§3020-a Procedures); Article Nineteen (Working Conditions of School Secretary Assistants); Article Twenty-One (Working Conditions of Per Diem Substitutes) and Article Twenty-Two (Working Conditions of Day-to-Day (Occasional) Substitute School Secretaries).

## ARTICLE TWENTY-ONE
## WORKING CONDITIONS OF
## PER DIEM SUBSTITUTES

**A. Applicability**

Per diem substitutes covered by this Agreement are:

1. Full term substitutes: serving after the fifteenth day of the school term for the duration of that term in a full-time or regularly scheduled part-time position.

2. Other-than-occasional: covering the absence of a particular employee for thirty consecutive work days or more.

Per diem substitutes covered by this Agreement shall serve under the terms and conditions of this Agreement except as otherwise set forth in this Article or elsewhere in this Agreement.

**B. Pro-Rata Vacation Pay**

Per diem substitutes covered by this Agreement shall continue to receive vacation pay on the same basis as heretofore.

**C. Welfare Fund Benefits**

Only those full-term per diem substitutes who are assigned to a position which is expected to be vacant for the remainder of the term shall be covered by Article 3F (Welfare Fund Benefits) of this Agreement. Secretaries serving in a regularly scheduled part-time position (commonly known as F-status) will be entitled to full health and welfare fund benefits if scheduled to work for at least one-half of the regular full-time schedule for that particular title. Secretaries in a regularly scheduled, but less than half-time position are not eligible for health insurance or welfare fund benefits.

**D. Sick Leave**

Per diem substitutes covered by this Agreement shall continue to receive sick leave on the same basis as heretofore.

**E. Inapplicable Provisions**

The following provisions of this Agreement shall not apply to any per diem substitute covered by this Agreement: Article Four A (Annuity Fund); Article Four B (Support for Program); Article Eleven A (Cumulative Absence Reserves and Sick Leave), Article Eleven B (Sabbatical Leaves), Article Eleven D (Leaves of Absence Without Pay); Article Twelve (Excessing and Layoff); Article Thirteen A and B (General and Hardship Transfers); Article Sixteen F (Suspension); Article Sixteen H (§3020-a Procedures); Article Nineteen (Working Conditions of School Secretary Assistants); Article Twenty (Working Conditions of Substitute School Secretary Interns) and Article Twenty-Two (Working Conditions of Day-to-Day (Occasional) Substitute School Secretaries).

**F. Continuation of Benefits**

Nothing contained in this Article or elsewhere in this Agreement shall be construed to deprive a per diem substitute of any benefit currently granted as a matter of Board policy and practice.

**G. Creation of F-Status Positions**

1. Every one or more F-Status position(s) in a single school that equal 1.0 FTE (i.e. positions equaling 5 days per week) in the same license will be considered one full-time position. Only if no appointed secretaries are reasonably available (through excesses, transfers and/or new hires assigned by the Division of Human Resources) may such school create F-Status positions equaling 1.0 FTE.

2. Notwithstanding the restriction in the preceding paragraph G 1, a school will be allowed to create such F-Status positions in order to accommodate a hardship for a previously appointed pedagogue or because of the particular needs of the program.


### ARTICLE TWENTY-TWO
### WORKING CONDITIONS OF DAY-TO-DAY (OCCASIONAL)
### SUBSTITUTE SCHOOL SECRETARIES


**A. Rates of Pay and Frequency of Payment**

During the term of this Agreement the pay rates per day applicable to day-to-day secretaries shall be:

| Effective Date | Rate |
|---|---|
| May 19, 2008 | $115.61 |
| May 1, 2013 | $116.77 |
| May 1, 2014 | $117.94 |
| May 1, 2015 | $121.50 |
| May 1, 2016 | $125.74 |
| May 1, 2017 | $131.46 |
| May 1, 2018 | $134.04 |
| June 16, 2018 | $138.06 |

Secretaries covered by this Article shall continue to be paid on a semi-monthly basis.

**B. Applicable Contractual Provisions**

Only the following provisions of this Agreement are applicable to school secretaries covered by this Article:

