# EXHIBIT C

## JOINT INTENTIONS AND COMMITMENTS

Enhanced student achievement based upon high standards and expectations must be the driving force behind every activity of New York City public schools.  To accomplish this, we must reinvent schools so that decision making is shared by those closest to students, including parents, teachers, administrators and other stakeholders.  Layers of bureaucratic impediments must be peeled away so that flexibility, creativity, entrepreneurship, trust and risk-taking become the new reality of our schools.  The factory model schools of the 1900s must make way for the child-centered schools of this century.

To this end, the Union and the Board mutually agree to join together with other partners in the redesign and improvement of our schools, including closing those that have failed and supporting their restructuring.  We must challenge ourselves each day to improve student learning, based upon academic rigor, newfound flexibility, meaningful assessments and true accountability.  Roles and responsibilities of parents, staff and other partners must be defined.  The standards to which we hold our students must never be lower than those we hold for our own children.  To accomplish this, we must focus on both the depth and breadth of each proposed instructional and operational change, each designed to support the children and their teachers whom we expect to meet these rigorous standards.

Change must be service-oriented, supportive and sufficiently flexible so that each school's educational vision can become a reality.  It must be practical, possible, efficient and timely.  Respect for each other and for every student must be unconditional if we are to accomplish what we must.

To reach these goals, we commit to working together along with other stakeholders to develop specific recommendations in areas requiring immediate attention.  These will include, but not be limited to:

- School Based Budgeting
- Early Intervention and Prevention of Inappropriate Referrals to Special Education
- Professional Development
- Parent Outreach and Support
- Workload Standards.

This commitment is our pledge to the children of the City of New York, not just to a promise but to a reality of educational excellence.

AGREEMENT MADE AND ENTERED INTO by and between THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK (hereinafter referred to as the "Board") and UNITED FEDERATION OF TEACHERS, Local 2, American Federation of Teachers, AFL-CIO (hereinafter referred to as the "Union" or "UFT").

WHEREAS, the Board has voluntarily endorsed the practices and procedures of collective bargaining as a peaceful, fair and orderly way of conducting its relations with its employees insofar as such practices and procedures are appropriate to the special functions and obligations of the Board, are permitted by law and are consonant with the paramount interests of the school children, the school system and the public; and

WHEREAS, the Board on March 8, 1962, adopted a Statement of Policies and Practices with Respect to Representation of Pedagogical and Civil Service Employees for Purpose of Collective

Bargaining with the Board of Education (hereinafter referred to as the "Statement of Policies"); and

WHEREAS, pursuant to the Statement of Policies and pursuant to the provisions of the Public Employees Fair Employment Act (Chapter 392 of the Laws of 1967 as amended by Chapter 24, 391 et seq. of the Laws of 1969), in a secret ballot election conducted among employees in the titles of Teacher Aide, Educational Assistant, Educational Associate and Auxiliary Trainer in programs to Strengthen Early Childhood Education in Poverty Areas, Pre-kindergarten Classes in Poverty Areas, and More Effective Schools, to determine which labor organization they wished to represent them in collective bargaining with the Board, the Union received a majority of votes and the Board issued a Certificate of Exclusive Bargaining Status to the Union on January 21, 1970; and

WHEREAS, after an appropriate showing of majority representation, the Board also certified the Union on April 6, 1971, as the representative of employees in these same titles in programs other than programs to Strengthen Early Childhood Education in Poverty Areas, Prekindergarten Classes in Poverty Areas, and More Effective Schools; and accordingly the Union became the exclusive bargaining representative of all employees in these titles; and

WHEREAS, pursuant to the provisions of the Public Employees Fair Employment Act, the Union became the exclusive bargaining representative of all employees in the titles of Teacher Aide, Educational Assistant, Educational Associate, Auxiliary Trainer and Bilingual Professional Assistant effective September 9, 1975; and

WHEREAS, the parties entered into an Agreement effective October 13, 2007 until October 31, 2009; and

WHEREAS, the parties entered into a Memorandum of Agreement on May 1, 2014 effective from November 1, 2009 through November 30, 2018 ("the May 1st MOA"); and

WHEREAS, the Board and its designated representatives have met with the representatives of the Union and fully considered and discussed with them, on behalf of the employees in the bargaining unit, changes in salary schedules, improvement in working conditions, and machinery for the presentation and adjustment of certain types of complaints; it is agreed as follows:

## ARTICLE ONE
## UNION RECOGNITION

The Board recognizes the Union as the exclusive bargaining representative of all employees employed in the titles of Teacher Aide, Educational Assistant, Educational Associate, Auxiliary Trainer and Bilingual Professional Assistant.  These persons and each of them are hereinafter referred to variously as "employees (or employee) in the bargaining unit," or "employees (or employee) covered by this Agreement," or "paraprofessional" or "paraprofessionals."

During the term of this Agreement should the Board employ a new title or category of employees having a community of interest with employees in the existing bargaining unit, employees in such new title or category shall be included within the existing bargaining unit and upon request of the Union the parties shall negotiate the terms and conditions of employment for such new title or category of employees; but nothing contained herein shall be construed to require renegotiation of terms and conditions of employment applicable to employees in an existing bargaining unit as a result of the Board's re-designation of the title or category of employees in the unit.

2

Nothing contained herein shall be construed to prevent any Board official from meeting with any employee organization representing employees in this bargaining unit for the purpose of hearing the views and proposals of its members, except that, as to matters presented by such organizations which are proper subjects of collective bargaining, the Union shall be informed of the meeting and, as to those matters, any changes or modifications shall be made only through negotiation with the Union.

It is understood that all collective bargaining is to be conducted at Board headquarters level. There shall be no negotiations with the Union Chapter or with any other employee group or organization at the school or any other level.

Nothing contained herein shall be construed to prevent any individual employee from (1) informally discussing a complaint with his/her immediate superior or (2) processing a grievance in his/her own behalf in accordance with the complaint and grievance procedures hereinafter set forth in Article Twenty-Two.

Nothing contained herein shall be construed to deny to any employee his/her rights under Section 15 of the New York Civil Rights Law or under applicable civil service laws and regulations.

## ARTICLE TWO
## FAIR PRACTICES

The Union agrees to maintain its eligibility to represent all employees by continuing to admit persons to membership without discrimination on the basis of race, creed, color, national origin, sex, marital status, sexual orientation, handicapping condition or age and to represent equally all employees without regard to membership or participation in, or association with the activities of, any employee organization.

The Board agrees to continue its policy of not discriminating against any employee on the basis of race, creed, color, national origin, sex, marital status, sexual orientation, handicapping condition, age or membership or participation in, or association with the activities of, any employee organization.

The Board of Education agrees that, as a result of the strike and its related activities, it will not dismiss, demote, discipline, or otherwise act against any staff member because of his or her participation in said strike or related activities.  Specifically excluded from the foregoing are any and all provisions of the Taylor Law (New York Civil Service Law, Section 200 et seq.), none of which are waived hereby.

Any records of court proceedings or other memoranda relating to job action or strike shall not be put in a staff member's permanent file, except as required by law.

## ARTICLE THREE
## RATES OF PAY

### A.  Salaries

1.  Employees in the bargaining unit who work the entire workyear (regular school year) as set forth in Article Four A (Workyear) and who are assigned to programs comprised of the regular hours of work as set forth in Article Four B (Hours of Work) shall receive the annual rates of pay on the applicable effective dates set forth below:

### EFFECTIVE MAY 19, 2008

| Title | Base Pay | Base Pay Plus 5 Yr. Longevity | Base Pay Plus 15 Yr. Longevity |
|---|---|---|---|
| Teacher Aide | $21,713 | $22,213 | $23,300 |
| Ed. Asst. | $24,692 | $25,192 | $26,279 |
| Ed. Asst. A-I | $25,038 | $25,538 | $26,625 |
| Ed. Asst. A-II | $25,379 | $25,879 | $26,966 |
| Ed. Asst. B | $26,343 | $26,843 | $27,930 |
| Ed. Assoc. | $30,128 | $30,628 | $31,715 |
| Aux. Trainer | $31,774 | $32,274 | $33,361 |
| Biling. Prof. Asst.[1] | $31,774 | $32,274 | $33,361 |
| Ed. Assoc. A | $32,588 | $33,088 | $34,175 |
| Aux. Trainer A | $32,588 | $33,088 | $34,175 |
| Ed. Assoc. B | $34,540 | $35,040 | $36,127 |
| Aux. Trainer B | $34,540 | $35,040 | $36,127 |
| 5 Year Longevity | | $500 | |
| 15 Year Longevity | | | $1,587 |

### EFFECTIVE MAY 1, 2013

| Title | Base Pay | Base Pay Plus 5 Yr. Longevity | Base Pay Plus 15 Yr. Longevity |
|---|---|---|---|
| Teacher Aide | $21,930 | $22,435 | $23,533 |
| Ed. Asst. | $24,939 | $25,444 | $26,542 |
| Ed. Asst. A-I | $25,288 | $25,793 | $26,891 |
| Ed. Asst. A-II | $25,633 | $26,138 | $27,236 |
| Ed. Asst. B | $26,606 | $27,111 | $28,209 |
| Ed. Assoc. | $30,429 | $30,934 | $32,032 |
| Aux. Trainer | $32,092 | $32,597 | $33,695 |
| Bil. Prof. Asst.[2] | $32,092 | $32,597 | $33,695 |

[1] Employed in title prior to December 1975 and continuously thereafter.  Those employed in title effective December 1, l975 and thereafter shall be paid at the same rate as that established for paraprofessionals with the same level of education and experience under this Agreement.

[2] Employed in title prior to December 1975 and continuously thereafter.  Those employed in title effective December 1, l975 and thereafter shall be paid at the same rate as that established for paraprofessionals with the same level of education and experience under this Agreement.

| | Base Pay | Base Pay Plus 5 Yr. Longevity | Base Pay Plus 15 Yr. Longevity |
|---|---|---|---|
| Ed. Assoc. A. | $32,914 | $33,419 | $34,517 |
| Aux. Trainer A | $32,914 | $33,419 | $34,517 |
| Ed. Assoc. B. | $34,885 | $35,390 | $36,488 |
| Aux. Trainer B | $34,885 | $35,390 | $36,488 |
| | | | |
| 5 Year Longevity | | $505 | |
| 15 Year Longevity | | | $1,603 |

### EFFECTIVE MAY 1, 2014

| Title | Base Pay | Base Pay Plus 5 Yr. Longevity | Base Pay Plus 15 Yr. Longevity |
|---|---|---|---|
| Teacher Aide | $22,149 | $22,659 | $23,768 |
| Ed. Asst. | $25,188 | $25,698 | $26,807 |
| Ed. Asst. A-I | $25,541 | $26,051 | $27,160 |
| Ed. Asst. A-II | $25,889 | $26,399 | $27,508 |
| Ed. Asst. B | $26,872 | $27,382 | $28,491 |
| Ed. Assoc. | $30,733 | $31,243 | $32,352 |
| Aux. Trainer | $32,413 | $32,923 | $34,032 |
| Bil. Prof. Asst. [3] | $32,413 | $32,923 | $34,032 |
| Ed. Assoc. A. | $33,243 | $33,753 | $34,862 |
| Aux. Trainer A | $33,243 | $33,753 | $34,862 |
| Ed. Assoc. B. | $35,234 | $35,744 | $36,853 |
| Aux. Trainer B | $35,234 | $35,744 | $36,853 |
| | | | |
| 5 Year Longevity | | $510 | |
| 15 Year Longevity | | | $1,619 |

### EFFECTIVE MAY 1, 2015

| Title | Base Pay | Base Pay Plus 5 Yr. Longevity | Base Pay Plus 15 Yr. Longevity |
|---|---|---|---|
| Teacher Aide | $22,818 | $23,343 | $24,486 |
| Ed. Asst. | $25,949 | $26,474 | $27,617 |
| Ed. Asst. A-I | $26,312 | $26,837 | $27,980 |

---

[3] Employed in title prior to December 1975 and continuously thereafter.  Those employed in title effective December 1, l975 and thereafter shall be paid at the same rate as that established for paraprofessionals with the same level of education and experience under this Agreement.

| | | | |
|---|---|---|---|
| Ed. Asst. A-II | $26,671 | $27,196 | $28,339 |
| Ed. Asst. B | $27,684 | $28,209 | $29,352 |
| Ed. Assoc. | $31,661 | $32,186 | $33,329 |
| Aux. Trainer | $33,392 | $33,917 | $35,060 |
| Bil. Prof. Asst. [4] | $33,392 | $33,917 | $35,060 |
| Ed. Assoc. A. | $34,247 | $34,772 | $35,915 |
| Aux. Trainer A | $34,247 | $34,772 | $35,915 |
| Ed. Assoc. B. | $36,298 | $36,823 | $37,966 |
| Aux. Trainer B | $36,298 | $36,823 | $37,966 |
| | | | |
| 5 Year Longevity | | $525 | |
| 15 Year Longevity | | | $1,668 |

### EFFECTIVE MAY 1, 2016

| Title | Base Pay | Base Pay Plus 5 Yr. Longevity | Base Pay Plus 15 Yr. Longevity |
|---|---|---|---|
| Teacher Aide | $23,614 | $24,157 | $25,340 |
| Ed. Asst. | $26,855 | $27,398 | $28,581 |
| Ed. Asst. A-I | $27,230 | $27,773 | $28,956 |
| Ed. Asst. A-II | $27,602 | $28,145 | $29,328 |
| Ed. Asst. B | $28,650 | $29,193 | $30,376 |
| Ed. Assoc. | $32,766 | $33,309 | $34,492 |
| Aux. Trainer | $34,558 | $35,101 | $36,284 |
| Bil. Prof. Asst. [5] | $34,558 | $35,101 | $36,284 |
| Ed. Assoc. A. | $35,442 | $35,985 | $37,168 |
| Aux. Trainer A | $35,442 | $35,985 | $37,168 |
| Ed. Assoc. B. | $37,565 | $38,108 | $39,291 |
| Aux. Trainer B | $37,565 | $38,108 | $39,291 |
| | | | |
| 5 Year Longevity | | $543 | |
| 15 Year Longevity | | | $1,726 |

### EFFECTIVE MAY 1, 2017

---

[4] Employed in title prior to December 1975 and continuously thereafter.  Those employed in title effective December 1, l975 and thereafter shall be paid at the same rate as that established for paraprofessionals with the same level of education and experience under this Agreement.

[5] Employed in title prior to December 1975 and continuously thereafter.  Those employed in title effective December 1, l975 and thereafter shall be paid at the same rate as that established for paraprofessionals with the same level of education and experience under this Agreement.

| Title | Base Pay | Base Pay Plus 5 Yr. Longevity | Base Pay Plus 15 Yr. Longevity |
|---|---|---|---|
| Teacher Aide | $24,688 | $25,256 | $26,493 |
| Ed. Asst. | $28,077 | $28,645 | $29,882 |
| Ed. Asst. A-I | $28,469 | $29,037 | $30,274 |
| Ed. Asst. A-II | $28,858 | $29,426 | $30,663 |
| Ed. Asst. B | $29,954 | $30,522 | $31,759 |
| Ed. Assoc. | $34,257 | $34,825 | $36,062 |
| Aux. Trainer | $36,130 | $36,698 | $37,935 |
| Bil. Prof. Asst. [6] | $36,130 | $36,698 | $37,935 |
| Ed. Assoc. A. | $37,055 | $37,623 | $38,860 |
| Aux. Trainer A | $37,055 | $37,623 | $38,860 |
| Ed. Assoc. B. | $39,274 | $39,842 | $41,079 |
| Aux. Trainer B | $39,274 | $39,842 | $41,079 |
| 5 Year Longevity | | $568 | |
| 15 Year Longevity | | | $1,805 |

## EFFECTIVE MAY 1, 2018

| Title | Base Pay | Base Pay Plus 5 Yr. Longevity | Base Pay Plus 15 Yr. Longevity |
|---|---|---|---|
| Teacher Aide | $25,172 | $25,751 | $27,012 |
| Ed. Asst. | $28,627 | $29,206 | $30,467 |
| Ed. Asst. A-I | $29,027 | $29,606 | $30,867 |
| Ed. Asst. A-II | $29,424 | $30,003 | $31,264 |
| Ed. Asst. B | $30,541 | $31,120 | $32,381 |
| Ed. Assoc. | $34,929 | $35,508 | $36,769 |
| Aux. Trainer | $36,838 | $37,417 | $38,678 |
| Bil. Prof. Asst. [7] | $36,838 | $37,417 | $38,678 |
| Ed. Assoc. A. | $37,781 | $38,360 | $39,621 |

[6] Employed in title prior to December 1975 and continuously thereafter. Those employed in title effective December 1, l975 and thereafter shall be paid at the same rate as that established for paraprofessionals with the same level of education and experience under this Agreement.

[7] Employed in title prior to December 1975 and continuously thereafter. Those employed in title effective December 1, l975 and thereafter shall be paid at the same rate as that established for paraprofessionals with the same level of education and experience under this Agreement.

| | | | |
|---|---|---|---|
| Aux. Trainer A | $37,781 | $38,360 | $39,621 |
| Ed. Assoc. B. | $40,044 | $40,623 | $41,884 |
| Aux. Trainer B | $40,044 | $40,623 | $41,884 |
| | | | |
| 5 Year Longevity | | $579 | |
| 15 Year Longevity | | | $1,840 |

### EFFECTIVE JUNE 16, 2018

| Title | Base Pay | Base Pay Plus 5 Yr. Longevity | Base Pay Plus 15 Yr. Longevity |
|---|---|---|---|
| Teacher Aide | $25,927 | $26,523 | $27,822 |
| Ed. Asst. | $29,486 | $30,082 | $31,381 |
| Ed. Asst. A-I | $29,898 | $30,494 | $31,793 |
| Ed. Asst. A-II | $30,307 | $30,903 | $32,202 |
| Ed. Asst. B | $31,457 | $32,053 | $33,352 |
| Ed. Assoc. | $35,977 | $36,573 | $37,872 |
| Aux. Trainer | $37,943 | $38,539 | $39,838 |
| Bil. Prof. Asst. [8] | $37,943 | $38,539 | $39,838 |
| Ed. Assoc. A. | $38,914 | $39,510 | $40,809 |
| Aux. Trainer A | $38,914 | $39,510 | $40,809 |
| Ed. Assoc. B. | $41,245 | $41,841 | $43,140 |
| Aux. Trainer B | $41,245 | $41,841 | $43,140 |
| | | | |
| 5 Year Longevity | | $596 | |
| 15 Year Longevity | | | $1,895 |

    2.   Employees in the bargaining unit who were employed as of the last day of the program in June 1970 in any of the titles set forth above will be paid the rates specified above for the respective titles based on the educational requirements in effect on that date.

    3.   Employees in the bargaining unit who work less than the entire workyear (regular school year) set forth in Article Four A (Workyear) or who are assigned to programs of less than the regular hours of work as set forth in Article Four B (Hours of Work) and employees in the Office of Adult and Continuing Education who are assigned to programs comprised of more than the regular hours of work of  30 hours per week or more than the regular workyear (regular school year) shall receive a pro-rated amount based on the hours and workyear worked.

---

[8] Employed in title prior to December 1975 and continuously thereafter.  Those employed in title effective December 1, l975 and thereafter shall be paid at the same rate as that established for paraprofessionals with the same level of education and experience under this Agreement.

4. Employees will be entitled to receive a longevity differential in the amount set forth above per year after 15 years of paraprofessional service.

5. Effective school year 2007-2008, all paraprofessional longevities are to be included as part of gross annual salary rates.