Article One, Recognition
Article Two, Fair Practices
Article Three G, Reimbursement for Medical Expenses
Article Three H, Damage or Destruction of Property
Article Three L, Ratification Bonus
Article Three N, Lump Sum Payments Stemming From the 2009-2011 Round of Bargaining
Article Three O, Healthcare Savings
Article Four C, Board of Education Retirement System
Article Four D, Pension Legislation
Article Four E, Tax Deferred Annuity Plan
Article Six A-1, School Secretaries Serving in Schools (Hours)
Article Six A-3, All School Secretaries (Hours)
Article Six C, Pilot Program
Article Seven B, Limitation on Assignments
Article Nine C, Reduction of Paperwork
Article Ten, Safety and Health
Article Fourteen A, Restrictions on Union Activities
Article Fourteen C, Exclusive Check-Off
Article Fourteen D, Agency Fee Deduction
Article Fourteen H, Political Check-Off
Article Sixteen A, School Secretary Files
Article Sixteen B, Counseling Memos
Article Sixteen C, Summons
Article Sixteen J, Medical Review Procedures
Article Seventeen, Grievance Procedure
Article Eighteen, Special Complaints
Article Twenty-Two, Working Conditions of Day-to-Day Substitute School Secretaries
Article Twenty-Four, Progressive Redesign Opportunity Schools For Excellence (PROSE)
Article Twenty-Eight, Notice - Legislative Action
Article Thirty, Incorporation of Determination and Award
Article Thirty-One, Duration

## C. Joint Study

During the term of this Agreement the parties will examine the cost, appropriateness and feasibility of providing sick leave and vacation pay as benefits for employees covered by this Article in the successor Agreement.

## ARTICLE TWENTY-THREE
## CHARTER SCHOOLS

### A. Conversion Charter Schools

Pursuant to Article 56 of the New York State Education Law (the "Charter Schools Law") an existing public school may be converted to a charter school. As modified below, secretaries of a Conversion Charter School shall be subject to this collective bargaining agreement, in accordance with the Charter Schools Law, including but not limited to salary, medical, pension and welfare benefits and applicable due process procedures. The provisions regarding the right of return which follow apply to secretaries in such Board schools that are converted to charter schools ("Conversion Charter Schools").

1. At the point of conversion of a Board school to a Conversion Charter School, incumbent employees who choose not to remain as employees in the school as a charter school will have the placement rights contained in Articles 12 and 13 of this Agreement.

2. The Board agrees to extend leaves beyond the statutory two year period to the full term of their employment in the charter school for Board employees who become Conversion Charter School employees. Such employees shall have a right to return to their former geographic district or superintendency in accordance with their seniority. For such employees, service in a Conversion Charter School and Board service shall be combined for all contractual purposes where length of service is a factor.

3. Conversion Charter School pedagogical employees placed at the Board shall be eligible for up to a total of two years credit toward tenure based upon satisfactory service at a Conversion Charter School and any applicable prior Board service.

4. The contractual salary limitations for Conversion Charter School employees placed at the Board shall not apply to certified pedagogical employees.

5. If a Conversion Charter School closes or if the employee is laid off due to economic necessity beyond their control, certified pedagogical Conversion Charter School employees who were not Board employees when hired by the Conversion Charter School shall have placement rights in the Board equal to a certified provisional teacher with no seniority.

6. If a Conversion Charter School closes or if the employee is laid off due to economic necessity beyond their control, uncertified pedagogical Conversion Charter School employees shall have no placement rights in the Board, but the Board will use its best efforts to place such employees in available vacancies.

7. Conversion Charter Schools shall be required to maintain the same medical, pension and welfare fund benefits as apply to Board employees covered by this Agreement.

8. Except as otherwise set forth herein, pursuant to and in accordance with the Charter Schools Law, the terms and conditions of this collective bargaining agreement apply to secretaries serving in the Converted Charter Schools. However, nothing shall limit the Board of Trustees of the converted Charter School from exercising their rights to modify the collective

bargaining agreement for the purposes of employment in the charter school, in accordance with and pursuant to the provisions of Section 2854 3(b) of the Charter Schools Law.

9. While the Charter Schools Law, as written, provides that the decision to apply for conversion of an existing school resides in the parents of the student body, the Board believes the participation of the UFT and its members is critical in this process. The successful conversion of schools to the Charter model necessitates the involvement of the faculty at these schools. Because of this, the Board fully intends to consult with the UFT in the conversion process, and will seek a collaborative atmosphere in moving forward. Towards that end, in Board schools that are under consideration for conversion to Charter School status, if 50% or more of the staff chooses to stay at the Board of Education, the Board and the Union shall undertake a joint review of the impact of conferring charter status on the school.

10. Also, for Board schools that convert to charter status, the Memorandum of Understanding between the Board and the Charter School shall provide that the grievance procedure for UFT employees, unless and until modified in accordance with the Charter Schools Law, shall be the contractual grievance procedure modified to provide that Step 1 shall be at the level of the head of the school, Step 2 shall be to the Board of Directors of the school and Step 3 shall be to binding arbitration.