6. Effective May 19, 2008, employees will be entitled to receive a longevity differential in the amount set forth above per year after five (5) years of paraprofessional service until they have completed fifteen (15) years of paraprofessional service.

**B. Advancement to Higher Title**

Employees in the bargaining unit will advance to the next higher title upon satisfactorily completing the following requirements:

1. A Teacher Aide with one year's experience in the program will be advanced to Educational Assistant upon satisfactorily completing six semester hours of approved college courses.

2. An Educational Assistant will be advanced to Educational Assistant A-I upon satisfactorily completing 15 semester hours of approved college courses.

3. An Educational Assistant A-I or an Educational Assistant will be advanced to Educational Assistant A-II upon satisfactorily completing 30 semester hours of approved college courses.

4. An Educational Assistant A-II or an Educational Assistant A-I or an Educational Assistant will be advanced to Educational Assistant B upon satisfactorily completing 45 semester hours of approved college courses.

5. An Educational Assistant B or an Educational Assistant A-II or an Educational Assistant A-I or an Educational Assistant will be advanced to Educational Associate upon satisfactorily completing 60 semester hours of approved college courses and two years of service as an Educational Assistant or an Educational Assistant A-I or an Educational Assistant A-II or an Educational Assistant B or upon satisfactorily completing 90 semester hours of approved college courses and one year of service in the program.

6. An Educational Associate or an Educational Assistant B, or an Educational Assistant A-II or an Educational Assistant A-I or an Educational Assistant will be advanced to Educational Associate A upon satisfactorily completing 90 semester hours of approved college courses and two years of service as an Educational Assistant or an Educational Assistant A-I or an Educational Assistant A-II or an Educational Assistant B or an Educational Associate. To be eligible for the advancement to Educational Associate A after December 16, 1999, the employee must have matriculated in a college program appropriate to a teaching career or to another professional career with the Board of Education. Prior to December 16, 1999, ninety (90) credits and two years of service beyond the level of Teacher Aide qualified a paraprofessional for the new rate regardless of whether the paraprofessional was or is matriculated, provided the paraprofessional applied no later than December 16, 1999.

7. Effective October 1, 2006 an Educational Associate A or an Educational Associate or an Educational Assistant B or an Educational Assistant A-II or an Educational Assistant A-I or an Educational Assistant will be eligible for assignment to Educational Associate B upon completing a baccalaureate degree from a recognized college or university and one year of satisfactory service as an Educational Assistant or an Educational Assistant A-I or A-II or B or as an Educational Associate or Educational Associate A.

9

8.   An Educational Associate or an Educational Associate A will be eligible for assignment to Auxiliary Trainer or Auxiliary Trainer A, as applicable, upon satisfactorily completing 60 semester hours of approved college courses and three years of service as an Educational Assistant or an Educational Assistant A-I or A-II or B or as an Educational Associate or Educational Associate A.   An Educational Associate or Educational Associate A not having three years experience as required in the preceding sentence will be eligible for assignment to Auxiliary Trainer or Auxiliary Trainer A as applicable, upon satisfactorily completing 90 semester hours of approved college courses and two years of service as an Educational Assistant or an Educational Assistant A-I or A-II or B or as an Educational Associate or Educational Associate A.

An Educational Associate B will be eligible for assignment to Auxiliary Trainer B upon satisfactorily completing a baccalaureate degree from a recognized college or university and one year of satisfactory service as an Educational Assistant or an Educational Assistant A-I or A-II or B or as an Educational Associate or Educational Associate A or B.

9.   An Auxiliary Trainer will be advanced to Auxiliary Trainer A upon satisfactorily completing the requirements for promotion to Educational Associate A.

10. An Auxiliary Trainer or an Auxiliary Trainer A will be advanced to Auxiliary Trainer B upon satisfactorily completing the requirements for promotion to Educational Associate B.

### C.  In-Service Course Credit

Satisfactorily completed in-service courses for which college credit is granted will be approved as college courses for advancement to higher title.

### D.  Summer Vacation Pay

Summer vacation pay shall be pro-rated for the school year on the following basis: Paraprofessionals who are appointed after the start of the school year and paraprofessionals who are terminated, laid off, resign or retire on or before the end of the school year shall receive vacation pay for the summer following their appointment or cessation of service as follows: one-tenth of the amount of the vacation pay which would be payable for a full year's service shall be paid for each month of service or major fraction thereof during the school year except that service of six working days or more during the first month of appointment shall be credited for summer vacation pay.

Paraprofessionals employed in the Office of Adult and Continuing Education who are assigned to programs comprised of more than the regular hours of work as set forth in Article Four B, and/or more than the regular school year as set forth in Article Four A, shall receive a prorated amount of summer vacation pay based on their hours of work and workyear.

### E.  Performance Incentives Committee

A committee co-chaired by the Chancellor, the President of the UFT and the New York City Commissioner of Labor Relations, or his or her high-ranking designee, shall be established to investigate the viability and desirability of merit pay and to address other compensation issues such as comparability, skills and responsibility, shortage and hard to staff areas and potential career ladder opportunities.

### F.  Lump Sum Payment

Effective January 1, 2007, a lump sum cash payment shall be paid to all Employees covered by this Agreement ("Eligible Employees").

The lump sum cash payment shall be pensionable, consistent with applicable law, and shall not become part of the Employee's basic salary rate.

Full-time Employees shall be paid $750.  Other Eligible Employees shall have the amount of their cash payment pro-rated based on their hours worked during the applicable payroll periods between mid September and mid December compared to the full-time hours of Employees in their title.

**G. Ratification Bonus**

1.  A lump sum cash payment in the amount of $1,000, pro-rated for other than full-time employees, shall be payable as soon as practicable upon ratification of the May 1st MOA to those employees who are on payroll as of the day of ratification.  This lump sum is pensionable, consistent with applicable law, and shall not be part of the Employee's basic salary rate.

2.  Any disputes arising under this section G shall be determined by Martin F. Scheinman. The parties shall share the costs of his services.

**H. Structured Retiree Claims Settlement Fund**

1.  Upon ratification, the City shall establish a Structured Retiree Claims Settlement Fund in the total amount of $180 million, as modified by the decision of Arbitrator Martin F. Scheinman dated November 17, 2014, to settle all claims by retirees who have retired between November 1, 2009 through June 30, 2014 concerning wage increases arising out of the 2009-2011 round of bargaining.  The Fund will be distributed based upon an agreed upon formula.

2.  Any disputes arising under this section H shall be determined by Martin F. Scheinman. The parties shall share the costs of his services.

**I. Lump Sum Payments Stemming From the 2009-2011 Round of Bargaining**

1.  Schedule for actives for those continuously employed as of the day of payout:
    - i.   10/1/15 – 12.5%
    - ii.  10/1/17 – 12.5%
    - iii. 10/1/18 – 25%
    - iv.  10/1/19 – 25%
    - v.   10/1/20 – 25%

2.  Employees who retire after June 30, 2014 shall receive lump sum payments based on the same schedule as actives as set forth in this section I.

3.  Any disputes arising under this section I shall be determined by Martin F. Scheinman. The parties shall share the costs of his services.

**J. Lead Educational Associate**

A Lead Educational Associate will receive additional compensation in the amount of $5,000 per year above the applicable paraprofessional salary in accordance with this Agreement.


**ARTICLE FOUR**
**HOURS**

**A. Work Year**

1.  The work year for employees in the bargaining unit will begin on the Tuesday following Labor Day and will end at the conclusion of the regular school year in June.

Employees assigned to programs which start at the beginning of the school year will report for a professional day on Brooklyn-Queens Day and will be paid at their regular rates.  The Tuesday following Labor Day may be an instructional day.  Other employees will report for

orientation and work on the day the program to which they are assigned starts, and will be paid at their regular rates.

2.   Emergency Closings

a.   The Board of Education ("DOE") and UFT recognize that due to emergency conditions (including, but not limited to snow closings) there may be situations where the DOE may fall short of the minimum number of instructional days required annually by the Education Law.

b.   Prior to opening of each school year, the DOE and UFT agree to jointly determine those vacation days during designated recess periods which shall be used in the event that there is a need to make up days in order to meet the statutory minimum and the order in which such days would be used.

c.   In no event shall the number of make-up days exceed the number needed to meet the minimum required by the Education Law.

**B.   Hours of Work**

1.   The following shall apply except as set forth in Article 4(B)(2) below:

a.   The workday of paraprofessionals shall be 6 hours and 20 minutes inclusive of a duty-free lunch period equal to that of teachers in the school.

b.   The parties agreed, effective February, 2006**,** to extend the paraprofessional work day in "non Extended Time Schools" by an additional 37 ½ minutes per day, Monday through Thursday following student dismissal.  Friday's work schedule is 6 hours and 20 minutes.  The 37 ½ minutes of the extended four (4) days per week shall be used for tutorials, test preparation and/or small group instruction. In single session schools, the day will start no earlier than 8:00 am and end no later than 3:45 p m.

c.   Multi-session schools that cannot utilize the additional time in this manner due to space or scheduling limitations will have a 6 hour 50 minute day.

d.   In District 75 buildings and District 75 self-contained classes in other school sites, the school day will be 6 hours and 50 minutes unless the principal and chapter leader agree to schedule the time as set forth in paragraph 2 above.  Non-District 75 self contained classrooms shall have either (a) a 6 hour and 50 minute day, (b) a 6 hour and 57 ½ minute day Monday through Thursday and 6 hour and 20 minute day on Friday, or (c) the time shall be utilized as set forth in paragraph 1(b) above.

e.   On professional development days, the school day shall be 6 hours and 50 minutes.

2.   Detailed below are the terms for a two (2) year pilot to occur during the 2014-2015 and 2015-2016 school years only.  Should the parties wish to continue this model, they must agree in writing to do so by May 15, 2016.  If no such agreement is reached, the workday shall automatically revert to the provisions of Article 4(B)(1).

a.   Unless modified through a School Based Option ("SBO") pursuant to Article 8B of the collective bargaining agreement between the UFT and the Board covering teachers (the "Teachers' CBA"), the following shall apply to Paraprofessionals in Single Session Schools:

(1) Paraprofessionals shall have the same default workday as teachers in single session schools (as set for in Art. 6, Sec. B(1)(a) of the Teachers' CBA), except that on Tuesdays when school is in session paraprofessionals shall only be required to work a 70-minute block immediately following the conclusion of the school day.

(2) Any SBO adopted by a school reconfiguring the workday shall not increase or decrease the workday of paraprofessionals.

b.   Professional Development

(1) Paraprofessionals shall participate in Professional Development activities per the guidelines set forth in Art. 6, Sec. B(1)(b) of the Teachers' CBA.

(2) There shall be a citywide Paraprofessional Staff Development Committee ("SDC") consisting of the Paraprofessional Chapter Leader and equal numbers of members selected by the DOE and the Paraprofessional Chapter Leader.  The Paraprofessional SDC shall collaboratively review, consider and develop professional development programs relevant to Paraprofessional duties for both citywide professional development days and for schools to consider. The DOE shall review the SDC's work but shall have final approval of Professional Development.

c.  Parent Engagement.  During this block of time, as defined in Art. 6, Sec. B(1)(c) of the Teachers' CBA, paraprofessionals shall assist teachers in Parent Engagement activities or other activities appropriate to their title subject to approval by the principal.

d.  Other Professional Work.  During either of the Professional Development or Parent Engagement blocks of time, as defined in Art., 6, Sec. B(1)(d) of the Teachers' CBA, when teachers may engage in Other Professional Work and when no relevant appropriate professional development is offered, paraprofessionals shall assist teachers by performing Other Professional Work appropriate to their title.

**C.  Holidays and Vacations**

Employees in the bargaining unit will be paid for all school vacations and holidays and all other regular school days on which the schools are closed for special observance or emergencies pursuant to action of the Chancellor or community superintendent, including the winter and spring school recesses.

The official school year calendar shall provide a one week February mid-winter recess which includes Washington's Birthday, without reducing the number of instructional days for students.

**ARTICLE FIVE**
**HEALTH INSURANCE, WELFARE FUND AND BENEFITS**

**A.  Health Insurance**

1.  The Board will provide employees covered by this Agreement who regularly work 20 hours or more a week with health insurance coverage on a 12 month basis.

2.  Employees who are laid off and who are covered by a health and hospital insurance plan at the time they are laid off shall continue to be so covered for ninety days from the day on which they are laid off and the Board will pay the full cost of such coverage.

3.  The Board, the Union and the City of New York continue to discuss, on an ongoing basis, the citywide health benefits program covering employees represented by the Union and employees separated from service.  Any program-wide changes to the existing basic health coverage will be expressly incorporated into and made a part of this Agreement.

4.  The parties acknowledge that collective bargaining regarding health benefits is within the purview of negotiations between the Municipal Labor Committee and the City.  Cost-containment initiatives and program modifications in the City Health Benefits Program shall be discussed with the Municipal Labor Committee.

5.  Retiree Health Insurance Coverage

The parties shall jointly take whatever action is necessary, including joint support of legislation, to modify retiree eligibility for health insurance coverage so that vested retirement and service retirement retirees with less than fifteen (15) years of credited service as a member of such retirement or pension system shall no longer be eligible for health insurance and welfare

benefit coverage, although they may remain vested for pension purposes after ten (10) years of credited service.

The above shall apply to UFT-represented employees in TRS and BERS hired after the legislation is enacted.

### B.  Welfare Fund

1.  The Board will provide funds at the rate of  $1,720 ($1,745 effective July 1, 2014, $1,770 effective July 1, 2015, $1,795 effective July 1, 2016, $1,820 effective July 1, 2017) per year on a pro rata basis per month during the regular school year on behalf of each employee covered by this Agreement, whether a member of the Union or not, for the purpose of making available for each such employee supplemental welfare benefits and benefits for the education of employees in the bargaining unit under a plan to be devised and established jointly by representatives of the Board and of the Union.

2.  Domestic partners of covered employees will be provided with welfare fund benefits in the same manner in which covered employees who are married receive such benefits for their spouses.

3.  The Board will continue to make payments for supplemental benefits at the rates per year set forth herein on a pro rata basis per month during the regular school year for ninety days from the day of layoff on behalf of each laid off employee.

4.  Contributions for employees separated from service effective September 9, 1984 or thereafter to the Welfare Fund which covers such employees shall be increased in the same manner as contributions for other employees are increased pursuant to this Article.

5.  Employees who are separated from service and thereafter return to active service will be entitled to the same Welfare Fund benefits as other active employees.  For the period of their active employment, such employees will not also receive retiree benefits.  Accordingly, the Union Welfare Fund will receive only one contribution on behalf of each such employee, which shall be at the applicable contribution rate for active employees.

6.  The 2009 Health Benefits Agreement, dated July 2, 2009 between the City Commissioner of Labor Relations James F. Hanley and Municipal Labor Committee Chair Harry Nespoli, is deemed to be part of this Agreement.  The Letters of Agreement regarding Welfare Fund Contributions, dated May 5, 2014 and August 14, 2014, between the City Commissioner of Labor Relations Robert W. Linn, and Municipal Labor Committee Chair Harry Nespoli, are deemed to be part of this Agreement.  The side letter agreement between the City Commissioner of Labor Relations James F. Hanley and UFT President Randi Weingarten, dated October 21, 2004, is deemed to be part of this Agreement.  Pursuant to those Agreements, the parties have agreed to a series of payments to the Welfare Fund.

7.  Pursuant to the Municipal Labor Coalition Benefits Agreement, the Union Welfare Fund shall provide welfare fund benefits equal to the benefits provided on behalf of an active Welfare Fund-covered employee to widow(ers), domestic partners and/or children of any active Welfare Fund-covered employee who dies in the line of  duty as that term is referenced in Section 12-126(b)(2) of the New York City Administrative Code.  The cost of providing this benefit shall be funded by the Stabilization Fund.

### C.  Health Care Flexible Spending Account

1.  A flexible health care spending account has been established pursuant to Section 125 of the Internal Revenue Code.  Those employees covered by this Agreement shall be eligible to participate on the same basis as they are eligible to participate in the citywide health benefits

program.  Participating employees shall contribute at least $260 per year up to a maximum of $5,000 per year.  The labor-management health committee which includes Union and City representatives may modify these contributions levels, based on experience of the plan.

2.  Expenses covered by the account shall include but not be limited to deductibles, co-insurance, co-payments, excess expenses beyond plan limits, physical exams and health related transportation costs for vision, dental, medical and prescription drug plans where the employee and dependents are covered.  In no case will any of the above expenses include those non-deductible expenses defined as non-deductible in IRS Publication 502.

3.  An administrative annual fee of $48.00 shall be charged for participation in the program. Pursuant to Section 125 of the Internal Revenue Code, an employee's participation in the account is irrevocable during any plan year and any excess funds in an employee's account at the close of any plan year is retained by the plan and not refundable to the employee.

### D.  Dependent Care Assistance Program

1.  A dependent care assistance program has been established pursuant to Section 125 of the Internal Revenue Code.  Those employees covered by this Agreement shall be eligible to participate on the same basis as they are eligible to participate in the citywide health benefits program.  Participating employees shall contribute at least $500 per year up to a maximum of $5,000 per year.  The labor-management health committee which includes Union and City representatives may modify these contribution levels, based on experience of the plan.

2.  An annual administrative fee of $48.00 shall be charged for participation in the program. Pursuant to Section 125 of the Internal Revenue Code, an employee's participation in the account is irrevocable during any plan year and any excess funds in an employee's account at the close of any plan year is retained by the plan and not refundable to the employee.

### E.  Transportation Benefit Program

Employees are eligible to participate in the NYC Transit Chek program.

The parties agree that the City will expand the current Transit Chek program to offer to eligible employees the ability to purchase a Transit Debit Card through payroll deductions in accordance with IRC Section 132.  In addition to the current MTA Surface and Subway lines, the Transit Debit Card may be used to purchase tickets for mass transit commutation only (i.e., LIRR, LI MTA Buses, MetroNorth).  The administrative fee for this benefit will be borne by the participants and will be deducted on a prorated basis from the participating employee's paycheck. After one year of experience with this benefit, the City will examine the level of participation and the associated costs of providing this benefit to determine whether or not the administrative fee requires adjustment.

The parties further agree to examine the possible expansion of this benefit to include other regional mass transit carriers.

### F.  Healthcare Savings

1.  The UFT and the City/DOE agree the UFT will exercise its best efforts to have the MLC agree to the following:

a.  for fiscal year 2015 (July 1, 2014-June 30, 2015), there shall be $400 million in savings on a citywide basis in health care costs in the NYC health care program.

b.  for fiscal year 2016 (July 1, 2015-June 30, 2016), there shall be $700 million in savings on a citywide basis in health care costs in the NYC health care program.

15

c.   for fiscal year 2017 (July 1, 2016-June 30, 2017), there shall be $1 billion in savings on a citywide basis in health care costs in the NYC health care program.

d.   for fiscal year 2018 (July 1, 2017-June 30, 2018), there shall be $1.3 billion in savings on a citywide basis in health care costs in the NYC health care program.

e.   for every fiscal year thereafter, the savings on a citywide basis in health care costs shall continue on a recurring basis.

f.   The parties agree that the above savings to be achieved on a Citywide basis are a material term of this agreement.

g,   In the event the MLC does not agree to the above citywide targets, the arbitrator shall determine the UFT's proportional share of the savings target and, absent an agreement by these parties, shall implement the process for the satisfaction of these savings targets.

h.   Stabilization Fund: (1) Effective July 1, 2014, the Stabilization Fund shall convey $1 billion to the City of New York to be used in support of the pro rata funding of this Agreement. (2) Commencing on July 1, 2014, $200 million from the Stabilization Fund shall be made available per year to pay for ongoing programs (such as $65 welfare fund contribution, PICA payments, budget relief).  In the event the MLC does not agree to provide the funds specified in this paragraph, the arbitrator shall determine the UFT's proportional share of the Stabilization Fund monies required to be paid under this paragraph.