**B. New Charter Schools**

It is agreed that UFT represented employees who leave the Board to serve in a new charter school shall have the following rights:

1. Employees shall be granted a two year leave of absence;

2. Employees returning from a leave of absence shall be credited for time served at the charter school toward their placement on the salary schedule; and

3. Employees shall have a right to return to their former geographic district or superintendency in accordance with their seniority.

# ARTICLE TWENTY-FOUR
## PROGRESSIVE REDESIGN OPPORTUNITY SCHOOLS FOR EXCELLENCE
## (PROSE)

**A. Mission**

1. To achieve success and outstanding results through a truly collaborative environment for all schools at all levels among the key stakeholders responsible for educating New York City's schoolchildren – teachers and other school-based staff, principals, and parents.

2. To build this partnership on a basis of collaboration and mutual respect that empowers school-based staff (including administrators) and enables students to learn, thrive, and achieve mastery.

3. To treat instructional staff as professionals by empowering them and holding them responsible for providing the highest quality of teaching.

4. To foster continuous innovation in the way that labor and management, principals, supervisors, and teachers and other school-based staff share information, share decision-making, and share accountability for student achievement and sound educational outcomes.

5. To empower school-based staff to embrace new ways of teaching children, even if this means modifying certain existing regulations and work rules. This includes reexamining current

instructional practice, such as the school day and school year, student assessment, evaluation, and class size.

6. To leverage technology in instruction to engage students and improve professional development. This partnership will use technology to improve the assessment of student learning, workforce engagement, and parent satisfaction.

7. To use joint training and labor-management facilitators.

8. To give existing schools the opportunity and flexibility to change certain rules and challenge the traditional way of doing things – provided they meet specific, measurable performance targets.

9. To demonstrate creativity and innovation in the pursuit of educational excellence.

**B. Joint PROSE Panel.**

1. Upon ratification of the successor collective bargaining agreements  to the 2007-2009 collective bargaining agreements, a collaborative, decision-making Panel made up of an equal number of members selected by the UFT President and the Chancellor will invite school teams of UFT-represented employees and CSA-represented administrators to submit proposals for five years long for participation in the PROSE program where schools with real educator voice and decision making input and/or authority are permitted to design schools that work best for the students and communities they serve.

2. The program will begin as soon as practicable, consisting of a mix of high- and low achieving schools, and a mix of elementary, middle, and high schools.

3. The Panel will set a goal of implementing two hundred (200) PROSE Program schools over the next five years that will be overseen and report into the office of the Senior Deputy Chancellor.

4. Proposals will be for a maximum of five (5) years.  The Panel may end a school's participation in the program only if the school is not succeeding.

**C. How the Joint Panel screens and evaluates proposals.**

**1. Proposals will be screened based on the extent to which they demonstrate:**

a. Partnership between UFT-represented employees and CSA-represented administrators in decision-making;

b. A proven record of previous collaboration and success (which includes, but is not limited to, academic success on assessments);

c. Creativity and flexibility in modifying DOE-regulations and CBA provisions as specified in section C(1)(j);

d. A school community where many voices are listened to;

e. Strong buy-in from both UFT-represented employees and CSA-represented administration;

f. A commitment to capacity-building and sustainability from the Board (DOE), UFT and CSA;

g. Jointly-designed and job-embedded professional development and training;

h. A five (5) year commitment to the proposal;

i. Measurable, reportable performance targets (defined more broadly than academic success on assessments).  If any school does not meet its targets, the panel may take away its PROSE status at the end of five years or sooner;

j. Proposals may (but do not have to) include changes to this Agreement that relate to (i) configuration of the existing work hours and/or work year (Article 6), including extending the

school day and/or year, provided there is no diminution of annual salary; (ii) programs, assignments and teaching conditions in schools and programs (Article 7); professional support for new teachers (Article 8G); (iii) evaluation; (iv) professional development assignments and positions (Article 11 IV); (v) working conditions of per session teachers (Articles 15C2 and 15C4); (vi) Step 1 of the grievance process (Article 22B1a); and (vii) transfers to the school (Article 18A, paragraph 1, sentence 2). The Chancellor and UFT President may agree to other articles of this Agreement that schools may propose to change. Proposals may (but do not have to) include modifications to Chancellor's Regulations except those affecting student safety or implementing state and federal laws and regulations.