2.   Dispute resolution regarding this section F

a.   In the event of any dispute, the parties shall meet and confer in an attempt to resolve the dispute.  If the parties cannot resolve the dispute, such dispute shall be referred to Arbitrator Martin F. Scheinman for resolution.

b.   Such dispute shall be resolved within ninety (90) days.

c.   The arbitrator shall have the authority to impose interim relief that is consistent with the parties' intent.

d.   The arbitrator shall have the authority to meet with the parties at such times as the arbitrator determines is appropriate to enforce the terms of this agreement.

e.   The parties shall meet and confer to select and retain an impartial health care actuary.  If the parties are unable to agree, the arbitrator shall select the impartial health care actuary to be retained by the parties.

f.   The parties shall share the costs for the arbitrator and the actuary the arbitrator selects.

**G.  Parking**

Provisions with respect to parking placards are contained in the letter agreement set forth in Appendix F.


# ARTICLE SIX
## JOINT COMMITTEES

1.   The Board and the Union shall establish a joint committee to review and consider appropriate staff development programs for new and experienced paraprofessionals.

2.   Reduction of Paperwork

a.   A Central Paperwork Committee (the "Central Committee") will convene within thirty (30) days of the ratification of this agreement by the UFT.  The Central Committee will be made up of an equal number of representatives appointed by the UFT President and the Chancellor.

The representatives appointed by the Chancellor will include someone from the office of the Deputy Chancellor for Teaching and Learning.  The Central Committee will meet at least monthly, on the first Wednesday of the month or at a mutually agreeable time, to review system-wide paperwork issues (whether paper or electronic), including, but not limited to, the requests for data in connection with the Quality Review process. The Central Committee will also establish, subject to agreement by the Chancellor and the UFT President, system-wide standards for the reduction and elimination of unnecessary paperwork ("System-wide Standards"). Should the Central Committee fail to establish System-wide Standards approved by the Chancellor within sixty (60) days of their first meeting, either the UFT or the Board (DOE) may request the assistance of a member of the Fact-Finding Panel of Martin F. Scheinman, Howard Edelman and Mark Grossman, or another mutually agreeable neutral, to help facilitate the Central Committee's discussions. Should the intervention of a neutral not result in an agreement by the Central Committee approved by the Chancellor within sixty (60) days of the neutral's involvement, the DOE and UFT will submit position statements to said neutral who will issue a binding decision. The neutral's decision setting the System-wide Standards shall be subject to Article 75 of the New York State Civil Practice Law and Rules.

b.  Once the System-wide Standards have been established they will be distributed to all schools and key stakeholders (including SLT Chairpersons, PA/PTA Presidents, UFT Chapter Leaders, UFT District Representatives, District Superintendents and CSA Representatives). Thereafter, District/High School Superintendency Paperwork Committees ("District Committees") shall be established in each community school district and high school superintendency.  The District Committees shall meet monthly, at a regularly scheduled time, for the purpose of addressing paperwork issues (whether paper or electronic) at the school level and to ensure the System-wide Standards are being implemented properly in schools.  These District Committees will be made up of an equal number of representatives appointed by the UFT President and the Chancellor.  The representatives appointed by the Chancellor shall include the District/High School Superintendent or his/her designee.

c.  Employees (including those in functional chapters) may request that their Chapter Leader raise school-specific paperwork issues (whether paper or electronic) before the District Committee.  Subject to approval by the Chancellor, if a District Committee agrees on the resolution of the paperwork issue, the resolution shall be enforced by the District or High School Superintendent.  In the event that a District Committee cannot agree on the resolution of an issue raised by a Chapter Leader of an individual school, the District Committee shall refer the issue to the Central Committee for review. Subject to approval by the Chancellor, if the Central Committee agrees on the resolution of an issue raised by a Chapter Leader, the resolution shall be enforced by the District or High School Superintendent.

d.  For alleged violations of the System-wide Standards the UFT may file a grievance, in accordance with the grievance and arbitration procedures set forth in Article 22 of this Agreement. It is understood that, prior to a grievance being filed, the paperwork issues shall go through the committee process as described above. Such grievances shall be filed directly with the DOE's Office of Labor Relations ("OLR"), which may be scheduled for arbitration within twenty (20) days of notice to OLR. The parties shall negotiate pre-arbitration hearing procedures so that each party is aware of the allegations and defenses being raised at the arbitration. All arbitration days shall be part of the existing number of days as set forth in this Agreement.  An arbitrator may hear up to three (3) paperwork grievances on each arbitration date.  The arbitrator

will issue a brief award that is final and binding upon the parties, within five (5) school days of the arbitration.

# ARTICLE SEVEN
# CAREER TRAINING

It is the joint purpose of the parties that employees in the bargaining unit be afforded an opportunity to qualify for advancement to professional positions including positions other than classroom teacher, with the Board of Education through experience and through appropriate undergraduate career training, except that paraprofessionals who have a degree may be enrolled for such undergraduate education courses as would qualify them to meet the requirements for certification as a teacher or other pedagogical position with the Board.  To achieve this purpose, the Board will make available each school year to all employees covered by this Agreement, six semester hours of career training each semester and six additional semester hours of career training during the summer, each semester hour being equivalent to one credit; and it is further agreed that:

**A.  New Paraprofessional Staff Development**

Four days of staff development will be offered to all paraprofessionals prior to their actual employment. For paraprofessionals who are unable to take the four days prior to their actual employment four days of staff development shall be offered during their first year of service. The content and design of this professional development program for new paraprofessionals shall be developed collaboratively by the Union and the Board. Participation will be agreed upon by the Union and the Board based upon the availability of funds.

There shall be an expense stipend for each day of mandatory professional development for paraprofessionals paid at the following rate per day:

| Effective | Amount |
| --- | --- |
| May 19, 2008 | $40.20 |
| May 1, 2013 | $40.60 |
| May 1, 2014 | $41.01 |
| May 1, 2015 | $42.25 |
| May 1, 2016 | $43.72 |
| May 1, 2017 | $45.71 |
| May 1, 2018 | $46.61 |
| June 16, 2018 | $48.01 |

**B.  Career Training Program**

1.  Paraprofessionals must enroll for and complete at least three credits of study during each semester in which they enroll in the program.

2.  Paraprofessionals must apply for tuition assistance applicable to the semester in which they are enrolled in the career training program.  The Board will assist paraprofessionals in applying for tuition assistance.

3.  The Board will pay directly to the college the difference between the tuition and fees and the amount of tuition assistance received by paraprofessionals, or on their behalf, enrolled in the program in accordance with this Agreement, provided the paraprofessional makes a good faith effort to complete the course or courses in which he/she is enrolled.  Effective July 1, 2016, the Board ("DOE") will no longer reimburse paraprofessionals for activity, application, technology and other esoteric fees.

4.   Unless there are extenuating circumstances, the Board shall be entitled to recover from a paraprofessional who fails to apply for tuition assistance or who fails to complete the course or courses in which he/she is enrolled, the amount of the tuition and fees incurred by the Board and attributable to the uncompleted course or courses, or attributable to the failure to apply for the tuition assistance.

5.   Effective June 1, 2016, it is mandatory to matriculate into a degree bearing program after completion of 45 credits in the program in order to continue have credits paid for by the DOE.

6.   Effective June 1, 2016, the payment for six credits for substitute paraprofessionals is eliminated.

7.   Effective June 1, 2016, the number of credits that paraprofessionals will be reimbursed for in the CTP program is limited to 120 credits.  Exceptions will be reviewed on a case by case basis.

8.   Effective June 1, 2016, paraprofessionals must maintain a "C" average (2.0) to remain in the CTP Program.

8.   Effective June 1, 2016, the DOE will reimburse all paraprofessionals for the cost of up to 12 graduate credits paid at the CUNY rate (3 credits per semester for up to four semesters) for those who are pursuing a degree in education. No release time for graduate credits will be given.

9.   Effective June 1, 2016, the DOE will reimburse all paraprofessionals enrolled in bilingual programs for the cost of an additional 12 credits (graduate) along with release time for classes leading to these bilingual education credits. The DOE will reimburse such paraprofessional for the cost of the application fee and state BEA examination.

10. Except as expressly stated above, nothing in the changes to the CTP program effective in 2016 shall constitute a modification of, limitation on or waiver of any provision of any collective bargaining agreement between the parties or past practice

**C.  School-Year Training**

1.   The Board will grant each college semester to bargaining unit employees released time of two and one-half (2½) hours per week with pay for study at an approved college or for high school equivalency training provided that in that semester the employee is enrolled for and completes a total of at least five semester hours of such study or training.

2.   Employees who are enrolled in the college training program financed by the Human Resources Administration will be covered by the provisions of the preceding sub-paragraphs only in the event that the Human Resources Program is discontinued.

**D.  Counseling and Training**

The Board will provide counseling and training for paraprofessionals enrolled in career training which will guide and encourage them to prepare for meeting the qualifications in those license areas where there is a shortage of fully qualified personnel, or where job opportunities are expanding.

The parties agree to encourage paraprofessionals to take courses which are appropriate to a teaching career or to another professional career with the Board of Education.

**E.  Placement in Setting**

Where the paraprofessional's college program requires service in a particular educational setting (such as special education and student teaching) the Board shall cooperate in providing for the appropriate placement of the paraprofessional, upon his/her request, to an opening in such setting.  A paraprofessional who is so placed shall retain the benefits (including seniority) that

he/she would have had if he/she had not been placed pursuant to this provision, except to the extent that changes are required by the nature of the program in which he/she is placed. If the paraprofessional is placed in a different district he/she shall return to his/her district at the conclusion of such placement and take his/her place in the district in accordance with his/her seniority.

### F.  Continuance for Laid Off Employees

Paraprofessionals who are laid off shall be permitted to continue in the career training program for one term following their layoff.

### G.  Summer Training

1.  In the summer, the Board will make available to all employees covered by this Agreement having a high school or a high school equivalency diploma, a six-week college summer career training program.

2.  The Board will pay a stipend of $40.00 per week to each employee who regularly works during the spring semester for satisfactory attendance in the summer career training program.

3.  Employees who work for the Board of Education while in attendance in the summer career training program shall not receive the stipend.

4.  The stipend for satisfactory attendance in the college summer career training program shall be paid to employees who enroll for six credits during the summer.  Where fewer than six credits are needed to complete a B.A., or if six credits in the courses needed are not available, the stipend shall be paid for enrollment to complete the B.A. requirements or the available courses needed.

### H.  Expedited Career Training

1.  The Career Training Program has been an effective recruitment vehicle for new teachers. The Board and the Union wish to assist paraprofessionals in the expeditious completion of their baccalaureate degrees. For this purpose, paraprofessionals who need one year or less to complete their baccalaureate degree may apply for a leave with pay for the purpose of attending college full-time.

2.  The Board will provide tuition reimbursement for courses enrolled for and completed toward their degrees during the paid leave.

3.  A paraprofessional who receives the leave with pay will commit to take the necessary steps to qualify as a teacher and serve as such for a minimum of two years in the NYC public school system.

4.  The Board and the Union shall meet each year to decide upon the number of such leaves based upon available funds.

### I.  Union Contribution

The Union will contribute each year toward career training an amount equal to 15% of $190.00, or $28.50, on a pro rata basis for each employee in the bargaining unit from the welfare payments made to it by the Board in accordance with Article Five hereof.

### J.  Student Teaching Support

The Board ("DOE") will provide a paid 40-day leave of absence for paraprofessionals to complete student teaching requirements.  This will be limited to 100 such leaves per school year. In cases where the 40-day model is not in accordance with an Institution of Higher Education's model for their state approved teacher education program, the DOE may grant a full term (or

less) leave of absence. In these cases, the limit of 100 per year may be reduced pro rata to ensure the cost for the DOE of the total number of leaves does not increase.

### K. Certification Requirements

1. The Board ("DOE") will reimburse all paraprofessionals, one time for each paraprofessional, for the cost of the NYS teacher certificate application.

2. The DOE will reimburse all paraprofessionals, one time for each paraprofessional, of up to $400 for state teacher certification examinations once certification is granted for those participating in the tuition reimbursement program described under "Career Training Modifications" above.

### J. Apprenticeship Position

The UFT and the Board ("DOE") agree to further negotiations to create a paraprofessional-aligned title that can be used for structured programs of study/work that lead to teacher certification in a year or less. Once agreed to, during this time, the candidate can work as a teacher apprentice/resident at the rate of $25,000 per year. Such apprentices will be eligible for health insurance. While in this role, the teacher apprentice will be engaged in an intensive clinical experience that is part of an integrated teacher preparation program. Terms and conditions, including the possible assignment of teacher apprentices as teachers of record for part of the day, will be negotiated by the parties.

## ARTICLE EIGHT
## PER SESSION WORK

1. Summer and other per session work which is available in the district shall be given to applicants in the bargaining unit in the district in order of their seniority[9]. If no bargaining unit employee in the district applies, the senior bargaining unit applicant from outside the district will be selected. The application of this paragraph to Adult Education programs will be the subject of continuing negotiations between the parties.

2. The hourly compensation for summer and other per session work shall be 1/1375 of the applicable annual rate for the title (including longevity) set forth in Article Three, except that paraprofessionals employed in the New Suspension Program's summer school program (the "Suspension Summer Program") will be paid at the rate of 1/1147 of the applicable annual rate for the title (including longevity) set forth in Article Three.[10]

## ARTICLE NINE
## CHAPTER 683 PROGRAM

UFT-represented employees who elect to be employed in the Board's program which implements Chapter 683 of the Laws of 1986 ("Program") shall serve under the following terms and conditions of employment during July and August:

1. The gross annual salary rate of each such employee who serves the same student population during the regular work year (September through June) as is eligible to participate in the Program during July and August shall be computed by adding the sum of either:

    a. seventeen and one-half ($17\frac{1}{2}$) percent of the applicable gross annual salary rate; or

---

[9] Selection rights of paraprofessionals in the Suspension Summer Program are set forth in Appendix C, paragraph 6.
[10] See paragraph 6 of Appendix C.

b.  the number of hours served during July and August multiplied by the applicable per session rate; whichever is greater, to the employee's annual salary rate ascertained without consideration of said sum.

2.  The pay rate of each such employee who does not serve the same student population during the regular work year (September through June) as is eligible to participate in the Program in July and August shall be the applicable per session pay rate.

3.  a.  As set forth in the applicable Board Vacancy Circulars advertising the positions available for the 1988 Program, the selection procedure for the Program shall provide a priority to those employees who serve the same student population during their regular work year as is eligible to participate in the Program in July and August.

b.  Employees who serve satisfactorily in the Program during July and August for two successive years shall be retained for succeeding years if they apply to serve in the Program during July and August provided they continue to serve the same eligible student population during their regular work year. Retention rights of other employees who serve satisfactorily in the Program during July and August for two successive years shall be subordinate to the rights of those employees who serve the same eligible student population during the regular work year.

c.  If there is a reduction of positions in the Program during July and August, employees who are lowest in order of priority for selection will be the first to be retrenched, in inverse seniority order.

4.  The work day for employees serving in the Program during July and August shall be  6 hours effective February 2006 exclusive of one-half hour for a duty-free lunch.

5.  Employees paid in accordance with Paragraph 1 of this Article Nine A will receive two sick days for use during July and August on a self-treated basis.  Unused sick days shall be accrued and credited to the employee's cumulative absence reserve for use during the regular school year.

6.  In light of the needs of the student population served by the Program, the Board is committed to providing air-conditioned facilities for as many sites as possible.  The Board will keep the Union informed of its progress in achieving the objective of air-conditioning all sites utilized by students.

7.  The Board official with responsibility for this Program shall meet and consult at times mutually agreed with representatives of the Union on matters of policy and the implementation of this Article Nine A.

8.  Except as otherwise set forth in this Article Nine A:

a.  the working conditions for employees paid in accordance with Paragraph 1 of this Article will be consistent with the standards of working conditions for the regular work year prescribed in this Agreement.

b.  the working conditions of employees paid in accordance with Paragraph 2 of this Article will be those working conditions applicable to per session employees covered by this Agreement.

## ARTICLE TEN
## SUBSTITUTE COVERAGE

Where the Board is legally required to provide coverage for mandated paraprofessional services to children in special education programs, paraprofessionals employed to provide such coverage shall serve under the following conditions:

a.   No fewer than fifty (50) paraprofessionals to be known as the District Paraprofessional Reserves (DPRs) will be assigned to the community school districts, high school superintendencies, and the citywide program superintendency.  These DPRs will be assigned to cover the absences of special education paraprofessionals in the appropriate superintendency. All the provisions of this Agreement apply to DPRs.

b.   The absences of special education paraprofessionals which are not covered by DPRs will be covered by day-to-day substitute paraprofessionals.

Day-to-day substitute paraprofessionals will be paid at the following rates for 6 hours and 50 minutes per day effective February 2006 inclusive of a duty-free lunch period equal to that of teachers in the school:

| Effective | Rate |
|---|---|
| May 19, 2008 | $129.61 |
| May 1, 2013 | $130.91 |
| May 1, 2014 | $132.22 |
| May 1, 2015 | $136.21 |
| May 1, 2016 | $140.96 |
| May 1, 2017 | $147.37 |
| May 1, 2018 | $150.26 |
| June 16, 2018 | $154.77 |

The rates above shall be pro-rated for longer or shorter work days.

Day-to-day substitute paraprofessionals will be centrally hired and assigned by the Board.  To the extent possible assignments will be offered in accordance with preferences indicated by the day-to-day substitute paraprofessionals.  If a principal does not select a transfer applicant or an excessed paraprofessional to fill a vacancy, paraprofessionals with at least 3 months on or who have actually worked at least twenty-five (25) days as a day-to-day substitute on the current Substitute Paraprofessional Registry (Registry) or any successor program will have priority over the hiring of any new employees for DPR and other paraprofessional vacancies.  Seniority of day-to-day substitutes accrues on the basis of the number of days actually worked, but not more than one year accrues during any twelve months.

Day-to-day substitute paraprofessionals shall be entitled to tuition reimbursement under the same requirements as the participants in the career training program for the six semester hours of college credits required by the Commissioner's Regulations to qualify as a paraprofessional.  This tuition assistance shall be available during the term or summer after the day-to-day substitute paraprofessional has worked 30 days in the prior term and continues to work or be available for employment in the current term.

The Board will provide day-to-day substitutes with the opportunity to discuss the circumstances which have given rise to complaints against them (with Union representation at the option of the employee) if such complaints could lead to their being excluded from assignment as a day-to-day substitute paraprofessional.

Except to the extent otherwise set forth herein, day-to-day substitutes will be covered by the following provisions of this Agreement:  Articles 1, 2, 4B, 11E, 14, 16, 17B, 20, 21, 22, 25, 26A, 27, 28, 29, 30, 31, 32, 33,  36, 37, 38 and 39.

Article 17A shall apply as follows: leave for injury in the line of duty may extend up to the day or days for which the day-to-day substitute paraprofessional was notified he/she would be employed.

Article 35 shall apply only to the extent consistent with their status as day-to-day substitutes.

In addition, day-to-day substitute paraprofessionals who cover the absence of a particular paraprofessional for thirty consecutive work days or more shall be covered by all the provisions of this Agreement during such assignment.

c.  District Paraprofessional Reserves and day-to-day substitute paraprofessionals will participate in the staff development program for newly-hired paraprofessionals.

d.  District Paraprofessional Reserves and day-to-day substitute paraprofessionals will be employed exclusively to provide mandated special education services during the absence of special education paraprofessionals or their released time under Article 7C1.  The Board of Education will monitor the assignment of DPRs and day-to-day substitute paraprofessionals for compliance with this limitation.