**2. Proposals must include:**

a. Evidence of the school's current success, or if a group, at least one (1) school in the group's success in providing a quality education to students. The Panel will consider multiple measures of success, not only academic measures. Schools that serve high-need students and schools without screened or selective admissions are especially encouraged to apply.

b. A list of the types of innovative, teacher-led practices that the school currently uses or is planning to use to promote student success. Examples could include: school-based staff selection procedures, UFT-represented employee representation on and powers of current school committees that positively influence the quality of instruction delivered to students, School-Based options for scheduling or other policies;

c. A specific description of how the school intends to use the contractual and regulatory flexibility of the PROSE program to provide employees with decision-making input and authority in the school and build on its successes during the duration of the plan. As part of their proposals, schools may choose to establish committees consisting of key school-based stakeholders to examine resource allocation, schedules, curriculum, technology, professional development, hiring, and parent engagement.

d. A proposed budget for the initial year, including both current budgetary resources and any requested supplementary funds. No such supplemental funds are guaranteed. The UFT and DOE will commit to pursuing additional outside funding to support innovative school plans, where feasible. The PROSE program is not contingent on securing additional outside funding.

e. A mechanism for PROSE Program schools to regularly report their progress to the Panel including, but not limited to, annual goals and budgets.

**C. How a school becomes a PROSE Program School.**

1. Applying schools must submit a proposal which has been approved by the School Leadership Team of their school.

2. To be accepted, the UFT and DOE Panel members must agree to accept the proposal and allow a school's participation in the PROSE program. Once approved by the Panel (including any required revisions), a proposal is submitted to the school for adoption.

3. The proposal may be implemented only upon ratification by sixty-five percent (65%) of all those UFT-represented employees voting and acceptance by the school's principal. Proposals may also be modified by the same ratification and approval process set forth in this subsection D.

4. UFT-represented employees who wish to transfer out of a school that has been approved to participate in the PROSE program may do so on the same basis as similarly situated employees, with the exception that teachers who wish to transfer out of the school for the 2014-15 school year may do so by October 15th without Principal release if they find another position in accordance with the applicable CBA.

5.  If accepted and approved as provided herein, the UFT, DOE and the applying school will implement the proposal as approved.

6.  Individual schools or groups of schools may apply; however, preference will be given to groups of schools which demonstrate a mix of types of schools.  Where a group of schools apply, each school in the group must ratify the proposal by sixty-five percent (65%), as provided herein, in order to participate.

7.  Participation in the PROSE program can be renewed at the expiration of the initial proposal term, in accordance with the Panel's approval, and with ratification by sixty-five percent (65%) of school's staff, and approval by the school's principal, and a vote of the school leadership team.

8.  The Panel shall, as soon as practicable, implement the PROSE program, adopt application procedures, and accept proposals from schools.

9.  The DOE and UFT will collaborate in developing pre-application and post-application workshops to be delivered during the 2014-15 school year for applications which will be implemented after the 2014-15 school year.

**D. New Schools.**

1.  The DOE and the UFT will develop an alternative process for the creation of new schools that are proposed by either teachers and parents.

2.  These schools can be proposed in addition to the two hundred (200) PROSE Program Schools and if approved in accordance with the agreed upon procedures will have the same flexibility with regard to Chancellor's regulations and work rules as PROSE Program Schools.


# ARTICLE TWENTY-FIVE
## CONFORMITY TO LAW - SAVING CLAUSE

A.  If any provision of this Agreement is or shall at any time be contrary to law, then such provision shall not be applicable or performed or enforced, except to the extent permitted by law and any substitute action shall be subject to appropriate consultation and negotiation with the Union.

B.  In the event that any provision of this Agreement is or shall at any time be contrary to law, all other provisions of this Agreement shall continue in effect.


# ARTICLE TWENTY-SIX
## NO-STRIKE PLEDGE

The Union and the Board recognize that strikes and other forms of work stoppages by school secretaries are contrary to law and public policy.  The Union and the Board subscribe to the principle that differences shall be resolved by peaceful and appropriate means without interruption of the school program.  The Union therefore agrees that there shall be no strikes, work stoppages, or other concerted refusal to perform work, by the employees covered by this Agreement, nor any instigation thereof.

## ARTICLE TWENTY-SEVEN
## DEFINITIONS

1. Wherever the term "Board" is used in the Agreement it shall mean the City Board, it being understood, nevertheless, that this contract is binding on all community school districts in accordance with Section 2590 of the Education Law.

2. Wherever the term "community school board" or "community board" is used in the Agreement it shall mean the board of education of a community district.

## ARTICLE TWENTY-EIGHT
## NOTICE - LEGISLATIVE ACTION

The following article is required by the Public Employees' Fair Employment Act, as amended by Section 204a, approved March 10, 1969:

It is agreed by and between the parties that any provision of this Agreement requiring legislative action to permit its implementation by amendment of law or by providing the additional funds therefore, shall not become effective until the appropriate legislative body has given approval.

## ARTICLE TWENTY-NINE
## COPY OF AGREEMENT

The parties will have available copies of this Agreement upon request.