<h2 style="text-align:center">ARTICLE ELEVEN<br>INSTRUCTIONAL CONDITIONS IN SCHOOLS</h2>

### A.  School-Based Management/Shared Decision-Making (SBM/SDM)

The Union and the Board agree that SBM/SDM is a process in which all members of the school community collaborate in identifying issues, defining goals, formulating policy and implementing programs.  The uniqueness of each school community requires that the SBM/SDM process and the organizational and instructional issues discussed are determined by the staff, parents, administration and students (where appropriate) at individual schools through the SBM/SDM team.  The Union and the Board agree that in order to achieve SBM/SDM at the school level significant restructuring of instruction must occur, and the parties agree to work cooperatively in an effort to bring about these changes.

#### 1.  Eligibility and Involvement

a.  All schools are eligible to apply for participation in SBM/SDM. School participation shall be voluntary and subject to approval by fifty-five (55) percent of the voting, non-supervisory school based staff (e.g. teachers, paraprofessionals, support staff and others) and agreement of the principal, the appropriate superintendent and parents. Similarly, schools involved in SBM/SDM may choose to opt out of the program at any time.  The decision to opt out shall be voluntary and subject to approval by at least fifty-five (55) percent of the voting, non-supervisory school based staff.

b.  All votes of non-supervisory school based staff concerning participation in SBM/SDM shall be conducted by the UFT chapter.

c.  Schools involved in SBM/SDM shall conduct ongoing self-evaluation and modify the program as needed.

#### 2.  SBM/SDM Teams

a.  Based upon a peer selection process, participating schools shall establish an SBM/SDM team.  For schools that come into the program after September 1993, the composition will be determined at the local level.  Any schools with a team in place as of September 1993 will have an opportunity each October to revisit the composition of its team.

b.  The UFT chapter leader shall be a member of the SBM/SDM team.

c.  Each SBM/SDM team shall determine the range of issues it will address and the decision-making process it will use.

### 3.  Staff Development

The Board shall be responsible for making available appropriate staff development, technical assistance and support requested by schools involved in SBM/SDM, as well as schools expressing an interest in future involvement in the program.  The content and design of centrally offered staff development and technical assistance programs shall be developed in consultation with the Union.

### 4.  Waivers

a.  Request for waivers of existing provisions of this Agreement or Board regulations must be approved in accordance with the procedure set forth in Article 8B (School Based Options) of the Teacher Agreement i.e., approval of fifty-five (55) percent of those UFT chapter members voting and agreement of the school principal, UFT district representative, appropriate superintendent, the President of the Union and the Chancellor.

b.  Waivers or modifications of existing provisions of this Agreement or Board regulations applied for by schools participating in SBM/SDM are not limited to those areas set forth in Article 8B (School-Based Options) of the Teacher Agreement.

c.  Existing provisions of this Agreement and Board regulations not specifically modified or waived, as provided above, shall continue in full force and effect in all SBM/SDM schools.

d.  In schools that vote to opt out of SBM/SDM, continuation of waivers shall be determined jointly by the President of the Union and the Chancellor.

### B.  School Allocations

Before the end of June and by the opening of school in September, to involve faculties and foster openness about the use of resources, the principal shall meet with the chapter leader and UFT chapter committee to discuss, explain and seek input on the use of the school allocations.  As soon as they are available, copies of the school allocation will be provided to the chapter leader and UFT chapter committee.

Any budgetary modifications regarding the use of the school allocations shall be discussed by the principal and chapter committee.

The Board shall utilize its best efforts to develop the capacity to include, in school allocations provided pursuant to this Article 11B, the specific extracurricular activities budgeted by each school.

The Board ("Department") shall provide to the Chapter Committee and Chapter Leader in school the School Leadership Team ("SLT") view of the Galaxy Table of Organization.  This shall be supplied before the end of June each school year and again by the opening of school in September of each school year.

In addition, should there be any budget modification regarding the use of school allocations, these shall be discussed by the Principal and Chapter committee.  In order to facilitate such discussion, the modifications shall be provided to the Chapter Committee.

### C.  Basic Instructional Supplies

The Board and the Union agree that schools should provide appropriate and sufficient basic instructional supplies and books to deliver an effective educational program.  Basic instructional supplies and books are those that must be provided for use by students without which classroom instruction will be impaired.

In the event a member or members of the faculty believe that such supplies and books are not available to students and faculty, the chapter may request a meeting with the principal. Upon the request of the chapter leader, the principal shall meet with the chapter committee to resolve the issue. If no resolution is achieved at the school level, the district representative and the appropriate superintendent will meet within five (5) school days to attempt to resolve it. If they are unable to do so, the dispute will be forwarded by the Union to the Chancellor for his/her prompt review and response.

### D. Program Guidelines

Paraprofessionals shall be informed of the guidelines for their program which affect their duties and working conditions.

### E. Damage or Destruction of Property

1. Employees shall not be held responsible for loss of school property when such loss is not the fault of the employee. This does not exonerate the employee from responsibility for school property in his/her charge.

2. The Board of Education will reimburse paraprofessionals in the bargaining unit in an amount not to exceed a total of $100.00 in any school year for loss or damage or destruction, while on duty in the school, or while on duty on a field trip, of personal property of a kind normally worn to or brought into school, or on a field trip, when the paraprofessional has not been negligent, to the extent that such a loss is not covered by insurance.

The term "personal property" shall not include cash. The terms "loss," "damage" and "destruction" shall not cover the effects of normal wear and tear and use.

### ARTICLE TWELVE
### SCHOOL RETENTION AND EXCESSING

### A. Retention

Paraprofessionals shall be retained in their school or work site in accordance with their seniority. If excessing occurs because of lack of work, the least senior employee will be excessed from the school or site, except that he/she may be retained only if and so long as he/she meets any of the following requirements for the program, and no paraprofessional with greater seniority meets such requirements:

1. Special competence in the particular program by reason of at least sixty hours of special training, required in the specifications for the program;

2. Special knowledge or skills, such as bilingual proficiency or competence in such subject areas as mathematics, reading, music or art, as required in the specifications for the program;

3. Fifteen or more college credits, acquired through career training, necessary for his/her duties in the program and prescribed in the specifications for the program.

### B. Unique Programs

A paraprofessional serving in a unique program which is moved to another site will be moved with the program unless the paraprofessional expresses a preference to remain at the same site and the superintendent approves.

### C. Paraprofessionals with Bilingual Proficiency

Paraprofessionals with bilingual proficiency in a designated citywide shortage language area who were assigned to a school to meet the particular language needs of students may be excessed when those students leave the building or no longer require bilingual services. If excessed for

either of these reasons, they will have a right of return to the school or district they were excessed from at the next reorganization following the excessing, if a vacancy exists in their shortage language area.  If there is more than one paraprofessional with the particular bilingual proficiency in the school, excessing shall take place in inverse order of seniority.  Excessing shall be to a vacancy in their shortage language area in their district, except for those paraprofessionals who were notified in writing when hired that they could be assigned as needed to meet the language needs of students system-wide, in which case, they can be excessed to an available vacancy in their shortage language area outside of their district (if no vacancy in their shortage language area exists within their district).  However, excessing to shortage language area vacancies outside of a district shall be to the same borough if available.

If there is no vacancy in their shortage language area paraprofessionals with bilingual proficiency shall have the retention and layoff rights contained in Articles 12A and 13A of this Agreement.

### D. Placement of Excessed Paraprofessionals[11]

Unless a principal denies the placement, an excessed paraprofessional will be placed by the Board into a vacancy within his/her district/superintendency or, if such a vacancy is not available, then in a vacancy within the same borough, and if such a vacancy is not available then in a vacancy citywide.  The Board will place the excessed paraprofessional who is not so placed in an Alternate Paraprofessional Reserve (APR) position in the school from which he/she is excessed, or in another school in the same district or superintendency.

Paraprofessionals identified as being at risk of being excessed at the commencement of the following school year will be informed of this no later than June 15, or as soon as is practicable if identified as being at risk of excess after June 15.  The deadlines for excessing will continue to be governed by applicable law.

A paraprofessional who has been excessed to another school may request an opportunity to return to the school from which he/she was excessed if within a year a vacancy should occur in that school.  Such a request will have priority over any other transfer or appointment to that vacancy, and it shall be effectuated at the next reorganization of the school to which the paraprofessional is returning, except that should the vacancy occur within ten school days after the paraprofessional is excessed, he/she shall be informed of the vacancy and he/she may return to the school immediately.[12]

### E. Voluntary Severance for Personnel Who Have Been Excessed

The Board ("DOE") may offer excessed personnel who have not secured a regular assignment after at least one year of being excessed, a voluntary severance program in an amount to be negotiated by the parties.  If the parties are unable to reach agreement on the amount of the severance payment, the dispute will be submitted to arbitration pursuant to the contractual grievance and arbitration procedure.  Such a severance program, if offered, will be offered to all personnel who have been in excess for more than one year.

In exchange for receipt of such severance, an excessed person shall submit an irrevocable resignation or notice of retirement.

---

[11] Placement rights of paraprofessionals excessed from District 79 Closing Programs are set forth in Appendix C, paragraphs 3, 4 and 5.

[12] The right of return to a vacancy in New Programs of District 79 paraprofessionals excessed from Closing Programs is set forth in Appendix C, paragraph 10.

## ARTICLE THIRTEEN
## LAYOFF AND RECALL

**A. Layoff**

In the event of layoff of employees in the bargaining unit because of a city-wide lack of work, the employee with the least seniority shall be selected for layoff except that an employee who would otherwise be laid off on the basis of seniority may be retained only if and so long as he/she meets any of the following requirements for the program and no employee with greater seniority meets such requirements:

1. The employee possesses special competence in the particular program by reason of at least 60 hours of special training, required in the specifications for the program.

2. The employee possesses special knowledge or skills such as bilingual proficiency or competence in such subject areas as mathematics, reading, music or art, as required in the specifications for the program.

3. The employee has acquired 15 or more college credits through career training and such training is necessary for his/her duties in the program and is prescribed in the specifications for the program.

**B. Recall**

Recall of employees who are laid off because of lack of work shall be made to available positions in the bargaining unit on the basis of greatest seniority except where the employee does not meet any of the following requirements for an available position:

1. The employee is required to have at least 60 hours of special training as provided in the specifications for the program.

2. The employee is required to have special knowledge or skills such as bilingual proficiency or competence in such subject areas as mathematics, reading, music or art, as provided in the specifications for the program.

3. The employee is required to have 15 or more college credits through career training and such training is necessary for his/her duties in the program and is prescribed in the specifications for the program.

An "available" position as used herein is a new or vacant position or the position of a paraprofessional on leave.

**C. Retention of Seniority**

An employee in the bargaining unit who is laid off because of lack of work and who is recalled shall regain the seniority he/she had, and shall be credited with the accumulated sick leave to which he/she was entitled, at the time he/she was laid off

The right of an employee in the bargaining unit to be recalled under Section B of this Article shall end after he/she has been laid off continuously for four years.

**D. Tipping**

Beginning the Spring term in 1992 education funds in the Mayor's Safe City/Safe Streets Program will be utilized to eliminate tipping by establishing a dispute resolution program staffed by teachers.

## ARTICLE FOURTEEN
## TRANSFERS

A.  Effective school year 2005-2006, principals will advertise all vacancies.  Interviews will be conducted by school-based human resources committees (made up of pedagogues and administration) with the final decision to be made by the principal.  Vacancies are defined as openings created by the termination of a regularly employed employee or a new position assigned to a school or a position in a newly constructed or re-designed school.  The determination of qualifications for employment in an opening in a particular school in the bargaining unit shall be made by the head of the school or by the head of the program.

Vacancies will be posted as early as April 15 of each year and will continue being posted throughout the spring and summer.  Candidates (paraprofessionals wishing to transfer and excessed paraprofessionals) will apply to specifically posted vacancies and will be considered, for example, through job fairs and/or individual application to the school.  Candidates may also apply to schools that have not advertised vacancies so that their applications are on file at the school should a vacancy arise.

Selections for candidates may be made at any time; however, transfers after August 7th require the release of the paraprofessional's current principal.  Paraprofessionals who have repeatedly been unsuccessful in obtaining transfers or obtaining regular positions after being excessed, will, upon request, receive individualized assistance from the Division of Human Resources on how to maximize their chances of success in being selected for a transfer.

B.  Vacancies in the position of Auxiliary Trainer, Auxiliary Trainer A and Auxiliary Trainer B shall be posted for seven school days in all schools in the district in which the vacancy occurs. The senior qualified applicant shall be selected.

C.  The Board will post positions in new programs so that qualified paraprofessionals will have an opportunity to apply.

D.  The Board will post notices of available positions in titles such as substitute vocational assistant, secretary assistant, and teacher's assistant, so that paraprofessionals who meet the qualifications will have an opportunity to apply.

## ARTICLE FIFTEEN
## LABOR/MANAGEMENT COMMITTEE ON
## LONG TERM REFORMS

With regard to the long term recommendations the 2005 Fact Finders made subject to adequate CFE funding, the parties shall establish a Labor Management Committee to discuss the following issues: a) bonuses, including housing bonuses, for shortage license areas; b) a pilot project for school-wide based performance bonuses for sustained growth in student achievement; and c) a program for the reduction of class size in all grades and divisions.  If the parties agree on the terms of any or all of these issues, they may be implemented by the BOE using whatever funds may be identified.

## ARTICLE SIXTEEN
## STAFFING NEW OR REDESIGNED SCHOOLS

The following applies to staffing of New or Redesigned Schools ("Schools"):[13]

1.  A Personnel Committee shall be established, consisting of two Union representatives designated by the UFT President, two Board representatives designated by the community

---

[13] The rights of paraprofessionals to staff the New Programs in District 79 are set forth in Appendix C, paragraph 2.

superintendent for community school district schools, or by the Chancellor for schools/programs under his/her jurisdiction, a principal or project director, and where appropriate a school planning committee representative and a parent.

2. For its first year of operation the School's staff shall be selected by the Personnel Committee which should, to the extent possible, make its decisions in a consensual manner.

In the first year of staffing a new school, the UFT Personnel Committee members shall be school-based staff designated from a school other than the impacted school or another school currently in the process of being phased out.  The Union will make its best effort to designate representatives from comparable schools who share the instructional vision and mission of the new school, and who will seek to ensure that first year hiring supports the vision and mission identified in the approved new school application.

In the second and subsequent years, the Union shall designate representatives from the new school to serve on its Personnel Committee.

3. If another school(s) is impacted (i.e., closed or phased out), staff from the impacted school(s) will be guaranteed the right to apply and be considered for positions in the School.  If sufficient numbers of displaced staff apply, at least 50% of the School's paraprofessional positions shall be selected from among the most senior applicants from the impacted school(s).  The Board will continue to hire pursuant to this provision of the Agreement until the impacted school is closed.

4. Any remaining vacancies will be filled by the Personnel Committee from among other applicants who may be transferees, excessees, and/or day-to-day substitute paraprofessionals with at least three (3) months on or who have actually worked at least twenty-five (25) days as a day-to-day substitute on the current Registry or any successor program.  In performing its responsibilities, the Personnel Committee shall adhere to all relevant legal and contractual requirements including the hiring of personnel holding the appropriate credentials.

5. In the event the Union is unable to secure the participation of members on the Personnel Committee, the Union will consult with the Board to explore other alternatives.  However the Union retains the sole right to designate the two UFT representatives on the Personnel Committee.

**ARTICLE SEVENTEEN**
**ASSAULT AND INJURY IN LINE OF DUTY**

**A.  Disability Benefits**

1. A leave of absence with pay and without charge to time allowance, for a period not to exceed one calendar year, shall be granted, subject to established administrative practices, upon the determination of the Chancellor that the employee has been physically disabled because of an assault made upon him/her during the performance of his/her official duties, or because of injury in the line of duty.

2. Paraprofessionals receiving Workers' Compensation will be granted leaves of absence without pay.

**B.  Assistance in Assault Cases**

1. The principal shall report as soon as possible but within 24 hours to the Office of Legal Services, to the Victim Support Program and to the Chief Executive of School Safety and Planning that an assault upon an employee has been reported to him/her.  The principal shall investigate and file a complete report as soon as possible to the Office of Legal Services and to the Chief Executive of School Safety and Planning.  The full report shall be signed by the

employee to acknowledge that he/she has seen the report and he/she may append a statement to such report.

2.   The Office of Legal Services shall inform the paraprofessional immediately of his/her rights under the law and shall provide such information in a written document.

3.   The Office of Legal Services shall notify the paraprofessional of its readiness to assist the paraprofessional.

This assistance is intended solely to apply to the criminal aspects of any case arising from such assault.

4.   Should the Office of Legal Services fail to provide an attorney to appear with the paraprofessional in Family Court, the Board will reimburse the paraprofessional if he/she retains his/her own attorney for only one such appearance in an amount up to $40.00.

5.   An assaulted employee who presses charges against his/her assailant shall have his/her days of court appearance designated as non-attendance days with pay.

6.   The provisions of the 1982-83 Chancellor's Memorandum entitled "Assistance to Staff in Matters Concerning Assaults" shall apply.

## ARTICLE EIGHTEEN
## EXCUSABLE ABSENCES WITH PAY

Employees will be excused with pay for absence during working hours subject to established policies covering non-attendance of pedagogical employees.  These policies cover but are not limited to absences for the following reasons: bereavement, jury duty, attendance at graduation, religious observance and ordered military duty.

## ARTICLE NINETEEN
## LEAVES

### A.  Sick Leave

1.   Employees will be granted one day's sick leave with pay for each month of work during the regular school year.  Unused sick leave shall be cumulative from month to month during the school year and from year to year up to a maximum of 145 days.  Members of the Teachers Retirement System accrue sick leave up to a maximum of 200 days.

Paraprofessionals will be allowed to use up to three sick days per year for personal business, provided that reasonable advance notice is given to the head of the school.  Paraprofessionals may use the days allowed for personal business for the care of ill family members.  For the purpose of this provision, family member shall be defined as: spouse; natural, foster or step parent; child; brother or sister; father-in-law; mother-in-law; any relative residing in the household; and domestic partner, provided such domestic partner is registered pursuant to the terms set forth in the New York City Administrative Code Section 3-240 et seq.  Days off for personal business are intended to be used for personal business which cannot be conducted on other than a school day and during other than school hours.

2.   Employees whose sick leave allowance is exhausted shall have the right to apply to the Division of Human Resources to borrow against future sick leave in accordance with applicable administrative regulations.

3.   Information on accumulated sick leave will be given to each employee, in writing, once a year.

4.   Paraprofessionals serving in schools shall not suffer loss of sick leave days for absence due to illness from the following children's diseases: rubeola (measles), epidemic parotitis (mumps) and varicella (chicken pox).  It is understood that this paragraph does not apply to rubella (German measles).

5.   The Board will approve absences without loss of sick bank days for paraprofessionals who contract Hepatitis B as a result of working with children who have been evaluated as presenting a substantial risk of exhibiting acting out behavior.

6.   Employees who are absent due to allergic or positive reaction from a skin test shall not suffer loss of sick leave days.

7.   Employees may apply for a leave for reasons of personal illness, including pregnancy-related disabilities, and such leave shall be granted, subject to approval of the Medical Bureau. They shall be entitled to return within one year on the basis of seniority and shall regain the seniority and other rights they had before leaving.  Any leave granted under this Section may, subject to approval of the Medical Bureau, be extended for a period of one additional year.