## ARTICLE THIRTY
## INCORPORATION OF DETERMINATION AND AWARD

The determination and award of the arbitration panel in Case No IA-1-85 is incorporated into this Agreement and made a part hereof.

## ARTICLE THIRTY-ONE
## DURATION

This Agreement and each of its provisions shall be effective as of November 1, 2009 and shall continue in full force and effect through November 30, 2018.

Negotiations for a subsequent Agreement will commence no sooner than April 30, 2018 upon request of either party filed two weeks in advance or as otherwise mutually agreed.

**APPENDIX A**
**BOARD OF EDUCATION**
**of the City of New York**
**110 Livingston Street**
**Brooklyn, N.Y. 11201**

MEMORANDUM

November 13, 1972

To:     Community School Board Chairman
         All Superintendents
Re:     Building Security for School Secretaries:

LADIES AND GENTLEMEN:

It was agreed during the recent negotiations with the United Federation of Teachers that the memorandum concerning building security for school secretaries, issued on October 13, 1971, would again be brought to the attention of the school principals.

Will you, therefore, inform all principals that "the principal is charged with the responsibility of developing suitable security arrangements which will provide for the presence (during the work day) within the school premises, of the principal or his designated representatives, who shall be accessible to the area where the school secretaries are stationed."

IRVING ANKER

Deputy Chancellor

## APPENDIX B
## GRIEVANCE FORM
## STEP ONE GRIEVANCE

School:_____District:_____

Name of Grievant:_____

Title (teacher, school secretary, etc):_____

File Number:_____

Date Grievance Occurred:_____


Set forth specifically the act or condition and the grounds on which the grievance is based:
Specific contractual article and section alleged to be violated:
Specific remedy sought:

_____
<em>(Signature of Grievant)</em>


Date filed:


## GRIEVANCE CONFERENCE

Date:

Attendees:
|              Name              |              Title              |
|--------------------------------|---------------------------------|

Decision including supporting reason:

_____
<em>(Signature)</em>


Date

# APPENDIX C
## HEALTH INSURANCE

In accordance with the LOBA determination and award in Case No. IA-1-85 and subsequent agreements, the following shall apply:

1. Effective July 1, 1983 and thereafter, the Employer's cost for each contract for each Employee under age 65 and for each retiree under age 65 who selects either HIP/HMO or Blue Cross/GHI-CBP coverage (or a replacement plan) shall be equalized at the community rated basic HIP/HMO plan payment rate as approved by the State Department of Insurance on a category basis of individual or family, e.g. the Blue Cross/GHI-CBP payment for family coverage shall be equal to the HIP/HMO payment for family coverage.

2. If a replacement plan is offered to employees and retirees under age 65 which exceeds the cost of the HIP/HMO equalization provided for in Section 1, the City shall not bear the additional costs.

3. The Employers shall contribute on a City employee benefits program-wide basis the additional annual amount of $30 million to provide a health insurance stabilization reserve fund which shall be used to continue equalization and protect the integrity of health insurance benefits.

4. The health insurance stabilization reserve fund shall be used: to provide a sufficient reserve; to maintain to the extent possible the current level of health insurance benefits provided under the Blue Cross/GHI-CBP plan; and, if sufficient funds are available, to fund new benefits.

5. The health insurance stabilization reserve fund shall be credited with the dividends or reduced by the losses attributable to the Blue Cross/GHI-CBP plan.

# APPENDIX D
## PROCEDURES FOR PROBABLE CAUSE HEARINGS

On October 2, 2005 the following understanding was reached regarding probable cause hearings:

The UFT will conduct a meeting of lawyers who represent UFT members at 3020-a proceedings to inform them about the new procedures regarding offenses involving sexual misconduct with a student or a minor not a student. During that meeting there will be a discussion of what could constitute probable cause, including that we agree that in a probable cause hearing the hearing officer may accept hearsay as evidence of probable cause, and that a criminal complaint and corroborating affidavit or the SCI report is sufficient evidence to create a rebuttable presumption of probable cause.

October 17, 2007


Randi Weingarten
President
United Federation of Teachers
52 Broadway – 14th Floor
New York, NY 10004

Dear Ms. Weingarten:

This letter will confirm certain mutual understandings and agreements of the parties.

The parties agree to jointly support legislation to amend current pension provisions that will contain the following elements in order to implement an optional "25/55" retirement program for current employees in the Teachers Retirement System (TRS) and the below listed UFT-represented members in the Board of Education Retirement Systems (BERS) and to provide a revised retirement paradigm for newly-hired employees in TRS and newly-hired UFT-represented members in BERS listed below. The UFT-represented BERS titles to be included are: all nurse and therapists titles, substitute vocational assistants, all non-annualized adult education titles, directors and assistant directors of drug and alcohol programs, sign language interpreters, all military science instructor titles, and all education officer and analyst titles.