8.   Employees who work during the summer will be granted one day of sick leave with pay for July or two days during August, in accordance with the Standard Operating Procedures Manual.  Unused sick leave is not cumulative from year to year in the summer activity but it will be added to sick leave acquired under paragraph 1 above for use during the regular school year.

9.   Employees with two or more years of service who leave for reasons of illness in the immediate family shall be entitled to return within one year on the basis of seniority and shall regain the seniority and other rights they had before leaving.  The term "immediate family" includes a parent, child, brother, sister, grandparent, grandchild, husband, wife or parent of a husband or wife, or any relative residing in the employee's household; and domestic partner, provided such domestic partner is registered pursuant to the terms set forth in the New York City Administrative Code Section 3-240 et seq.

10. Unused sick leave accumulated as a paraprofessional shall be transferred to the employee's sick "bank" if he/she is employed in a different Board position.

11. All applications for leaves of absence within the provisions of this Article shall be forwarded to the Division of Human Resources with proper medical documentation attached for approval.

12. Paraprofessionals who are members of the TRS and who resign or retire, shall upon application, receive termination pay on a basis of one half of up to 200 days of the unused sick leave accumulated.  If the resignation or retirement becomes effective at any time other than the end of a school year, sick leave for the period of service during that school year shall be paid at the rate of one day for each two full months of service.  Any paraprofessional who takes termination pay pursuant to this paragraph shall be paid such amounts in three equal cash installments payable two months, fourteen months and twenty six months following his/her termination date.

The estate of such a paraprofessional who dies during the term of this contract shall receive termination pay calculated on the same basis.  This paragraph shall not apply to those paraprofessionals who are presumed to have retired on the day immediately preceding their death pursuant to Section 13-545 of the Administrative Code of the City of New York, as amended and recodified.

Absence immediately prior to resignation shall be paid on the same basis as termination pay.

### B.  Leaves Without Pay

1.  An employee with two or more years of service who leaves for reasons of maternity and/or child care and returns to employment within four years shall regain the seniority he/she had at the time he/she left, and shall be credited with the accumulated sick leave to which he/she was entitled at the time he/she left less the sick days used while on maternity leave.

2.  An employee with three or more years of service who leaves for approved study or to teach within the New York City school system and returns to employment within one year shall regain the seniority he/she had at the time he/she left and shall be credited with the accumulated sick leave to which he/she was entitled at the time he/she left.

3.  Upon application a leave of absence without pay will be granted to an employee to serve as a school secretary assistant or bilingual school secretary assistant.  Such leave shall be for up to 18 months, but shall terminate upon cessation of employment as a school secretary assistant or bilingual school secretary assistant.  Upon termination of the leave the employee who returns to employment as a paraprofessional shall regain the seniority he/she had at the time he/she left and shall be credited with his/her accumulated sick leave at the time of return.

4.  Paraprofessionals who are officers of the Union or who are appointed to its staff shall, upon proper application, be given a leave of absence without pay for each school year during the term of this Agreement for the purpose of performing legitimate duties for the Union, on the same basis with respect to service credit for retirement purposes and contributions to the retirement system as is applicable to teachers pursuant to Article Nineteen C (Leaves of Absence for Union Officers) of the Teacher Agreement.

5.  Through at least July 31, 1995, the Board will implement a liberal policy concerning the granting of leaves of absence without pay to UFT bargaining unit members who meet the stated criteria for such leaves.  Bargaining unit members who are denied such a leave at the school or district level may appeal to the Chief Executive of the Division of Human Resources for review and final determination.

### C.  Discipline for Authorized Absences

No employee shall be disciplined, adversely rated or have any derogatory material placed in his/her file for taking an approved unpaid leave for restoration of health or a central DOE approved paid leave. Discipline for time and attendance is not a reflection of the employee's performance while at work.

### D.  Return from Leave of Absence

(a) Commencing with the beginning of the 2014-15 school year, employees on leaves of absence, for one school year or semester, through the end of the school year, must notify the DOE's Chief Executive Officer of the Division of Human Resources or his/her designee in a manner prescribed by the DOE on or before May 15th of their intent to either return to service or apply to extend their leave of absence for the following school year. Failure to comply with this deadline shall be deemed as a voluntary resignation from the DOE, except in cases where it can be demonstrated that special circumstances prevented the employee from notifying the DOE.

(b) Notwithstanding this notification given to the Board (DOE), prior to the commencement of the school year an employee may return to service or apply to extend his/her leave if he/she can demonstrate relevant circumstances materially changed after May 15th provided that the employee acts expeditiously following the change in circumstances.  An application to extend a leave made under these circumstances shall be granted under the same circumstances as one made on or before May 15th.

(c) An employee on leave for a restoration of health shall be required to notify the DOE's Chief Executive Officer of the Division of Human Resources or his/her designee, in a manner prescribed by the DOE on or before May 15th, of his/her medical status and any plans, if known, as to whether he or she intends to return to work the following school year. Failure to notify the DOE in writing by May 15th shall be deemed as a voluntary resignation from the DOE, except in cases where it can be demonstrated that special circumstances prevented the employee from notifying the DOE.

(d) Whether special circumstances prevented an employee from notifying the DOE on or before May 15th, relevant circumstances materially changed after May 15th, or an employee acted expeditiously shall be subject to the grievance procedure, including binding arbitration.

## ARTICLE TWENTY
## PENSIONS

### A.  Pension Legislation

The parties have agreed to jointly support pension legislation as set forth in the letter attached as Appendix D.

### B.  Tax Deferred Annuity Plan

The parties agree to enroll newly-hired employees who do not enroll in a retirement or pension system maintained by the City of New York in the Board's 403(b) Annuity Plan at the time the employee is hired.  It is further agreed that such employees will be provided with the option to withdraw from enrollment in the Board's 403(b) Annuity Plan.

### C.  Pension Benefits Agreement and Deferred Compensation Plan

1.  The Pension Benefits Agreement dated June 6, 2000, is deemed to be a part of this Agreement.

2.  The Board and the City shall promptly make available to the employees covered by this Agreement an eligible deferred compensation plan under Section 457 of the Internal Revenue Code in accordance with all applicable laws, rules and regulations.

## ARTICLE TWENTY-ONE
## SAFETY

### A.  School Safety Plan

The principal is charged with the responsibility of maintaining security, safety and discipline in the school.  To meet this responsibility, he/she shall develop in collaboration with the Union chapter committee and the parents association of the school, a comprehensive safety plan, subject to the approval of the Chief Executive of School Safety and Planning.  The safety plan shall be updated every year using the same collaborative process, and reports of any incidents shall be shared with the Chapter Leader.

A complaint by a paraprofessional, or the Chapter Leader that there has been a violation of the safety plan, may be made to the principal as promptly as possible.

He/she will attempt to resolve the complaint within 24 hours after receiving the complaint.

If the paraprofessional or chapter is not satisfied an appeal may be made to the Chief Executive of School Safety and Planning who will arrange for a mediation session within 48 hours.

If the paraprofessional/chapter is not satisfied with the results of the mediation, an appeal may be made by an expedited arbitration process, to be developed by the parties.

**B.  Citywide Security and Discipline Committee**

1.  The Union and the Board shall establish a joint committee which shall meet on a regular basis to discuss and consider appropriate means of resolving safety and discipline issues.  Other city agencies will be invited to participate when the Union and Board deem it appropriate.

2.  The joint committee or joint designees and any experts the Union and/or Board may designate will have access to all schools and other Board workplaces in which staff represented by the Union are assigned for the purpose of investigating and assessing allegedly unsafe working conditions.  If possible, such visits shall be made on reasonable notice to the school, and in a manner that minimizes disruption to the school or other workplace.

3.  The joint committee, from time to time, may establish sub-committees to deal with special safety/discipline issues.  It shall establish a sub-committee to deal with the issues of safety and discipline in special education schools and programs.

**C.  Environmental Health and Safety Joint Committee**

1.  The Union and the Board shall establish a joint committee which shall meet on a regular basis to discuss and consider appropriate means of resolving health and safety issues.  The School Construction Authority will be invited to participate on issues raised by school capital modernization projects.

2.  The joint committee or joint designees, and any experts the Union and/or the Board may designate, will have access to all schools and other Board workplaces in which staff represented by the UFT are assigned for the purpose of investigating and assessing allegedly hazardous working conditions.  Such visits will be made upon reasonable notice to the Board's office of occupational safety and health and in a manner that minimizes disruption to the school or other workplace.

**D.  Safe Environment**

1.  In recognition of the importance of employee safety and health, the Board agrees to provide the appropriate recognized standards of workplace sanitation, cleanliness, light, and noise control, adequate heating and ventilation.  The Board of Education agrees to eliminate recognized hazards that are likely to cause serious physical harm.

2.  If the Union believes a situation has arisen that is likely to cause serious physical harm, it may bring it to the attention of the Chancellor or designee who shall immediately assess the situation, including onsite inspection where appropriate; and take such action as the Chancellor deems appropriate.  In the event the Union seeks to contest the Chancellor's determination, it may exercise its statutory rights under New York State Labor Law Section 27a (PESH) or other legal authority.

3.  The Board will issue a circular advising staff of their rights under PESH and other applicable law and post the notices required by law.

**E.  Renovation and Modernization**

The Union and the Board believe that modernization and renovation projects are vital to enable children to receive the educational services to which they are entitled.  However, in order to limit any educational disruption that a modernization project can create, and to protect the health and safety of the staff and students that use a school setting undergoing modernization, the Board and Union have agreed to standard procedures that help to ensure that health, safety and

educational standards are maintained during school capital modernization projects. These standard procedures will be applied in school capital modernization projects undertaken by the School Construction Authority and will be posted and reviewed with all staff in any school undergoing modernization. Where conditions require it, the standard procedures may be modified after consultation with the Union.

## ARTICLE TWENTY-TWO
## COMPLAINT AND GRIEVANCE PROCEDURES

### A. Policy

It is the policy of the Board to encourage discussion on an informal basis between a supervisor and an employee of any employee complaint. Such discussion should be held with a view to reaching an understanding which will dispose of the matter in a manner satisfactory to the employee, without need for recourse to the formal grievance procedure. An employee's complaint should be presented and handled promptly and should be disposed of at the lowest level of supervision consistent with the authority of the supervisor.

In order to accomplish its stated purpose, a grievance conference must be attended by those individuals who may be able to promote resolution or, if resolution is not possible in a particular case, to provide the necessary information for a fair determination of the grievance. At the Chancellor's level, principals will be expected to attend or to have a suitable representative present at the conference. Failure to attend may result in sustaining the grievance on procedural grounds.

Upon request to the head of the school, a Union staff representative shall be permitted to meet with employees in the unit during their non-working time, within the school, for the purpose of investigating complaints and grievances, under circumstances which will not interfere with the paraprofessional program or other school activities. When necessary, any employee in the unit who is a chapter leader in the school in which the aggrieved employee is assigned will be given time off to represent the employee in the presentation of his/her grievance.

### B. Informal Complaint Procedures

It is desirable that any employee having a complaint should discuss it informally with his/her immediate supervisor or with any other appropriate level of supervision at the school.

The employee should request an opportunity to discuss the matter and the supervisor should arrange for the discussion at the earliest possible time. At such informal discussion, the employee may be accompanied by a Union representative or by another employee in the unit who is not an official or agent of another employee organization. The Union representative shall be the chapter leader at the school or a Union representative.

The objective should be to dispose of the majority of employee complaints in this manner.

### C. Formal Grievance Procedure

If the matter has not been disposed of informally, an employee having a complaint concerning any condition of employment within the authority of the Board of Education may, within a reasonable period of time following the action complained of, present such complaint as a grievance in accordance with the provisions of this grievance procedure.

Complaints concerning matters which are not within the authority of the Board should be presented in accordance with the review procedures of the agency having authority over such matters.

The grievance procedure does not apply to complaints concerning discharge, except as set forth in Article Twenty-Three.

If a group of employees has the same complaint, a member of the group may present the grievance in the group's behalf under this procedure.

The Union has the right to initiate or appeal a grievance involving alleged violation of any term of this Agreement. Such grievance shall be initiated with the appropriate Board official.

Complaints against supervisors will be considered in an expeditious manner in accordance with the procedures set forth in Article 23 (Special Complaints) of the teacher agreement.

Following is the procedure for presentation and adjustment of grievances, except that salary and leave grievances shall be initiated by the Union to the Division of Human Resources at Step 2 of this procedure and the decision shall be treated as a decision of the Chancellor:

**School Level (Step 1)**

The employee shall initiate the grievance at Step 1 with the head of the school as the Board representative.

**Chancellor Level (Step 2)**

If the grievance is not resolved at Step 1, the Union may appeal from the decision at Step 1 to the Chancellor within 10 school days after the decision of the head of the school is received.

When a grievance is appealed to the Chancellor at Step 2, the Union may advise the arbitrator of that appeal, in order to expedite possible scheduling before the arbitrator in the event that the grievance is subsequently appealed to the arbitrator.

**Representation**

At each step, the employee may be accompanied by a Union representative. At Step 1, the Union representative shall be the chapter leader at the school. At Step 2 the Union representative shall be a Union staff representative.

**Conferences and Decisions**

At each step of this grievance procedure, a conference shall be arranged by the Board representative, or his/her designee, with the aggrieved employee and his/her representative, if any. Conferences held under this procedure shall be conducted at a time and place which will afford a fair and reasonable opportunity for all persons entitled to be present to attend. When such conferences are held during working hours, employees who participate shall be excused with pay for that purpose.

Every attempt should be made to reach a mutually satisfactory resolution of the grievance at the conference held under this procedure. If the grievance is not resolved at the conference, then a decision must be rendered by the Board representative. The decision at each step should be communicated to the aggrieved employee and his/her representative within the following time limits:

1. At Step 1, within five school days after the grievance is initiated;
2. At Step 2, within ten school days after the appeal is received;

If a satisfactory resolution is not reached or if a decision is not rendered within the time limit at Step 1 or 2, the Union may appeal the grievance to the next higher step.

**D. Appeals to Arbitration (Step 3)**

A grievance which has not been resolved by the Chancellor at Step 2 may be appealed by the Union to arbitration. A grievance may not be appealed to arbitration unless a decision has been rendered by the Chancellor at Step 2, except in cases where the decision on the grievance has not

been communicated to the aggrieved employee and his/her representative by the Chancellor within the time limit specified for Step 2 appeals.

The appeal to arbitration with a copy to the Board, shall be filed within ten school days after receipt of the decision of the Chancellor.  Where no hearing has been held, or no decision has been issued, within ten school days following receipt of the grievance by the Chancellor at Step 2, the appeal to the arbitration shall be filed within ten school days following the expiration of the ten-day period.

A panel of seven arbitrators, or more, shall be designated by mutual agreement of the parties to serve for any case or cases submitted to them in accordance with their ability to promptly hear and determine the case or cases submitted.

Any costs relating to the participation of the arbitrator shall be shared equally by the parties to the dispute.

With respect to grievances which involve the application or interpretation of the provisions of this Agreement the arbitrator shall be without power or authority to make any decision:

1.  Contrary to, or inconsistent with, or modifying or varying in any way, the terms of this Agreement or of applicable law or rules and regulations having the force and effect of law;

2.  Involving Board discretion or Board policy under the provisions of this Agreement, under Board by-laws, or under applicable law, except that the arbitrator may decide in a particular case that such policy was disregarded or that the attempted application of any such term of this Agreement was so discriminatory, arbitrary or capricious as to constitute an abuse of discretion, namely whether the challenged judgment was based upon facts which justifiably could lead to the conclusion as opposed to merely capricious or whimsical preferences or the absence of supporting factual reasons.

3.  Limiting or interfering in any way the powers, duties and responsibilities of the Board under its by-laws, applicable law, and rules and regulations having the force and effect of law.

With respect to grievances which involve the application or interpretation of the provisions of this Agreement the decision of the arbitrator, if made in accordance with his/her or her jurisdiction and authority under this Agreement, will be accepted as final by the parties to the dispute and both will abide by it.

With respect to all other grievances, if the grievance is not resolved at the conference, then a report and recommendation of the arbitrator shall be transmitted to the Chancellor.  Within ten school days after the date that the report and recommendation are received by the Chancellor, he/she shall indicate whether he/she will accept the arbitrator's recommendation.  Unless the Chancellor disapproves the recommendation within ten school days after the date it is received by him/her, the recommendation shall be deemed to be his/her decision.

A recommendation of the arbitrator which has been approved by the Chancellor, or which has not been disapproved by the Chancellor within the ten day limit specified above, shall be communicated to the aggrieved employee and the Union.  If the Chancellor decides to disapprove a recommendation of the arbitrator, he/she shall notify the aggrieved employee and the Union of his/her decision.

Two hundred (200) arbitration dates may be scheduled per year for all UFT grievances.  The use of the two hundred (200) days will governed in all respects by the rules in this Agreement, including, but not limited to, rules that exclude certain arbitrations from the two hundred (200) day limit.

Principals may testify at arbitrations by telephone subject to the following conditions:  (i) the principal may not look at any written material or be aided by anyone in the room during his/her testimony except as authorized or directed by the arbitrator; (ii) the principal may not be joined in the room by anyone without notifying the arbitrator, all parties and their representatives; (iii) the UFT district representative, or the UFT district representative's designee, may be present in the room with the principal;  and (iv) the principal's testimony shall still be under oath.  The sole role of the UFT district representative, or the UFT district representative's designee, shall be to verify the principal's compliance with these conditions; the UFT district representative or designee may not participate in the proceedings except to notify the arbitrator and/or the parties' representatives if he or she believes these conditions are being violated.  The UFT district representative, or the UFT district representative's designee, shall not be released from his/her classroom responsibilities for this purpose.  Nothing in this Agreement shall in any way limit the right of the UFT arbitration advocate to cross-examine the principal.  If the arbitrator orders the principal to testify or be cross-examined in person, the principal shall not be allowed to testify or be cross-examined by telephone.

Nothing in this Agreement shall in any way limit the currently existing rights of Employees to attend arbitrations.

## ARTICLE TWENTY-THREE
## DISCHARGE REVIEW PROCEDURES

It is the policy of the Board that the discharge of an employee should be based on good and sufficient reason and that such action should be taken by the supervisor having such authority only after he/she has given due consideration to the matter.

If an employee with more than the equivalent of one school term of continuous service exclusive of any service as a day-to-day substitute paraprofessional is discharged, he/she shall, upon his/her request, be given a written notice of discharge and a statement of the general reasons for such action.  Such employee will also, upon his/her request, be afforded an opportunity for a prompt and careful review of the discharge in accordance with the provisions set forth in Article Twenty-Two of this Agreement.

If the Union is not satisfied with the determination made at Step 2, it may appeal under Article Twenty-Two of this Agreement for final arbitration.

The time limits at each step for review of discharge complaints shall be the same as for grievances filed pursuant to Article Twenty-Two of this Agreement.

In any arbitration reviewing the discharge of an employee based on allegations of sexual misconduct there shall be a mandatory penalty of discharge if the employee is found by the arbitrator to have engaged in sexual misconduct or has pleaded guilty to or been found guilty of criminal charges for such conduct.  For purposes of this section, sexual misconduct shall include the following conduct involving a student or a minor who is not a student: sexual touching, serious or repeated verbal abuse (as defined in Chancellor's Regulations) of a sexual nature, action that could reasonably be interpreted as soliciting a sexual relationship, possession or use of illegal child pornography, and/or actions that would constitute criminal conduct under Article 130 of the Penal Law against a student or minor who is not a student.