The legislation will incorporate the following:

(1)   An "opt-in period" of six months in which any incumbent employee who wishes to participate in this optional program must affirmatively submit a written election to participate.

(2)   Additional Member Contributions (AMC) – in addition to all currently required statutory contributions, an Additional Member Contribution (AMC) of 1.85% shall be paid by those employees electing to participate in this optional program as well as by all newly-hired employees participating in the TRS and newly-hired UFT-represented above listed members participating in BERS retirement systems. These additional member contributions shall become effective on the first business day after the enactment of this enabling legislation.

(3)   Current incumbent employees including those on leave who elect to participate in this optional program and who pay the requisite AMC shall be eligible to retire at age 55

with 25 years of credited service with immediate payability of pension benefits without any reduction. Assuming the legislation is effectuated in the 2007-08 school year, those who elect this pension will be eligible to retire 6/30/2008 or later.

(4)     Employees hired after enactment of this enabling legislation shall be eligible to retire at age 55 with 27 years of service and receive immediate payability of pension benefits without any reduction. This will not be construed to change the eligibility for retiree health insurance benefits (i.e., ten years of credited service and pension payability) as determined by the City and Municipal Labor Committee and in accordance with the Administrative Code.

(5)     To the extent the parties have not captured all of the necessary elements required to be enacted with enabling legislation (e.g., loan provisions, refund rules, etc.), the intent is that those elements shall be analogous to those comparable provisions contained in Chapter 96 of the Laws of 1995. Should the parties be unable to agree on those specific terms in a timely fashion, they agree that the City Actuary, in consultation with the Law Department's Pension Division and the UFT, shall determine the final language for the proposed legislation consistent with the parties' mutual understandings.

If the above accords to your understanding, please execute the signature line below.

Very truly yours,

James F. Hanley

Agreed and Accepted By:

_____          _____ October 17, 2007 _____
Randi Weingarten                                    Date
President
United Federation of Teachers

**APPENDIX F**
**DISTRICT 79 REORGANIZATION**

Memorandum of Agreement entered into this 29th day of June 2007, by and between the Board of Education of the City School District of the City of New York (hereinafter referred to as the "BOE") and the United Federation of Teachers, Local 2, AFT, AFL-CIO (hereinafter the "UFT") amending the collective bargaining agreements for 2003-07 and 2007-09 between the UFT and the BOE governing Teachers and the corresponding provisions of the other collective bargaining agreements for 2003-07 and 2007-09 that govern other UFT-represented employees assigned to District 79 (hereinafter collectively the "Contract") to the extent set forth below.

**IN WITNESS WHEREOF**, it is mutually agreed to as follows:

1. The UFT will withdraw with prejudice any currently pending grievances related to the reorganization of District 79. The UFT will withdraw with prejudice any currently pending grievances related to (i) the closure of the current GED program (ASHS, CEC, OES, and VTC), (ii) New Beginnings, (iii) Schools for Pregnant Teens, (iv) Second Opportunity Schools and (v) Off-site Suspension Centers (hereinafter collectively, the "Closing Programs") and the creation of (i) a new GED program known as GED Plus (hereinafter "GED Plus"); (ii)a new school known as Restart; (iii) two new ACCESS schools (hereinafter, collectively, "GED Plus/Restart/ACCESS") and (iv) a new program for students suspended for one year (hereinafter "the New Suspension Program") (GED Plus/Restart/ACCESS and the New Suspension Program hereinafter collectively the "New Programs"). The UFT waives any claims under the Contract or under law not yet asserted as to (i) whether the Closing Programs are substantially the same as the New Programs; (ii) whether the BOE complied with its obligation to bargain with the UFT with respect to the BOE's decision to end the Closing Programs and create the New Programs; and (iii) whether the closure of the Closing Programs, the creation of the New Programs or the resulting personnel actions violate the Contract or any applicable law. The UFT does not waive any claims other than those set forth in this paragraph 1 nor any claim that the BOE violated this Memorandum of Agreement.