## ARTICLE TWENTY-FOUR

## PERSONNEL FOLDERS

### A.  Evaluations

Employees shall receive a copy of any evaluatory statement of their work performance or conduct which is placed in their permanent personnel folder.  Employees shall be given an opportunity to answer any such evaluatory statement placed in their folder, and their written answer shall be attached to the evaluatory statement in the folder.  Employees may not grieve material in file, except that if accusations of corporal punishment or verbal abuse against a UFT-represented employee are found to be unsubstantiated, all references to the allegations will be removed from the employee's personnel file.

However, the employee shall have the right to append a response to any letter. If disciplinary charges do not follow, the letter and response shall be removed from the file three years from the date the original material is placed in the file

### B.  Counseling Memos

Effective September, 2002, supervisors may issue counseling memos.  Counseling memos are not disciplinary.  Counseling memos provide the opportunity for supervisors, in a non-disciplinary setting, to point out to employees areas of work that the supervisor believes need improvement.  Counseling memos should include the supervisor's proposals for how such improvement may be achieved.  Any employee who receives a counseling memo may request from the supervisor either suggestions for how to improve or requests for the supervisor to model such improvement for the member.  Counseling memos are a vehicle for supportive improvement.

1.  A counseling memo may only be written to an employee to make him/her aware of a rule, regulation, policy, procedure, practice or expectation.  A counseling memo cannot include any disciplinary action or threat of disciplinary action.

a.  "Counseling Memo" must appear at the top of the memo in bold print and capital letters. At the conclusion of the memo the following must appear in bold print:  "A counseling memo is not disciplinary in any manner and cannot be used in action against an employee except to prove notice if the employee denies notice."  If the language required in this paragraph a) is not included in the memo, it must be added.

b.  A counseling memo must be presented to an employee within one (1) month of the latest incident recounted in the memo.  The memo may only reference similar prior incidents that occurred no more than four (4) months from the date of the latest incident.

2.  Counseling memos may <u>not</u> be used in any action or evaluation involving an employee in the bargaining unit ("U" rating, per session job, etc.) except to establish that the employee who denies knowledge of a rule, regulation, policy, procedure, practice or expectation was given prior notice of it, or to impeach factual testimony.

a.  Counseling memos may not be used in the rating of an employee in the bargaining unit.

b.  Counseling memos may not be referred to in, or attached to, any other letter sent to an employee for their official school file**.**

3.  Counseling memos may not be grieved.  Any employee who receives a counseling memo shall have the right to answer within one (1) month of receipt of the counseling memo and the answer shall be attached to the file copy of the counseling memo.

4.  All counseling memos will be permanently removed from employee's official school files three (3) years after the latest incident referred to in the memo.

## C.  False Accusations[14]

Knowingly false accusations of misconduct against employees will not be tolerated.

If an accusation of sexual misconduct or physical abuse against an employee is found by the Board or Special Commissioner of Investigation to have been knowingly false when made, the Board will take the following actions to restore the falsely accused employee's reputation: removing all references to the charges from the employee's personnel file(s) and adding evidence of the unfounded nature of the charge to any Board files that may have to be maintained to satisfy other legal requirements, if any; and restoring any back pay owed with interest and, at the employee's request, confirming to any regulatory agency the finding that the employee was falsely accused.  In addition, where the knowingly false accusation was made by a student of the employee, absent compelling and extraordinary circumstances the student will be permanently reassigned from the employee's class.

## ARTICLE TWENTY-FIVE
## PAY PRACTICES

### A.  Itemization

The Board will recommend to the Comptroller of the City of New York that he/she itemize more fully employee pay checks and that he/she provide accompanying explanations when lump sum payments are made.

### B.  Biweekly Payroll

The parties agree that a biweekly payroll gives an employee a date certain for receipt of their pay.  Therefore, the Board will convert the paraprofessional payroll to a biweekly payroll from a semi-monthly payroll as soon as practicable.  The parties will make whatever contractual changes are technically necessary to accomplish this goal.

### C.  Electronic Funds Transfer

The Board has in place an electronic funds transfer ('EFT') program without resort to a payroll lag for those bargaining unit members who are regularly scheduled employees in titles paid on the Q Bank and who elect the receipt of their paychecks by electronic funds transfer.  Annual enrollments will take place each March.

### D.  Performance Incentives Committee

A committee co-chaired by the Chancellor, the President of the UFT and the New York City Commissioner of Labor Relations, or his or her high-ranking designee, shall be established to investigate the viability and desirability of merit pay and to address other compensation issues such as comparability, skills and responsibility, shortage and hard to staff areas and potential career ladder opportunities.

### E.  Direct Deposit

As of school year 2007-2008, all newly-hired employees of the Board of Education shall have their wages paid through direct deposit.

## ARTICLE TWENTY-SIX
## INFORMATION AT THE SCHOOL

---

[14] See Appendix E.  This section C of Article Twenty-Four corresponds to Article 21H of the Teacher Contract.

A.  All official Board of Education circulars which deal with the working conditions or the welfare of employees covered by this Agreement shall be posted promptly.

B.  A copy of the seniority list for employees in the bargaining unit shall be posted in each school in the district.  A copy shall be given to the Union chapter chairman and to the Union district representative.

**ARTICLE TWENTY-SEVEN**
**CHECK-OFF**

**A.  Exclusive Check-Off Privilege**

The Board will honor, in accordance with their terms, only such written authorizations as are properly executed by employees in the unit covered by this Agreement for the deduction of their dues in behalf of the Union.

**B.  Dues Check-Off on Transfer**

The Board will honor, in accordance with their terms, the written authorizations for the deduction of dues in behalf of the Union, properly executed by individuals while employed by the City of New York, who thereafter transfer directly to employment with the Board in the unit covered by this Agreement.

**C.  Dues Check-Off Information**

The Board shall provide monthly to the Union a complete and up-to-date list of all employees in the bargaining unit who have properly executed written authorization for the deduction of dues in behalf of the Union.  The Board shall also furnish to the Union such other reasonably available information as may be necessary to the Union for maintaining appropriate check-off records.

**D.  Agency Fee Deduction**

The Board shall deduct from the wage or salary of employees in the bargaining unit who are not members of the UFT the amount equivalent to the dues levied by the UFT and shall transmit the sum so deducted to the UFT, in accordance with Chapters 677 and 678 of the Laws of 1977 of the State of New York. The UFT affirms it has adopted such procedure for refund of agency shop deduction as required in Section 3 of Chapters 677 and 678 of the Laws of the State of New York.  This provision for agency fee deduction shall continue in effect so long as the UFT establishes and maintains such procedure.

The Union shall refund to the employees any agency shop fees wrongfully deducted and transmitted to the Union.

The Union agrees to hold the Board harmless against claims arising out of the deduction and transmittal of agency shop fees where there is a final adjudication by a court or arbitrator or by PERB that said agency shop fees should not have been deducted and/or transmitted to the Union.

The agency shop fee deductions shall be made following the same procedures as applicable for dues check-off, except as otherwise mandated by law or this Article of the Agreement.

**E.  Political Check-Off**

The Board will arrange for voluntary payroll deduction contributions for federal political contests in accordance with Title 2, Section 441b of the United States Code.

## ARTICLE TWENTY-EIGHT
## CONSULTATION WITH UNION COMMITTEE

Appropriate representatives at Board headquarters level and representatives of the Union shall meet once a month during the school year to consult on matters of paraprofessional policy and questions relating to the implementation of this Agreement.

## ARTICLE TWENTY-NINE
## UNION MEETINGS

Upon request to the head of the school, members of the Union who are in the bargaining unit shall be permitted to meet within the school under circumstances which will not interfere with the paraprofessional program or other school activities.  Such meetings may be held only during the employees' lunch period or before or after the employees' working hours, at a place to be assigned by the head of the school, where other employees or children are not present. Union officials may attend such meetings.

## ARTICLE THIRTY
## RESTRICTION ON UNION ACTIVITIES

A.  No employee shall engage in Union activities during the time he/she is assigned to duty, except that members of the Union's negotiating committee shall, upon proper application, be excused without loss of pay for working time spent in negotiations with the Board or its representatives.

B.  The Paraprofessional Chapter leader shall be allowed two days per week for investigation of grievances and for other appropriate activities relating to the administration of this Agreement and to the duties of his/her office.

C.  The Union agrees that it will not seek through legislation or through revision of civil service regulations to change the present noncompetitive civil service status of paraprofessionals.

## ARTICLE THIRTY-ONE
## CHARTER SCHOOLS

**A.  Conversion Charter Schools**

Pursuant to Article 56 of the New York State Education Law (the "Charter Schools Law") an existing public school may be converted to a charter school.  As modified below, employees of a Conversion Charter School shall be subject to this collective bargaining agreement, in accordance with the Charter Schools Law, including but not limited to salary, medical, pension and welfare benefits and applicable due process procedures.  The provisions regarding the right of return which follow apply to employees in such Board schools that are converted to charter schools ("Conversion Charter Schools").

1.  At the point of conversion of a board school to a Conversion Charter School, incumbent employees who choose not to remain as employees in the school as a charter school will have the placement rights contained in Articles 12, 14 and 16 of this Agreement.

2.  The Board agrees to extend leaves beyond the statutory two year period to the full term of their employment in the charter school for Board employees who become Conversion Charter School employees. Such employees shall have a right to return to their former geographic district or superintendency in accordance with their seniority.  For such employees, service in a

Conversion Charter School and Board service shall be combined for all contractual purposes where length of service is a factor.

3.  Conversion Charter School pedagogical employees placed at the Board shall be eligible for up to a total of two years credit toward tenure based upon satisfactory service at a Conversion Charter School and any applicable prior Board service.

4.  The contractual salary limitations for Conversion Charter School employees placed at the Board shall not apply to certified pedagogical employees.

5.  If a Conversion Charter School closes or if the employee is laid off due to economic necessity beyond their control, certified pedagogical Conversion Charter School employees who were not Board employees when hired by the Conversion Charter School shall have placement rights in the Board equal to a certified provisional employee with no seniority.

6.  If a Conversion Charter School closes or if the employee is laid off due to economic necessity beyond their control, uncertified pedagogical Conversion Charter School employees shall have no placement rights in the Board, but the Board will use its best efforts to place such employees in available vacancies.

7.  Conversion Charter Schools shall be required to maintain the same medical, pension and welfare benefits as apply to Board employees covered by these agreements.

8.  Except as otherwise set forth herein, pursuant to and in accordance with the Charter Schools Law, the terms and conditions of this collective bargaining agreement apply to employees serving in the Converted Charter Schools.  However, nothing shall limit the Board of Trustees of the converted Charter School from exercising their rights to modify the collective bargaining agreement for the purposes of employment in the charter school, in accordance with and pursuant to the provisions of Section 2854 3(b) of the Charter Schools Law.

9.  While the Charter Schools Law, as written, provides that the decision to apply for conversion of an existing school resides in the parents of the student body, the Board believes the participation of the UFT and its members is critical in this process.  The successful conversion of schools to the Charter model necessitates the involvement of the faculty at these schools. Because of this, the Board fully intends to consult with the UFT in the conversion process, and will seek a collaborative atmosphere in moving forward.  Towards that end, in Board schools that are under consideration for conversion to Charter School status, if 50% or more of the staff chooses to stay at the Board of Education, the Board and the Union shall undertake a joint review of the impact of conferring charter status on the school.

10. Also, for Board schools that convert to charter status, the Memorandum of Understanding between the Board and the Charter School shall provide that the grievance procedure for UFT employees, unless and until modified in accordance with the Charter Schools Law, shall be the contractual grievance procedure modified to provide that Step 1 shall be at the level of the head of the school, Step 2 shall be to the Board of Directors of the school and Step 3 shall be to binding arbitration.

**B.  New Charter Schools**

It is agreed that UFT represented employees who leave the Board to serve in a new charter school shall have the following rights:

1.  Employees shall be granted a two year leave of absence;

2.  Employees returning from a leave of absence shall be credited for time served at the charter school toward their placement on the salary schedule; and

3.  Employees shall have a right to return to their former geographic district or superintendency in accordance with their seniority.

## ARTICLE THIRTY-TWO
## MATTERS NOT COVERED

With respect to matters not covered by this Agreement which are proper subjects for collective bargaining, the Board agrees that it will make no changes without appropriate prior consultation and negotiation with the Union.

## ARTICLE THIRTY-THREE
## CONFORMITY TO LAW-SAVING CLAUSE

A.  If any provision of this Agreement is or shall at any time be contrary to law then such provision shall not be applicable or performed or enforced, except to the extent permitted by law and any substitute action shall be subject to appropriate consultation and negotiation with the Union.

B.  In the event that any provision of this Agreement is or shall at any time be contrary to law, all other provisions of this Agreement shall continue in effect.

C.  If the Board delegates any of its authority or functions to a community school board, the terms of this Agreement, insofar as applicable, shall be binding upon the community school board to the extent permitted by law.

## ARTICLE THIRTY-FOUR
## COPY OF AGREEMENT

The parties will have available copies of this Agreement upon request.

## ARTICLE THIRTY-FIVE
## NO-STRIKE PLEDGE

The Union and the Board recognize that strikes and other forms of work stoppages by employees are contrary to law and public policy.  The Union and the Board subscribe to the principle that differences shall be resolved by peaceful and appropriate means without interruption of the school program.  The Union therefore agrees that there shall be no strikes, work stoppages, or other concerted refusal to perform work by the employees covered by this Agreement, nor any instigation thereof.

## ARTICLE THIRTY-SIX
## MINIMUM EDUCATIONAL REQUIREMENTS

The Commissioner's regulations regarding minimum educational requirements are applicable to paraprofessionals covered by this Agreement.

## ARTICLE THIRTY-SEVEN
## DEFINITIONS

A.  Wherever the term "semester hours" is used in this Agreement, it shall mean college credits.

B.  Wherever the term "Board" is used in the Agreement, it shall mean the City Board, it being understood, nevertheless, that this contract is binding on all community school boards in accordance with Section 2590 of the Education Law.

C.  Effective September 2006 "seniority" shall mean length of service as a paraprofessional employee in the bargaining unit, including seniority accrued as a day-to-day substitute paraprofessional.

## ARTICLE THIRTY-EIGHT
## NOTICE LEGISLATIVE ACTION

The following Article is required by the Public Employees Fair Employment Act, as amended by Section 204a, approved March 10, 1969:

It is agreed by and between the parties that any provision of this Agreement requiring legislative action to permit its implementation by amendment of law, or by providing the additional funds therefor, shall not become effective until the appropriate legislative body has given approval.

## ARTICLE THIRTY-NINE
## SCHOOL-WIDE BONUS PROGRAM

1.  As set forth in Article 15 of the 2003-07 collective bargaining agreement covering paraprofessionals, the New York City Department of Education and the United Federation of Teachers jointly support, and pledge to work together to implement on a pilot basis, a school-wide based bonus program pursuant to which educators will be awarded substantial cash bonuses for student achievement gains.

2.  The program will be initiated immediately, with bonuses awarded for achievement gains in the 2007-2008 school year.  Subject to the successful solicitation of private funds, which the BOE and UFT commit to work together to raise as soon as practicable, approximately 15% of the City's highest need schools will be eligible to participate in the program this first year.  In consultation with the UFT, the BOE will identify approximately 200 of the highest-need schools in the City.  Each will be invited to participate in the program, and the BOE and UFT jointly pledge to work in good faith to encourage them to do so both this year and throughout the life of the program.

3.  In future years, if the school-wide bonus program continues, awards will be funded from public appropriations which supplement and do not supplant funds available for collective bargaining.

4.  In 2008-09 at least 30% of BOE schools will be eligible to participate in the program.  In consultation with the UFT, the BOE will identify approximately 400 of the highest-need schools in the City.

5.  Participation in the program will be at the option of each school as determined by a vote of fifty-five percent (55%) of the UFT-represented school staff and with the assent of the principal of the school.  The vote shall be conducted by the UFT Chapter in the school,  held within  six weeks of the announcement of the program and shall be an up or down vote without conditions or restrictions on the terms of the program as set out herein.  Each year the bonus program is available eligible schools shall exercise the option to participate ("Participant Schools") or not by the same voting procedure.

6.   A school's agreement to participate in the bonus program shall be considered, along with other criteria, as a positive factor in determining whether the Participant School is to be phased out or given a year's moratorium on a possible phase-out.  Nothing herein alters applicable law with regard to school closings.

7.   Each Participant School will be eligible for a dollar award ("the pool"), which will be distributed to the school as a whole on the basis of the Progress Report or some other neutral criterion derived from the Progress Report.

8.   In consultation with the UFT, the BOE will set the criteria for awarding funds to schools. The criteria will provide objective standards /benchmarks aligned with Progress Report factors and the specific details of those standards/benchmarks will be communicated to schools when the program is announced. All Participant Schools that achieve the announced standards/benchmarks shall receive the applicable money award. There shall be no cap or ceiling imposed on the number of Participant Schools receiving the award, provided the school meets the standards/benchmarks.  Neither shall the relative standings of the Participant Schools affect their entitlement to the award once they have met the standards/benchmarks.

9.   To account for variation in the size of schools, the size of the award each Participant School is eligible to receive will be determined by appropriate objective criteria.

10.  The amount of the average per-person award should be sufficiently substantial to make a material difference to each awardee. As outlined below, each Participant School will determine the methodology for distributing any award it earns for school-wide performance. The size of each Participant School's total award for distribution in 2007-08 shall be the number of full-time UFT-represented employees on the school's table of organization times three thousand dollars ($3,000). In light of year-to-year appropriations uncertainties, nothing in this paragraph restricts the ability of the BOE to increase or decrease the total amount set annually for distribution pursuant to the program.

11. Each Participant School will form a compensation committee composed of the principal and a principal's designee (e.g., an assistant principal) and two UFT-represented staff members elected in a Chapter supervised election by the UFT-represented staff on an annual basis from among volunteers. The compensation committee will determine, by consensus, matters related to both eligibility for and the size of individual awards to UFT-represented staff members. However the compensation committee shall presume that all UFT-represented staff employed at a school that meets the targets for the bonus have contributed to the school's achievement to some extent and therefore should share in the bonus. If there is no consensus the pool of money will not be distributed to the school.

12. Among the topics each Participant School compensation committee may decide to consider, after receiving guidance from the BOE and UFT, are whether to make equal individual awards to all eligible UFT staff, equal awards to all those in the same title, or whether to make differential awards.

13. In making awards, a compensation committee shall not consider an awardee's length of service, provided however that it may make particular determinations for individuals who served at the school for less than a full academic year.

14. The school compensation committee shall make its decisions free of pressure from the BOE or UFT.

15. Funds will be awarded to schools as soon as practicable after the BOE's Office of Accountability has received and analyzed the information necessary to make the awards.   To the

extent such award is made after the beginning of the school year following the year that was the basis for the award, eligible staff who have left the school shall nevertheless share in the award for their contribution the prior year.

16.  The pilot school-wide bonus program shall be comprehensively evaluated by a mutually agreed upon outside independent entity which shall provide the parties with a written report and analysis of all aspects of its operation together with associated recommendations for future years the program is in operation.

17.  The Chancellor and the President of the UFT, or their designees, will constitute an Oversight Committee (OC) to review appeals of individual awards.  However if the awards made by the compensation committee are ratified by a simple majority of the UFT Chapter voting by secret ballot, no appeal may be taken to the OC.    The OC may modify a determination of a school compensation committee only if the OC, by consensus, finds that it was arbitrary, capricious or in clear violation of law or of the procedures and standards set out herein.