2. Section 18D of the Contract will apply to the staffing of the New Programs listed above except that section 18D(3) will apply to one-hundred percent of the bargaining unit positions (not fifty percent of the bargaining unit positions). There will be one personnel committee established for each of the New Programs, but, for GED Plus/Restart/ACCESS, there will be five subcommittees, one for each borough. Grievances challenging whether the personnel committee's decision regarding the qualifications of individual applicants will be granted if the arbitrator finds that there was no "reasonable basis" for the determination. If one subcommittee finds an applicant qualified for GED Plus/Restart/ACCESS, that

applicant shall be deemed qualified for employment in any borough. The GED Plus/Restart/ACCESS personnel committee may require applicants to submit a cover letter or resume explaining how they meet the posted qualifications. The BOE shall make every effort to have applications, including cover letters, submitted on-line. The subcommittees shall do phone interviews for applicants that have prior commitments that prevent them from coming to in-person interviews. The subcommittees will work according to a single hiring rubric created by the GED Plus/Restart/ACCESS personnel committee. The UFT and BOE will jointly conduct training sessions for members of the five subcommittees on the rubric. The GED Plus/Restart/ACCESS personnel committee and the subcommittees shall consider applicants from all employees in all license areas.

3. Employees excessed from the Closing Programs shall assert a preference as to where they will be deployed in the Absent Teacher Reserve (should they not secure a regular position) as follows: high school employees will list five individual high schools and then a borough; elementary and middle school employees will list five districts and then a borough. Preferences will be granted in seniority order up to a limit of one assignment per fully phased- in school (except in District 79, which is covered by paragraph 4 and not this paragraph 3). Should these employees still be in ATR status in subsequent school years they will be deployed in the same district or borough as the school they were deployed to under the preference system provided for in this paragraph 3.

4. Any actual vacancies in the New Programs that exist as of September 17, 2007 will be filled with excessed employees from the Closing Programs, in license (for GED Plus/Restart/ACCESS, all teaching licenses are appropriate) and in seniority order, under the following conditions: employees placed in these vacancies will serve for the balance of the 2007-2008 school year unless they are removed for disciplinary reasons. At the end of the 2007-2008 school year, if both the principal and employee agree, the employee will be appointed to fill the vacancy in the school. If either the employee or principal do not wish the assignment to continue, the employee will be placed back in ATR status and will be deployed according to the process set forth in paragraph 3 above.

5. The Second Opportunity Schools (hereinafter "SOS") and Off-Site Suspension Centers ("OSC") will close effective August 29, 2007. Employees currently working in SOS who wish to work in the New Suspension Program will be selected for the New Suspension Program. The second sentence of paragraph 6, the first sentence of paragraph 10 and the entire paragraph 12 of the Stipulation of Settlement executed November 17, 2006 with respect to SOS (the "Stipulation") shall apply to the New Suspension Program (the provisions in Paragraph 12 shall apply only to alleged violations of the second sentence of paragraph 6 and the first sentence of Paragraph 10 of the Stipulation). Those employees having rights under the first sentence of paragraph 10 of the Stipulation may, alternatively, choose to be deployed as an ATR according to the process set forth in paragraph 3

of this Agreement above. Nothing contained herein shall be construed as a waiver of any provision of the Stipulation until SOS and OSC are closed. Placement in the New Suspension Program shall continue to be voluntary. Staff presently assigned to SOS will have the right to remain in the New Suspension Program. Current SOS and OSC employees will notify the BOE by June 30, 2007 whether they will choose to work the SOS summer 2007 session. SOS employees will be given the opportunity to indicate by July 13, 2007 whether they will choose to work in the New Suspension Program or, alternatively, whether they will choose to be deployed as an ATR according to the process set forth in paragraph 3 of this Agreement above.

6. The New Suspension Program's summer school program (hereinafter the "Suspension Summer Program") will be governed in all respects by the provisions of the Contract and Chancellor's Regulations governing per session programs, except that the pay for such summer service for UFT-represented employees will be pro-rata. Employees working in the New Suspension Program shall have preference for the Suspension Summer Program.

7. Current SOS employees will be rated on their performance during the summer of 2007. Those who receive a satisfactory rating and who worked in SOS during the summer of 2006 and received a satisfactory rating for the 2005-2006 school year will have retention rights under Section 15c2(a) of the Contract for work in 2008 Suspension Summer Program.

8. The BOE will post teaching positions that will support pregnant and parenting teens across the system. 100% of the teachers currently serving in the School for Pregnant Teens who apply and meet the posted qualifications will be hired for these positions. The BOE will consult with the UFT regarding the posting for these positions. These teachers will be deployed out of the BOE's LYFE centers and referral centers ("hubs") where appropriate and the BOE will consult with the UFT regarding such deployment decisions. No LYFE Center shall be closed through at least the 2008-2009 school year.

9. The UFT will serve on a committee to be established by the BOE, which may also include advocates, community representatives and experts, to examine and make recommendations regarding best practices in supporting students across the system who are pregnant or parenting teens.