18.  This Article Thirty-Nine is contingent on the implementation and passage of the legislation referred to in Paragraph 6 of the October 2005 Memorandum of Agreement between the parties entitled "Pension and Retirement Program"

## ARTICLE FORTY
### DISTRICT 79 REORGANIZATION

The Memorandum of Agreement controlling the rights of employees regarding the 2007 reorganization of District 79 is contained in Appendix C.

## ARTICLE FORTY-ONE
### PROGRESSIVE REDESIGN OPPORTUNITY SCHOOLS FOR EXCELLENCE
### (PROSE)

**A.  Mission**

1.  To achieve success and outstanding results through a truly collaborative environment for all schools at all levels among the key stakeholders responsible for educating New York City's schoolchildren – teachers and other school-based staff, principals, and parents.

2.  To build this partnership on a basis of collaboration and mutual respect that empowers school-based staff (including administrators) and enables students to learn, thrive, and achieve mastery.

3.  To treat instructional staff as professionals by empowering them and holding them responsible for providing the highest quality of teaching.

4.  To foster continuous innovation in the way that labor and management, principals, supervisors, and teachers and other school-based staff share information, share decision-making, and share accountability for student achievement and sound educational outcomes.

5.  To empower school-based staff to embrace new ways of teaching children, even if this means modifying certain existing regulations and work rules.  This includes reexamining current instructional practice, such as the school day and school year, student assessment, evaluation, and class size.

6.  To leverage technology in instruction to engage students and improve professional development.  This partnership will use technology to improve the assessment of student learning, workforce engagement, and parent satisfaction.

7.  To use joint training and labor-management facilitators.

8.  To give existing schools the opportunity and flexibility to change certain rules and challenge the traditional way of doing things – provided they meet specific, measurable performance targets.

9.  To demonstrate creativity and innovation in the pursuit of educational excellence.

**B.  Joint PROSE Panel.**

1.  Upon ratification of the successor collective bargaining agreements to the 2007-2009 collective bargaining agreements, a collaborative, decision-making Panel made up of an equal number of members selected by the UFT President and the Chancellor will invite school teams of UFT-represented employees and CSA-represented administrators to submit proposals for five years long for participation in the PROSE program where schools with real educator voice and decision making input and/or authority are permitted to design schools that work best for the students and communities they serve.

2.  The program will begin as soon as practicable, consisting of a mix of high- and low achieving schools, and a mix of elementary, middle, and high schools.

3.  The Panel will set a goal of implementing two hundred (200) PROSE Program schools over the next five years that will be overseen and report into the office of the Senior Deputy Chancellor.

4.  Proposals will be for a maximum of five (5) years.  The Panel may end a school's participation in the program only if the school is not succeeding.

**C.  How the Joint Panel screens and evaluates proposals.**

**1.  Proposals will be screened based on the extent to which they demonstrate:**

a.  Partnership between UFT-represented employees and CSA-represented administrators in decision-making;

b.  A proven record of previous collaboration and success (which includes, but is not limited to, academic success on assessments);

c.  Creativity and flexibility in modifying DOE-regulations and CBA provisions as specified in section C(1)(j);

d.  A school community where many voices are listened to;

e.  Strong buy-in from both UFT-represented employees and CSA-represented administration;

f.  A commitment to capacity-building and sustainability from the Board (DOE), UFT and CSA;

g.  Jointly-designed and job-embedded professional development and training;

h.  A five (5) year commitment to the proposal;

i.  Measurable, reportable performance targets (defined more broadly than academic success on assessments).  If any school does not meet its targets, the panel may take away its PROSE status at the end of five years or sooner;

j.  Proposals may (but do not have to) include changes to this Agreement that relate to (i) configuration of the existing work hours and/or work year (Article 6), including extending the school day and/or year, provided there is no diminution of annual salary; (ii) programs, assignments and teaching conditions in schools and programs (Article 7); professional support for new teachers (Article 8G); (iii) evaluation; (iv) professional development assignments and positions (Article 11 IV); (v) working conditions of per session teachers (Articles 15C2 and 15C4); (vi) Step 1 of the grievance process (Article 22B1a); and (vii) transfers to the school (Article 18A, paragraph 1, sentence 2). The Chancellor and UFT President may agree to other

articles of this Agreement that schools may propose to change. Proposals may (but do not have to) include modifications to Chancellor's Regulations except those affecting student safety or implementing state and federal laws and regulations.

**2. Proposals must include:**

a. Evidence of the school's current success, or if a group, at least one (1) school in the group's success in providing a quality education to students. The Panel will consider multiple measures of success, not only academic measures. Schools that serve high-need students and schools without screened or selective admissions are especially encouraged to apply.

b. A list of the types of innovative, teacher-led practices that the school currently uses or is planning to use to promote student success. Examples could include: school-based staff selection procedures, UFT-represented employee representation on and powers of current school committees that positively influence the quality of instruction delivered to students, School-Based options for scheduling or other policies;

c. A specific description of how the school intends to use the contractual and regulatory flexibility of the PROSE program to provide employees with decision-making input and authority in the school and build on its successes during the duration of the plan. As part of their proposals, schools may choose to establish committees consisting of key school-based stakeholders to examine resource allocation, schedules, curriculum, technology, professional development, hiring, and parent engagement.

d. A proposed budget for the initial year, including both current budgetary resources and any requested supplementary funds. No such supplemental funds are guaranteed. The UFT and DOE will commit to pursuing additional outside funding to support innovative school plans, where feasible. The PROSE program is not contingent on securing additional outside funding.

e. A mechanism for PROSE Program schools to regularly report their progress to the Panel including, but not limited to, annual goals and budgets.

**D. How a school becomes a PROSE Program School.**

1. Applying schools must submit a proposal which has been approved by the School Leadership Team of their school.

2. To be accepted, the UFT and DOE Panel members must agree to accept the proposal and allow a school's participation in the PROSE program. Once approved by the Panel (including any required revisions), a proposal is submitted to the school for adoption.

3. The proposal may be implemented only upon ratification by sixty-five percent (65%) of all those UFT-represented employees voting and acceptance by the school's principal. Proposals may also be modified by the same ratification and approval process set forth in this subsection D.

4. UFT-represented employees who wish to transfer out of a school that has been approved to participate in the PROSE program may do so on the same basis as similarly situated employees, with the exception that teachers who wish to transfer out of the school for the 2014-15 school year may do so by October 15th without Principal release if they find another position in accordance with the applicable CBA.

5. If accepted and approved as provided herein, the UFT, DOE and the applying school will implement the proposal as approved.

6. Individual schools or groups of schools may apply; however, preference will be given to groups of schools which demonstrate a mix of types of schools. Where a group of schools apply, each school in the group must ratify the proposal by sixty-five percent (65%), as provided herein, in order to participate.

7.   Participation in the PROSE program can be renewed at the expiration of the initial proposal term, in accordance with the Panel's approval, and with ratification by sixty-five percent (65%) of school's staff, and approval by the school's principal, and a vote of the school leadership team.

8.   The Panel shall, as soon as practicable, implement the PROSE program, adopt application procedures, and accept proposals from schools.

9.   The DOE and UFT will collaborate in developing pre-application and post-application workshops to be delivered during the 2014-15 school year for applications which will be implemented after the 2014-15 school year.

**E.  New Schools.**

1.   The DOE and the UFT will develop an alternative process for the creation of new schools that are proposed by either teachers and parents.

2.   These schools can be proposed in addition to the two hundred (200) PROSE Program Schools and if approved in accordance with the agreed upon procedures will have the same flexibility with regard to Chancellor's regulations and work rules as PROSE Program Schools.


# ARTICLE FORTY-TWO
# LEAD EDUCATIONAL ASSOCIATE


**A.  Eligibility and Selection of Lead Educational Associate**

1.   The minimum requirements for this position will be a Bachelor's Degree and any other requirements created by the Joint District UFT-DOE Selection Committee.  A Lead Educational Associate will receive additional compensation in the amount of $5,000 per year for the term of the collective bargaining agreement above the applicable paraprofessional salary in accordance with the collective bargaining agreement.

Lead Educational Associates will be selected in the following manner: A Joint Central UFT-DOE Selection Committee ("Joint Committee") consisting of equal numbers of members selected by the Chancellor and the UFT President or their designees will be established to screen and select qualified applicants to create a pool of eligible candidates. The establishment of Lead Educational Associate positions is discretionary by the principal. However, the principal may only select from the pool of eligible candidates created by the Joint Committee. Unless otherwise agreed to by the Joint Committee, this position will be posted in the spring of each year and to the extent possible will list schools in the district/superintendency that are establishing the position of Lead Educational Associate. Final selections of candidates for this position is to be done at the end of the teacher open market period or as soon thereafter as possible.  The Joint Committee will agree to a process whereby additional vacancies arise during the year can be filled by qualified candidates. No candidate in the pool of eligible candidates created by the Joint Committee is obligated to accept an offer for this position, and no principal is obligated to offer a position to a candidate in the pool, but positions may only be offered to candidates in the pool. This is an annual position that individuals will apply for each year, but the Joint Committee may choose to have a process whereby incumbent Lead Educational Associates may be renewed in the eligible pool through a modified screening and selection process.  Selections decisions for the position of Lead Educational Associate shall not be grievable. This includes both the selection

for the actual position by the principal or entry into the pool of qualified candidates as determined by the Joint Committee.

All Lead Educational Associates will be required to undergo training in at least one of a number of instructional programs determined by the DOE in consultation with the UFT. (ex.. Great Leaps, Reading Rescue etc.) The training will be designed by the DOE in collaboration with the UFT and will be done during normal work hours including current time allotted for professional development.

**B.  Duties of Lead Educational Associates**

This position functions as a true assistant teacher, working with a single teacher of record for a single class throughout the school year to support all aspects of instruction, except that, in exceptional circumstances, the Lead Educational Associate may be assigned to a different teacher and class.

The Lead Educational Associate shall:

1.  Assist the teacher of record in planning, including, but not limited to, the planning of the delivery of instruction.

2.  Assist the teacher of record by working with students alone or in small groups (5-10 students) under the general supervision of the teacher and, while, under the direct supervision of the teacher, assist in delivering instruction to the whole or part of the class.

3.  Supports the practice of other paraprofessionals in their school through on the job activities such as inter-visitation and demonstration of classroom work and attending and delivering professional development, during their work day, to bring their knowledge back to paraprofessionals in the school.

4.  The Lead Educational Associate may cover for the teacher of record to whom the Lead Educational Associate is assigned for up to 10 days over the course of the school year, provided the DOE has issued the Lead Educational Associate a per diem teacher substitute license.

**C.  Due Process for Lead Educational Associates**

The DOE must have just cause for any discipline (up to and including discharge) of a Lead Educational Associate for any conduct (incompetence and/or misconduct) that occurred while the Lead Educational Associate was not under the direct supervision of licensed teacher.

If the DOE wishes to discipline (up to and including discharge) a Lead Educational Associate for any conduct (incompetence and/or misconduct) that occurred while a Lead Educational Associate was not under the direct supervision of licensed teacher, the DOE shall first provide the Lead Educational Associate with 10 school days written notice.   If the Lead Educational Associate files a grievance within 10 school days of receiving such notice, the matter shall proceed directly to arbitration for the arbitrator to determine whether there is just cause for the DOE's proposed discipline (up to and including discharge).  The UFT and DOE will develop a process to exchange relevant discovery prior to the arbitration.  Such arbitration shall otherwise be conducted in accordance with Article 22(C) of the Teachers' CBA.  Such an arbitration shall not count towards the UFT's contractual number of arbitration days.

A Lead Educational Associate shall not be suspended without pay for any conduct (incompetence and/or misconduct) that occurred while a Lead Educational Associate was not under the direct supervision of licensed teacher prior to the conclusion of the arbitration (or the expiration of the 10 school day period to file a grievance, if no grievance is filed), including but not limited to during the pendency of any investigation, during the 10 school day period for filing a grievance about any discipline, and during any arbitration.

Pending investigation of possible misconduct, the DOE may reassign a Lead Educational Associate to an administrative assignment for up to sixty (60) days, except that the sixty (60) day limit shall not apply in the cases set forth in (i) – (v) in the second paragraph of article 21(G)(4)(a) of the Teachers' CBA.  A Lead Educational Associate may remain reassigned during the 10 school day period for filing a grievance about any discipline, and during any arbitration.

It is understood that above does not apply to misconduct that is alleged to have occurred on non-work time.

D. Except as expressly stated above, nothing herein shall constitute a modification of, limitation on or waiver of any provision of any collective bargaining agreement between the parties or past practice, including, but not limited to, Appendix A.

## ARTICLE FORTY-THREE
## DURATION

This Agreement shall become effective as of November 1, 2009 and shall continue in full force and effect through November 30, 2018.

**APPENDIX A**
**IMPROPER ASSIGNMENT OF UFT PARAPROFESSIONALS**

**PERSONNEL MEMORANDUM NO. 53, 1984-85 JUNE 11, 1985**

TO: PRESIDENTS OF COMMUNITY SCHOOL BOARDS, ALL SUPERINTENDENTS, EXECUTIVE DIRECTORS, HEADS OF OFFICES AND PRINCIPALS OF ALL DAY SCHOOLS

FROM: EDWARD AQUILONE, EXECUTIVE DIRECTOR

SUBJECT: IMPROPER ASSIGNMENT OF UFT PARAPROFESSIONALS


It has come to the attention of the Division of Personnel that some educational paraprofessionals are left unattended in a classroom setting.

In view of this, I am requesting that each Superintendent advise the programs under his or her jurisdiction that educational paraprofessionals must be under the direct supervision of a licensed teacher in a classroom and/or out-door play.

Your cooperation in this matter will be appreciated.



EA:BR:bt



cc: Members of the Board of Education

Nathan Quinones, Chancellor

**APPENDIX B**
**NEW CONTINUUM DISPUTE RESOLUTION**

**MEMORANDUM**

TO: All Superintendents, Executive Directors, Principals, Assistant Principals, UFT District Representatives, UFT Chapter Leaders, CSA Chairpersons

FROM: Francine B. Goldstein, Chief Executive, School Programs and Support Services

SUBJECT:  Special Education Services Dispute Resolution Process

Special education reform and the adoption of a revised Continuum of Special Education Services by the Board of Education will over time have a positive effect upon the number of students with disabilities participating in general education settings or less restrictive settings when special education services are required.  In our efforts to reform the system, however, we must be mindful of our legal and regulatory responsibilities to consider each child individually and preserve the procedural safeguards provided for in Commissioner's Regulations.

In order to resolve issues that arise regarding special education services, we have agreed with the UFT on to a dispute resolution process to resolve issues at the local level, if appropriate. The issues that are appropriate for this dispute resolution process are:

- Failure to provide services in accordance with the student's IEP;

- Actions inconsistent with State regulation and Board policy regarding referral of students for special education multidisciplinary assessment;

- Movement of a student(s) to different special education services without the prior mandated IEP meetings as required by law;

- IEP teams being denied access to SBST input, if requested by the IEP team; and,

- IEP team members and SBST members being inappropriately influenced to recommend specific services, group size and/or location of services for individual students.;

- The placement of an inappropriate number of students with IEPs whose management needs are severe and chronic requiring intensive, constant supervision, a significant degree of individualized attention, intervention and intensive behavior management in a general education class with one teacher. ;

- Educationally inappropriate distribution of IEP students in general education classes with one teacher, on a grade level and subject area.

- Teachers being denied their request for an expedited review for a student who they suspect is educationally inappropriate for their general education class.

It is important that if issues arise, they be resolved as locally and expeditiously as possible and, therefore, it is expected that issues particular to a specific school will be brought to the building principal.  The principal will schedule a meeting within five school days of being presented with the issue in dispute with a view toward resolving the matter at the school level.

At this meeting, the staff member(s) may be accompanied by a UFT member of his/her choice. The principal will resolve the matter at the school level within five school days.  If, however, the matter cannot be resolved at the school level within five school days, the issue can be brought to the Superintendent utilizing the enclosed form.

The superintendent or designee will schedule a meeting within five school days with the requestor(s), the UFT district representative, the UFT Functional Chapter Chairperson, if appropriate, the principal/designee and district staff as selected by the superintendent.  The issue will be resolved at the meeting or, if necessary, within two school days.  If resolution does not

take place, the Union may request a meeting with the Chief Executive for School Programs and Support Services in order to finally address the matter.  That the meeting will take place within five school days of the request and copies of the resolutions will be made available to the parties

Please find enclosed a form which must be utilized for requesting the principal's or superintendent's intervention.  Please make school staff aware of these procedures.  Thank you. This dispute resolution process will remain in effect until the parties agree to change it.  Labor management meetings will be convened to resolve implementation issues that may arise upon request of either party.

FBG : j c
Enclosure
c: Harold O. Levy; Judith A. Rizzo; Randi Weingarten, UFT; Jill Levy, CSA


N.B. Questions regarding special education policy and procedures attendant to the Continuum of Special Education Services may be addressed by referring to the following documents:

- Special Education Services as Part of a Unified Service Delivery System (The Continuum of Services for Students with Disabilities)

- 'Getting Started' (Implementation Guidelines for the Continuum of Services)

- Creating a Quality IEP

- Ensuring Appropriate Referrals to the Committee on Special Education

- A Parent's Guide to Special Education for Children Ages 5-21


### APPENDIX C
### DISTRICT 79 REORGANIZATION

Memorandum of Agreement entered into this 29th day of June 2007, by and between the Board of Education of the City School District of the City of New York (hereinafter referred to as the "BOE") and the United Federation of Teachers, Local 2, AFT, AFL-CIO (hereinafter the "UFT") amending the collective bargaining agreements for 2003-07 and 2007-09 between the UFT and the BOE governing Teachers and the corresponding provisions of the other collective bargaining agreements for 2003-07 and 2007-09 that govern other UFT-represented employees assigned to District 79 (hereinafter collectively the "Contract") to the extent set forth below.

**IN WITNESS WHEREOF**, it is mutually agreed to as follows:

1. The UFT will withdraw with prejudice any currently pending grievances related to the reorganization of District 79.  The UFT will withdraw with prejudice any currently pending grievances related to (i) the closure of the current GED program (ASHS, CEC, OES, and VTC), (ii) New Beginnings, (iii) Schools for Pregnant Teens, (iv) Second Opportunity Schools and (v) Off-site Suspension Centers (hereinafter collectively, the "Closing Programs") and the creation of (i) a new

GED program known as GED Plus (hereinafter "GED Plus"); (ii)a new school known as Restart; (iii) two new ACCESS schools (hereinafter, collectively, "GED Plus/Restart/ACCESS") and (iv) a new program for students suspended for one year (hereinafter "the New Suspension Program") (GED Plus/Restart/ACCESS and the New Suspension Program hereinafter collectively the "New Programs"). The UFT waives any claims under the Contract or under law not yet asserted as to (i) whether the Closing Programs are substantially the same as the New Programs; (ii) whether the BOE complied with its obligation to bargain with the UFT with respect to the BOE's decision to end the Closing Programs and create the New Programs; and (iii) whether the closure of the Closing Programs, the creation of the New Programs or the resulting personnel actions violate the Contract or any applicable law.  The UFT does not waive any claims other than those set forth in this paragraph 1 nor any claim that the BOE violated this Memorandum of Agreement.