10. District 79 staff who are excessed from the Closing Programs will have the right of return to a vacancy in New Programs in seniority order if they were found qualified by an 18D committee but did not secure the position because more senior qualified applicants were selected. For the programs in which multiple licenses are appropriate, all license areas will be grouped together for purposes of determining seniority with respect to the previous sentence.

11. All other terms of the Contract shall remain in full force and effect unless it is otherwise amended by or are inconsistent with the terms of this Memorandum of Agreement.

Agreed to this _____ day of June 2007:

Department of Education

/s/ Joel Klein

_____


United Federation of Teachers

/s/ Randi Weingarten

_____

## APPENDIX G
## FALSE ACCUSATIONS

Joel I. Klein
Chancellor
Department of Education
52 Chambers Street
New York, NY  10007

December 17, 2007

Randi Weingarten
President
United Federation of Teachers
52 Broadway
New York, NY 10002

Dear Ms Weingarten,

Notwithstanding any provision of the Teacher CBA (and corresponding provisions in other UFT contracts) to the contrary, the parties agree that grievances may be initiated under Article 21H (False Accusations) of the Teacher Agreement (and corresponding provisions in other UFT contracts) for the purpose of securing implementation of its specific provisions, including removal of material from the employee's personnel file.

Sincerely,

Joel I. Klein

# APPENDIX H
# PARKING



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

EDWARD SKYLER
DEPUTY MAYOR FOR OPERATIONS

August 26, 2008

Ms. Randi Weingarten
President
United Federation of Teachers
52 Broadway
New York, NY 10004

Dear Ms. Weingarten:

As you know, Mayor Bloomberg announced earlier this year that the City of New York is implementing a comprehensive program to reduce the number and abuse of government parking placards. This program is part of our efforts to reduce traffic congestion, decrease the City's carbon footprint, and encourage the use of public transportation. Accordingly, the City has designated the Department of Transportation (DOT) and the Police Department as the sole issuing agencies of placards for on-street parking. No other agencies, including the Department of Education (DOE), are now permitted to issue on-street parking placards. With respect to DOE, the transition to the new system will be implemented over the coming weeks as follows:

1. DOE currently has 10,007 on-street parking spots allocated by DOT. These spots have been assigned to individual schools by DOE based on the location of the on-street spots and schools. All of these spots will continue to be available for school parking. In addition, DOE has 15,060 off-street parking spots, each of which will also continue to be available for school parking.

2. DOT will produce and DOE will issue 10,007 Agency Authorized On-Street Parking Placards which allow an individual to park in the on-street spaces designated for a specific school. DOE will continue to issue separate placards valid only for access to the 15,060 off-street parking spots.

3. With respect to the recipients of the on-street and off-street placards, principals and the United Federation of Teachers (UFT) Chapter Leaders will decide on one of the following distribution methods: (1) assignment to individual staff; (2) pooling of placards for use each day; or (3) some combination of these two options. If a principal and the UFT Chapter Leader cannot agree, then the UFT

Printed on paper containing 30% post-consumer material.

President and Commissioner of the Office of Labor Relations, or their respective designees, will make a final decision.

4. If a principal or UFT Chapter Leader believes: (1) a school deserves additional curb-space allocated for school parking; (2) the number of current on-street spaces was incorrectly counted; or (3) there is additional off-street space that is underutilized, they can appeal to DOT and DOE through the Mayor's Office of Operations.

5. DOT will produce and DOE will issue at least 1,000 additional placards to teachers and staff whose work requires them to visit multiple sites during the course of their workdays, and will also consider requests for placards for teachers that travel between assigned schools. Specific offices and groups for whom these placards are intended include, but are not limited to, the following: Adult and Continuing Education, Citywide Speech Services, Educational Vision Services, Hearing Education Services, Home Instruction, Hospital Instruction, Non-Public Schools, UFT, and some administrative offices. The majority of these placards will be Agency Business Parking Placards which allow an individual to park citywide for three hours at a time (parking meters, etc). The distribution of these placards will be determined by the Chancellor or his designee.

6. The issuance of new placards will start with the beginning of the school year so that the system can be fully in place by October 1. Once the new system has been implemented, violators will be subject to enforcement by the Police Department.

7. The UFT will hold the grievance in abeyance.

Note that with respect to Transit Check, we are already in the process of implementing a program and the RFP that has been put out is due back to the City in September.

Please feel free to contact me at (212) 788-3191 with any questions or additional concerns regarding the transition to the new system.

Sincerely,

Edward Skyler

cc: Joel I. Klein, Chancellor, Department of Education
    Raymond W. Kelly, Commissioner, Police Department
    James F. Hanley, Commissioner, Office of Labor Relations
    Janette Sadik-Khan, Commissioner, Department of Transportation