2. Section 18D of the Contract will apply to the staffing of the New Programs listed above except that section 18D(3) will apply to one-hundred percent of the bargaining unit positions (not fifty percent of the bargaining unit positions). There will be one personnel committee established for each of the New Programs, but, for GED Plus/Restart/ACCESS, there will be five subcommittees, one for each borough.   Grievances challenging whether the personnel committee's decision regarding the qualifications of individual applicants will be granted if the arbitrator finds that there was no "reasonable basis" for the determination.  If one subcommittee finds an applicant qualified for GED Plus/Restart/ACCESS, that applicant shall be deemed qualified for employment in any borough.  The GED Plus/Restart/ACCESS personnel committee may require applicants to submit a cover letter or resume explaining how they meet the posted qualifications.  The BOE shall make every effort to have applications, including cover letters, submitted on-line.  The subcommittees shall do phone interviews for applicants that have prior commitments that prevent them from coming to in-person interviews.  The subcommittees will work according to a single hiring rubric created by the GED Plus/Restart/ACCESS personnel committee.  The UFT and BOE will jointly conduct training sessions for members of the five subcommittees on the rubric.  The GED Plus/Restart/ACCESS personnel committee and the subcommittees shall consider applicants from all employees in all license areas.

3. Employees excessed from the Closing Programs shall assert a preference as to where they will be deployed in the Absent Teacher Reserve (should they not secure a regular position) as follows: high school employees will list five individual high schools and then a borough; elementary and middle school employees will list five districts and then a borough.  Preferences will be granted in seniority order up to a limit of one assignment per fully phased- in school (except in District 79, which is covered by paragraph 4 and not this paragraph 3). Should these employees still be in ATR status in subsequent school years they

will be deployed in the same district or borough as the school they were deployed to under the preference system provided for in this paragraph 3.

4. Any actual vacancies in the New Programs that exist as of September 17, 2007 will be filled with excessed employees from the Closing Programs, in license (for GED Plus/Restart/ACCESS, all teaching licenses are appropriate) and in seniority order, under the following conditions: employees placed in these vacancies will serve for the balance of the 2007-2008 school year unless they are removed for disciplinary reasons.  At the end of the 2007-2008 school year, if both the principal and employee agree, the employee will be appointed to fill the vacancy in the school.  If either the employee or principal do not wish the assignment to continue, the employee will be placed back in ATR status and will be deployed according to the process set forth in paragraph 3 above.

5. The Second Opportunity Schools (hereinafter "SOS") and Off-Site Suspension Centers ("OSC") will close effective August 29, 2007.  Employees currently working in SOS who wish to work in the New Suspension Program will be selected for the New Suspension Program.  The second sentence of paragraph 6, the first sentence of paragraph 10 and the entire paragraph 12 of the Stipulation of Settlement executed November 17, 2006 with respect to SOS (the "Stipulation") shall apply to the New Suspension Program (the provisions in Paragraph 12 shall apply only to alleged violations of the second sentence of paragraph 6 and the first sentence of Paragraph 10 of the Stipulation).  Those employees having rights under the first sentence of paragraph 10 of the Stipulation may, alternatively, choose to be deployed as an ATR according to the process set forth in paragraph 3 of this Agreement above.  Nothing contained herein shall be construed as a waiver of any provision of the Stipulation until SOS and OSC are closed.  Placement in the New Suspension Program shall continue to be voluntary.  Staff presently assigned to SOS will have the right to remain in the New Suspension Program.  Current SOS and OSC employees will notify the BOE by June 30, 2007 whether they will choose to work the SOS summer 2007 session.  SOS employees will be given the opportunity to indicate by July 13, 2007 whether they will choose to work in the New Suspension Program or, alternatively, whether they will choose to be deployed as an ATR according to the process set forth in paragraph 3 of this Agreement above.

6. The New Suspension Program's summer school program (hereinafter the "Suspension Summer Program") will be governed in all respects by the provisions of the Contract and Chancellor's Regulations governing per session programs, except that the pay for such summer service for UFT-represented employees will be pro-rata.  Employees working in the New Suspension Program shall have preference for the Suspension Summer Program.

7. Current SOS employees will be rated on their performance during the summer of 2007.  Those who receive a satisfactory rating and who worked in SOS during the

summer of 2006 and received a satisfactory rating for the 2005-2006 school year will have retention rights under Section 15c2(a) of the Contract for work in the 2008 Suspension Summer Program.

8. The BOE will post teaching positions that will support pregnant and parenting teens across the system. 100% of the teachers currently serving in the School for Pregnant Teens who apply and meet the posted qualifications will be hired for these positions. The BOE will consult with the UFT regarding the posting for these positions. These teachers will be deployed out of the BOE's LYFE centers and referral centers ("hubs") where appropriate and the BOE will consult with the UFT regarding such deployment decisions. No LYFE Center shall be closed through at least the 2008-2009 school year.

9. The UFT will serve on a committee to be established by the BOE, which may also include advocates, community representatives and experts, to examine and make recommendations regarding best practices in supporting students across the system who are pregnant or parenting teens.

10. District 79 staff who are excessed from the Closing Programs will have the right of return to a vacancy in New Programs in seniority order if they were found qualified by an 18D committee but did not secure the position because more senior qualified applicants were selected. For the programs in which multiple licenses are appropriate, all license areas will be grouped together for purposes of determining seniority with respect to the previous sentence.

11. All other terms of the Contract shall remain in full force and effect unless it is otherwise amended by or are inconsistent with the terms of this Memorandum of Agreement.

Agreed to this _29th___ day of June 2007:

Department of Education

/s/ Joel Klein

_____


United Federation of Teachers

/s/ Randi Weingarten

_____

**APPENDIX D**
**PENSION LEGISLATION**

October 17, 2007


Randi Weingarten
President
United Federation of Teachers
52 Broadway – 14th Floor
New York, NY 10004

Dear Ms. Weingarten:

This letter will confirm certain mutual understandings and agreements of the parties.

The parties agree to jointly support legislation to amend current pension provisions that will contain the following elements in order to implement an optional "25/55" retirement program for current employees in the Teachers Retirement System (TRS) and the below listed UFT-represented members in the Board of Education Retirement Systems (BERS) and to provide a revised retirement paradigm for newly-hired employees in TRS and newly-hired UFT-represented members in BERS listed below.  The UFT-represented BERS titles to be included are:  all nurse and therapists titles, substitute vocational assistants, all non-annualized adult education titles, directors and assistant directors of drug and alcohol programs, sign language interpreters, all military science instructor titles, and all education officer and analyst titles.

The legislation will incorporate the following:

(1)    An "opt-in period" of six months in which any incumbent employee who wishes to participate in this optional program must affirmatively submit a written election to participate.

(2)    Additional Member Contributions (AMC) – in addition to all currently required statutory contributions, an Additional Member Contribution (AMC) of 1.85% shall be paid by those employees electing to participate in this optional program as well as by all newly-hired employees participating in the TRS and newly-hired UFT-represented above listed members participating in BERS retirement systems. These additional member contributions shall become effective on the first business day after the enactment of this enabling legislation.

(3)    Current incumbent employees including those on leave who elect to participate in this optional program and who pay the requisite AMC shall be eligible to retire at age 55 with 25 years of credited service with immediate payability of pension

benefits without any reduction.  Assuming the legislation is effectuated in the 2007-08 school year, those who elect this pension will be eligible to retire 6/30/2008 or later.

(4)     Employees hired after enactment of this enabling legislation shall be eligible to retire at age 55 with 27 years of service and receive immediate payability of pension benefits without any reduction.  This will not be construed to change the eligibility for retiree health insurance benefits (i.e., ten years of credited service and pension payability) as determined by the City and Municipal Labor Committee and in accordance with the Administrative Code.

(5)     To the extent the parties have not captured all of the necessary elements required to be enacted with enabling legislation (e.g., loan provisions, refund rules, etc.), the intent is that those elements shall be analogous to those comparable provisions contained in Chapter 96 of the Laws of 1995.  Should the parties be unable to agree on those specific terms in a timely fashion, they agree that the City Actuary, in consultation with the Law Department's Pension Division and the UFT, shall determine the final language for the proposed legislation consistent with the parties' mutual understandings.

If the above accords to your understanding, please execute the signature line below.

Very truly yours,

James F. Hanley

Agreed and Accepted By:

_____        October 17, 2007_____
Randi Weingarten                                      Date
President
United Federation of Teachers

**APPENDIX E**
**FALSE ACCUSATIONS**

Joel I. Klein
Chancellor
Department of Education
52 Chambers Street
New York, NY  10007

December 17, 2007

Randi Weingarten
President
United Federation of Teachers
52 Broadway
New York, NY 10002

Dear Ms Weingarten,

Notwithstanding any provision of the Teacher CBA (and corresponding provisions in other UFT contracts) to the contrary, the parties agree that grievances may be initiated under Article 21H (False Accusations) of the Teacher agreement (and corresponding provisions in other UFT contracts) for the purpose of securing implementation of its specific provisions, including removal of material from the employee's personnel file.

Sincerely,

Joel I. Klein

# APPENDIX F
# PARKING



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

EDWARD SKYLER
DEPUTY MAYOR FOR OPERATIONS

August 26, 2008

Ms. Randi Weingarten
President
United Federation of Teachers
52 Broadway
New York, NY 10004

Dear Ms. Weingarten

As you know, Mayor Bloomberg announced earlier this year that the City of New York is implementing a comprehensive program to reduce the number and abuse of government parking placards. This program is part of our efforts to reduce traffic congestion, decrease the City's carbon footprint, and encourage the use of public transportation. Accordingly, the City has designated the Department of Transportation (DOT) and the Police Department as the sole issuing agencies of placards for on-street parking. No other agencies, including the Department of Education (DOE), are now permitted to issue on-street parking placards. With respect to DOE, the transition to the new system will be implemented over the coming weeks as follows:

1. DOE currently has 10,007 on-street parking spots allocated by DOT. These spots have been assigned to individual schools by DOE based on the location of the on-street spots and schools. All of these spots will continue to be available for school parking. In addition, DOE has 15,060 off-street parking spots, each of which will also continue to be available for school parking.

2. DOT will produce and DOE will issue 10,007 Agency Authorized On-Street Parking Placards which allow an individual to park in the on-street spaces designated for a specific school. DOE will continue to issue separate placards valid only for access to the 15,060 off-street parking spots.

3. With respect to the recipients of the on-street and off-street placards, principals and the United Federation of Teachers (UFT) Chapter Leaders will decide on one of the following distribution methods: (1) assignment to individual staff; (2) pooling of placards for use each day; or (3) some combination of these two options. If a principal and the UFT Chapter Leader cannot agree, then the UFT

♻ Printed on paper containing 30% post-consumer material.

President and Commissioner of the Office of Labor Relations, or their respective designees, will make a final decision.

4. If a principal or UFT Chapter Leader believes: (1) a school deserves additional curb-space allocated for school parking; (2) the number of current on-street spaces was incorrectly counted; or (3) there is additional off-street space that is underutilized, they can appeal to DOT and DOE through the Mayor's Office of Operations.

5. DOT will produce and DOE will issue at least 1,000 additional placards to teachers and staff whose work requires them to visit multiple sites during the course of their workdays, and will also consider requests for placards for teachers that travel between assigned schools. Specific offices and groups for whom these placards are intended include, but are not limited to, the following: Adult and Continuing Education, Citywide Speech Services, Educational Vision Services, Hearing Education Services, Home Instruction, Hospital Instruction, Non-Public Schools, UFT, and some administrative offices. The majority of these placards will be Agency Business Parking Placards which allow an individual to park citywide for three hours at a time (parking meters, etc). The distribution of these placards will be determined by the Chancellor or his designee.

6. The issuance of new placards will start with the beginning of the school year so that the system can be fully in place by October 1. Once the new system has been implemented, violators will be subject to enforcement by the Police Department.

7. The UFT will hold the grievance in abeyance.

Note that with respect to Transit Check, we are already in the process of implementing a program and the RFP that has been put out is due back to the City in September.

Please feel free to contact me at (212) 788-3191 with any questions or additional concerns regarding the transition to the new system.

Sincerely,

Edward Skyler

cc: Joel I. Klein, Chancellor, Department of Education
    Raymond W. Kelly, Commissioner, Police Department
    James F. Hanley, Commissioner, Office of Labor Relations
    Janette Sadik-Khan, Commissioner, Department of Transportation

# APPENDIX G
# CLOSING OF ISLAND AND HORIZON ACADEMIES

CLOSING OF ISLAND AND HORIZON ACADEMIES
MEMORANDUM OF AGREEMENT
Between
THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK
And
UNITED FEDERATION OF TEACHERS, LOCAL 2, AFT, AFL-CIO

This Memorandum of Agreement ("MOA"), effective as of July 16, 2010, is made by and between the Board of Education of the City School District of the City of New York ("DOE") and the United Federation of Teachers, Local 2, AFT, AFL-CIO ("UFT") regarding the closing of Island and Horizon Academies ("Closing Programs") on Rikers Island and the opening of a single program ("Rikers Island Academy" or "New Program") for the 2010-2011 school year and beyond.

WHEREAS, the mission of District 79: Alternative Schools and Programs ("District 79") is to re-engage and empower students through rigorous instruction and quality support services, and to serve as a model for innovative and replicable strategies of alternative schools and programs and in connection therewith District 79 operates the educational programs on Rikers Island, public school programs that seek to educate and provide social/emotional and other supports to students who are incarcerated therein;

IN WITNESS WHEREOF, it is mutually agreed to as follows:

1.      The UFT waives any claims under any of the collective bargaining agreements (the "CBAs") between the UFT and the DOE or under law as to:
      (i)      Whether the Closing Programs are substantially the same as the New Program;
      (ii)    Whether the DOE complied with its obligation to bargain with the UFT with respect to the DOE's decision to end the Closing Programs and create the New Program; and
      (iii)   Whether the closure of the Closing Programs, the creation of the New Program or the resulting personnel actions violate the CBAs or any applicable law.

      The UFT does not waive any claims of any type other than those specifically set forth in this paragraph 1, nor any claim that the DOE violated this MOA.

2.      The Closing Programs will close effective August 27, 2010 and the New Program will open as of that same date.

3.      All UFT-represented employees ("Employees") excessed from the Closing Programs will have three options:
      (i)      apply for positions in the New Program and have the opportunity to be selected for a position in the New Program in accordance with the procedures set forth herein;
      (ii)    seek a position outside of District 79 through the Open Market Hiring System, the Excessed Staff Selection System, and any other applicable resources; or
      (iii)   be placed as an Absent Teacher Reserve ("ATR") in a District 79 program pursuant to the procedures set forth herein.

Employees currently assigned to the Closing Programs shall have until July 26, 2010 to apply to work in the New Program.

4.      Section 18D of the collective bargaining agreement covering teachers (the "Teachers' CBA") will apply to the staffing of all positions for all Employees in the New Program with the following changes:  Section 18D4 of the Teachers CBA will apply to one-hundred percent of the positions (not fifty percent of the positions). Notwithstanding Section 18D1 of the Teachers' CBA, there will be three (3) personnel committees established for the New Program and each committee shall consist
Page 1

of two (2) UFT representatives, two (2) DOE representatives, and either the principal of the New Program or District79 representative. These committees:

    (i)     May require applicants only to submit a cover letter or resume explaining how they meet the posted qualifications. The cover letters and resumes shall be submitted online to an address designated by the DOE in the postings.

    (ii)    Shall conduct interviews for all qualified applicants from July 20, 2010 through August 31, 2010.

    (iii)   Shall conduct phone interviews for applicants that have prior commitments that prevent them from coming to in-person interviews.

    (iv)   Shall work according to a single hiring rubric created by the personnel committee.

    (iv)   Shall consider qualified applicants from all Employees in all license areas.

The UFT and DOE will jointly conduct a training session for the members of the personnel committees on the rubric on July 19, 2010.

Grievances challenging whether the personnel committees' decision regarding the qualifications of individual applicants will be granted if the arbitrator finds that there was no "reasonable basis" for the determination.

    Teachers who are selected to work in the New Program may assert a program preference in accordance with the procedures set forth in the CBAs for the term beginning September 2010. To the extent any such preference process exists regarding programs or assignments in other applicable CBAs, this paragraph shall not be construed as a waiver of any such provisions. School seniority, where applicable, will include all prior service in either or both of the closing programs. The DOE agrees to implement any reorganization grievance decisions arising from the process no later than February 1, 2011.

5.     The UFT and DOE shall agree on the number of Absent Teacher Reserve ("ATR") positions that there may be at each school/program (and, where applicable, particular site) in District 79 given space limitations. All Employees excessed from the Closing Programs shall be given a complete list of these positions. The DOE shall place all Employees excessed from the Closing Programs (who are not selected by the personnel committees for the New Program and who do not secure another regular position) into an ATR position in District 79, in seniority order, at the school/program (and, where applicable, particular site) of the Employee's preference. In addition to any other rights the Employee may have, an Employee who believes that the particular location he/she is assigned to in an ATR position is an undue burden because of the travel time from the Employee's home to the site, he/she may request that representatives of the DOE and UFT jointly review the assignment. If the UFT and DOE representatives agree the assignment presents an undue burden, the Employee shall be reassigned to a location jointly determined by the UFT and DOE representatives. Should any Employee excessed from the Closing Programs be in ATR status in subsequent school years, they will not be assigned outside of the borough they were assigned to pursuant to the preference system provided for in this paragraph 5.

6.    By September 21, 2010, Employees excessed from Closing Programs serving in ATR positions pursuant to paragraph 5 shall, in license and in seniority order, be placed, if they choose, in any vacancies that exist in District 79 programs, under the following conditions: Employees placed in the vacancies shall serve for the balance of the 2010-2011 school year. At the end of the 2010-2011 school year, if both the principal and Employee agree, the Employee will be appointed to fill the vacancy in the school. If either the Employee or principal do not wish the assignment to continue, the Employee will be placed back in ATR status and will return to ATR status in District 79 in the same borough as they were assigned as an ATR pursuant to paragraph 5.

Page 2

7.     The summer school programs on Rikers Island will continue for the summer of 2010 and retentions rights to that program shall continue to be governed in all respects by the provisions of the applicable CBAs and existing regulations, precedents, policies and practices.   District 79 reserves the right to modify the size of its summer program for the summer of 2010 and beyond and also reserves the right to change the existing summer program at Rikers Island in the future.  This MOA shall not be construed as a waiver by the UFT or any Employee of any rights (under any CBA or otherwise) regarding summer school programs at Rikers Island, including, but not limited to, should District 79 change the summer programs in the future.

8.     The DOE shall maintain a Teacher Center in the New Program for the 2010-11 school year.

9.     District 79 shall request a "Gate 1" pass from the New York City Department of Corrections ("DOC") for use by a UFT-designated representative. The UFT acknowledges the DOC is not a party to this MOA and has the final authority as to whether the District 79 request is granted.

10.    Given the consolidation of programs and the unique setup at Rikers Island, to the DOE shall program the 5 release periods per week for the chapter leader pursuant to Article 19B1b of the Teachers' CBA either consecutively on one day or in two blocks on two days.

11.    Any settlement of, decision in or order in Public Employment Relations Board cases U-27415 and U-27692 shall apply fully to the New Program in the same manner as it would apply to the Closing Programs.

12.    Nothing in this Agreement shall constitute a waiver or modification of any provision of the CBA, other agreement between the Department and the UFT, applicable Department by-laws, policies, and regulations of the Chancellor, or past practice except as specifically set forth herein.

13.     This MOA may be executed in counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same instrument.

14.    This MOA represents the entire understanding and agreement of the parties with respect to the subject matter hereof and any other purported written and/or verbal agreement shall be null and void.

THE FOREGOING IS UNDERSTOOD, ACCEPTED AND AGREED TO BY:

UNITED FEDERATION OF TEACHERS, LOCAL 2, AFT, AFL-CIO

BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK

_____
Signature

_____
Signature

Name: _____

Name: _____

Title: _____

Title: _____

Date: _____

Date: _____

Page 3